UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

(RH 1341)
(KN 6601)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

COMPLAINT

Plaintiff,

Civil Action No.
CV-05-_____

- against-

INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, AFL-CIO,
JOHN BOWERS, President,
ROBERT E. GLEASON, Secretary-Treasurer,
ALBERT CERNADAS, Executive Vice-President,
BENNY HOLLAND, JR., General Vice-President,
GERALD OWENS, General Organizer,
HAROLD J. DAGGETT, Assistant General Organizer,
HORACE T. ALSTON, Vice-President,
JORGE L. APONTE FIGUEROA, Vice-President,
CHAUNCEY J. BAKER, Vice-President,
JOHN D. BAKER, Vice-President,
JOHN BOWERS, JR., Vice-President,
EDWARD L. BROWN, SR., Vice-President,
TIMOTHY BROWN, Vice-President,
JAMES A. CAMPBELL, Vice-President,
RONALD CAPRI, Vice-President,
CHARLES CHILLEMI, Vice-President,
ARTHUR COFFEY, Vice-President,
RAYMOND DESGAGNES, Vice-President,
MICHAEL DICKENS, Vice-President,
CLYDE FITZGERALD, Vice-President,
PERRY C. HARVEY, Vice-President,
STEPHEN KNOTT, Vice-President,
JOHN H. MACKEY, Vice-President,
JAMES T. MCCLELAND, JR., Vice-President,
WILLIAM R. MCNAMARA, Vice-President,
JAMES H. PAYLOR, JR., Vice-President,
LOUIS PERNICE, Vice-President,
KENNETH RILEY, Vice-President,
RAYMOND SIERRA, Vice-President,
HARRISON TYLER, Vice-President,
REUBEN WHEATLEY, Vice-President,
PETER GOTTI,
ANTHONY CICCONE,  a/k/a "Sonny,"

(_____, J.)
(_____, M.J.)

CV  05 . 32 12

GLASSER, J.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

POHORELSKY, M.J.    JUL 0 6 2005

BROOKLYN OFFICE

JEROME BRANCATO, a/k/a "Jerry,"
JAMES CASHIN,
THE MANAGEMENT - INTERNATIONAL
      LONGSHOREMEN'S ASSOCIATION
      MANAGED HEALTH CARE TRUST FUND,
THE BOARD OF TRUSTEES OF THE MANAGEMENT -
      INTERNATIONAL LONGSHOREMEN'S
      ASSOCIATION HEALTH CARE TRUST FUND,
THE METROPOLITAN MARINE MAINTENANCE
      CONTRACTORS' ASSOCIATION,
THE METRO-ILA FRINGE BENEFIT FUND,
THE BOARD OF TRUSTEES OF THE METRO-ILA
      FRINGE BENEFIT FUND,
THE METRO-ILA PENSION FUND,
THE BOARD OF TRUSTEES OF THE METRO-ILA
      PENSION FUND,
THE METRO-ILA INDIVIDUAL ACCOUNT
      RETIREMENT FUND,
THE BOARD OF TRUSTEES OF THE METRO-ILA
      INDIVIDUAL ACCOUNT RETIREMENT FUND,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

        The UNITED STATES OF AMERICA, by its attorney, ROSLYNN R.

MAUSKOPF, United States Attorney for the Eastern District of New York, Richard K. Hayes

and Kathleen A. Nandan, Assistant United States Attorneys, of counsel, alleges for its Complaint

herein as follows:

## INTRODUCTION

        At all times relevant to this Complaint:

### LCN Control Of The Waterfront And The ILA

        1.    The New York/New Jersey waterfront is an integrated commercial

marketplace composed of several separate ports, including the Port of New York and the Port of

New Jersey, occupying a common harbor and encompassing some 1500 square miles and 234 municipalities. The waterfront harbor plays a critical role in the movement of manufactured, agricultural, and other goods throughout the Eastern seaboard and has a major impact on this nation's commerce. United States v. Local 1804-1, International Longshoremen's Association, 812 F. Supp. 1303, 1312 (S.D.N.Y. 1993). For the purposes of this Complaint, the term "Waterfront" is defined as the Port of New York and New Jersey and all businesses and unions involved in commerce in the Port, whether located on Port property or not, including but not limited to container repair and storage businesses, chassis repair and storage businesses, trucking businesses, trucking dispatching businesses, shipping lines and terminals, the International Longshoreman's Association, AFL-CIO ("ILA") and all ILA locals and other ILA subordinate labor organizations.

2.       Notwithstanding its economic importance to the nation, the Waterfront has been the setting for corruption, violence, and abuse of Waterfront labor and businesses by New York-based La Cosa Nostra families. This pattern of racketeering has been facilitated by La Cosa Nostra's control and influence over labor unions, including the ILA and its Executive Officers, operating on the Waterfront.

3.       In addition to exercising criminal control over the Waterfront, the La Cosa Nostra families have exercised criminal control over businesses and unions elsewhere, including certain businesses and unions operating in the Port of Miami in Florida. For purposes of this Complaint, the term "Port of Miami" includes businesses and unions involved in commerce in the Port, whether located on port property or not, including but not limited to container repair and storage businesses, chassis repair and storage businesses, trucking businesses, trucking

dispatching businesses, shipping lines and terminals, the ILA and all ILA subordinate labor organizations.

      4.     La Cosa Nostra ("LCN"), a/k/a the "Mafia" or "Our Thing," is a nationwide criminal organization that has operated throughout the United States through entities known as "families." LCN figures have used their control of various labor unions to demand and receive payoffs from employers of union members in exchange for labor peace, to embezzle union funds, and to engage in other racketeering acts, including those described below. The existence of LCN was proven in United States v. Salerno, No. 85 Cr. 139 (S.D.N.Y.) (RO), aff'd, 868 F.2d 524 (2d Cir. 1989) (the "Commission Case"), as well as in other cases.

      5.     Since the late 1950s, two LCN families, the Gambino Organized Crime family ("Gambino family") and the Genovese Organized Crime family ("Genovese family"), have shared control of the Waterfront. United States v. Local 1804-1, International Longshoremen's Association, 812 F. Supp. 1303, 1313 (S.D.N.Y. 1993) (LBS). The existence of the Gambino family was proven, among other cases, in the Commission Case and in United States v. Gallo, No. 86 Cr. 452 (E.D.N.Y.) (JBW), aff'd, 863 F.2d 185 (2d Cir. 1988), cert. denied, 109 S. Ct. 1539 (1989). The existence of the Genovese family was proven in, among other cases, the Commission Case and in United States v. Salerno, No. 86 Cr. 245 (S.D.N.Y.) (MJL). The Gambino and Genovese families are headquartered in New York.

      6.     The Gambino and Genovese families each operate through groups of individuals headed by "captains," who are also referred to as "capos," "skippers," "caporegimes" and "capodecinas." These groups, which are referred to as "crews," "regimes" and "decinas," consist of "made" members, who are also referred to as "soldiers," "friends of ours," "good

follows" and "wise guys," and associates. Each captain is responsible for supervising the criminal activities of his crew and providing crew members and associates with support and protection. Above the captains are the three highest-ranking family members. The head of a family is known as the "boss." He is assisted by an "underboss" and a counselor, who is known as the "consigliere." With the assistance of the underboss and the consigliere, the boss is responsible for setting policy, resolving disputes between members of the family and members of other criminal organizations, and approving all significant actions by members of the family. From time to time, members of the family are appointed temporarily to boss, underboss, consigliere or captain positions and function in an "acting" capacity in the stead of an incarcerated or temporarily incapacitated family member who continues to hold the "official," as opposed to "acting," position within the family.

7.     Prior to December 1985, Paul Castellano was the boss of the Gambino family. After Castellano was murdered in December 1985, John J. Gotti became the boss of the Gambino family. On April 2, 1992, John J. Gotti was convicted of racketeering and other related offenses and received a sentence of life imprisonment. He thereafter appointed his son, John A. Gotti, to be acting boss. In or about early 1994, a committee consisting of three captains of the Gambino family was formed to assist John A. Gotti in running the Gambino family. On September 3, 1999, John A. Gotti was convicted of racketeering, loan-sharking and tax offenses and received a sentence of 77 months imprisonment. Thereafter, PETER GOTTI, John J. Gotti's brother, became boss of the Gambino family.

8.     From the 1980s through the date of the filing of this Complaint, the boss of the Genovese family was Vincent Gigante, also known as "Chin." In 1997, Vincent Gigante

6

was convicted of racketeering and related offenses and began serving a prison term. Although

Vincent Gigante remained the boss of the Genovese family, responsibility for the day-to-day

leadership of the Genovese family passed to a committee of members of the family, also known

as the "Administration," whose members have included acting bosses Liborio Bellomo and

Ernest Muscarella. Vincent Gigante communicated with the Administration, as well as with

other members of the Genovese family, using intermediaries, including his son, Andrew Gigante,

a Genovese family associate, who often visited Vincent Gigante in prison.

9.      With the approval of Vincent Gigante, the Administration was responsible

for setting policy for the Genovese family, resolving disputes between members of the family and

members of other criminal organizations, and approving all significant actions by members of the

Genovese family. The Administration supervised, supported, protected and disciplined the

captains, soldiers and associates and regularly received reports regarding the criminal activities of

members and associates of the Genovese family.

10.     Through the use of actual and threatened force, violence and fear, the

Gambino and Genovese families have exercised influence over labor unions and businesses at

commercial shipping terminals on the Waterfront and the Port of Miami. The Genovese family

has primarily exercised such influence at commercial shipping terminals in Manhattan, New

Jersey and the Port of Miami. The Gambino family has primarily exercised such influence at

commercial shipping terminals in Brooklyn and Staten Island. The influence of organized crime

on the Waterfront and in the Port of Miami has been facilitated by the ILA. While the ILA's

motto is "Sobriety, Truth, Justice and Morality," its actions and inaction establish that it has been

a complicit partner in the pervasive corruption that has prevailed on the docks for so many

decades. In a number of instances, members and associates of the Gambino and Genovese families have been ILA officials. These and other members and associates of the Gambino and Genovese families have had positions as trustees of various ILA benefit funds, or they have been paid advisors to the funds. Friends and relatives of LCN members and associates have been given well-paying union jobs at the expense of the ILA membership.

11.     This action is brought by the United States pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964, to put an end to the conspiracy among union officials, organized crime figures and others that has plagued some of the nation's most important ports for decades.

## JURISDICTION

12.     Jurisdiction for this action is predicated upon 18 U.S.C. § 1964(a), and 28 U.S.C. §§ 1331, 1345, 2201, and 2202.

## VENUE

13.     Venue for this action is predicated upon 18 U.S.C. § 1965 and 28 U.S.C. § 1391.

## PARTIES

14.     Plaintiff United States of America is a sovereign and body politic.

**The ILA**

15.     Defendant ILA is a labor organization, as that term is defined in 29 U.S.C. §§ 402 (i) and (j), which represents employees of businesses engaged in industries affecting interstate and foreign commerce. Specifically, the ILA is a national labor union that represents longshoremen and other laborers working at ports around the United States. The ILA is a

nominal Defendant herein, whose participation is necessary to effect the full relief sought in this

action. Pursuant to the terms of its constitution, the ILA is governed by an Executive Council,

and it is divided into two geographic districts, the Atlantic Coast District and the South Atlantic

& Gulf Coast District. Local union chapters exist within the districts. The ILA's principal office

is located at 17 Battery Place, Suite 930, New York, New York 10004.

      16.     The Executive Council of the ILA consists of a President, Secretary-

Treasurer, Executive Vice-President, General Vice-President, General Organizer, Assistant

General Organizer, and twenty-six Vice-Presidents. Great power and authority resides with the

Executive Council and, in particular, with the top six International Officers. For example,

Article IX, Section 1 of the ILA Constitution provides, in part, with respect to the office of the

President:

> The International President shall be the principal executive officer
> of the I.L.A.: He shall preside at Conventions and at meetings of
> the Executive Council. He shall convene meetings of the
> Executive Council or submit matters for its decision . . . he shall
> appoint all committees not otherwise provided for by this
> Constitution; he shall designate the duties and direct the
> performances thereof of District officers, representatives and Vice-
> Presidents. All bills covering expenses incurred must be approved
> by him before payment. He shall have power to examine, inspect,
> or audit personally, or by his designee or designees, all the books,
> records, papers, and accounts of any local union, district council, or
> district organization of the I.L.A., whenever he may deem it
> necessary he may compel the production of such books, records,
> papers, and accounts. . . . He shall have such other and further
> powers in addition to those herein enumerated, and shall perform
> such other and further duties as are usual to his office, and as are
> performed by the President in accordance with the usages of the
> I.L.A.

Article IX, Section 2 provides that the International Executive Vice-President:

> shall aid and assist the International President in the carrying out of his duties and functions, and shall act on behalf of the President whenever the International President shall be ill, absent, incapacitated, or unable to serve. The International President in his discretion may delegate such of his duties and functions as he determines to the International Executive Vice-President, and upon such delegation the International Executive Vice-President shall have and may exercise such powers of the International President as are necessary to the proper performance of such delegated duties and functions . . . .

Article IX, Section 3 states that the International General Vice-President:

> shall assist the International President and the International Executive Vice-President during Conventions, Executive Council meetings, Wage Scale Committee meetings and otherwise in the discharge of their duties and functions. The International President in his discretion may delegate such other duties and functions as he determines to the International General Vice-President in order to represent the interest of the I.L.A.

Article IX, Section 4 provides in part that the Vice-Presidents, the General Organizer and the

Assistant General Organizer:

> shall, at the request of the International President, aid and assist him during the session of the Convention and in such other manner and form as the International President may from time to time request or direct, and shall generally represent the interest in the I.L.A. in their areas. They shall render periodic reports of their activities to the International office.

Article IX, Section 5 provides in part that the International Secretary-Treasurer:

> shall act as Secretary of Conventions and all meeting of the Executive Council and shall . . . have charge of all funds of the I.L.A. . . . He shall collect from the locals and from all other available sources all information showing the condition of the workers. He shall act as legislative agent of the I.L.A., if directed by the President. He shall instruct local unions, district councils and districts as to the manner in which they shall keep accounts of their financial transactions and may require them to submit to him

periodic reports containing such information and in such forms as
he may prescribe.  When requested by the President, he shall act as
Auditor to audit the books and records of any local or any of the
subdivisions of the I.L.A., and shall perform such duties in
connection therewith as the President may direct.  He shall have
such further powers in addition to those herein enumerated as are
usual to his office.  He shall have power to employ and discharge
such employees as may be required to assist him in his work.

Article XVIII of the Constitution vests broad disciplinary powers in the Executive Council:

Section 1.  (a) The term "discipline when used in this Section
shall include, without limitation, a fine, removal from office or job,
disqualification to run for office, or suspension or expulsion from
membership, or suspension or cancellation of Charter.
(b) Any member, officer, or representative of the I.L.A. or any of
its subdivisions, shall be subject to discipline who is found guilty,
after notice of and opportunity for hearing upon charges, as
provided for in this Article, of violating any provision of this
Constitution, or a decision of the Executive Council or of his local
union, district council, or district organization, or of dishonesty,
misconduct, or conduct detrimental to the welfare of the I.L.A. . . . .
(c) The Executive Council shall have power to discipline any
member, officer or paid representative of a local union, any officer
or paid representative of or delegate to a district council or district
organization, any International officer or paid national
representative whom it finds guilty of any conduct specified in
paragraph (b).

Section 2.  The Executive Council shall have power, after notice of
and opportunity for hearing upon charges, to suspend, expel,
dissolve, merge, consolidate or otherwise discipline any local
union or district council which it finds guilty of violating any
provisions of this Constitution or decision of the Executive
Council made pursuant thereto.

Article XXI of the ILA Constitution further vests broad powers in the Executive Council to

impose trusteeships over ILA Locals:

Section 1.  Trusteeships over local unions, district councils, or
district organizations shall be established and administered in
accordance with this Article and for one or more of the following

purposes:  (1) to correct corruption, (2) to correct financial malpractice, (3) to assure the performance of collective bargaining agreements, (4) to assure the performance of the duties of a collective bargaining representative, (5) to restore democratic procedures, or (6) otherwise to carry out the objects and purposes of the I.L.A.

**Section 2.** Whenever in the judgment of the International President it shall be necessary to act to effectuate one or more of the purposes set forth in Section 1 of this Article, then the International President, with or without a hearing but after an investigation, shall have the power, with the approval of the Executive Council, to suspend the officers of a local union, district council or district organization and to appoint a trustee or trustees to take charge and control of the books, records, property, assets, funds and affairs of such subordinate body. . . .

17.     In its most recent annual filing with the Department of Labor, the ILA

reported that the top six ILA officers received the following compensation during calendar year

2004:

•JOHN BOWERS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 413,556.00
        President

•ROBERT GLEASON . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 383,012.00
        Secretary Treasurer

•ALBERT CERNADAS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 330,579.00
        Executive Vice-President

•Benny Holland  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 257,120.00
        General Vice-President

•Gerald Owens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 275,468.00
        General Organizer

•HAROLD J. DAGGETT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 261,751.00
        Assistant General Organizer

In addition to these salaries, these officers and the Vice-Presidents within the ILA Executive Council typically hold one or more other union offices at the district or local level and receive substantial salaries for holding those offices.

### ILA Officer Defendants

18.     Defendant JOHN BOWERS has been President of the ILA since 1987. Prior to his election as ILA President, BOWERS served as Executive Vice-President, the second highest union position in the ILA, for twenty-four years. BOWERS is President of the ILA's Atlantic Coast District and President of ILA Local 824. BOWERS is a member of Defendant Board of Trustees of Defendant Management International Longshoremen's Association Managed Health Care Trust Fund ("MILA Board"), a member of the Board of Trustees of the funds jointly managed by the ILA and the New York Shipping Association ("NYSA-ILA Funds") and, at one point, was President of ILA Locals 1809 and 1909. BOWERS was an unindicted co-conspirator in United States v. Coonan, et al., No. 87 Cr. 249 (S.D.N.Y.) (WK), aff'd, 876 F.2d 891 (2d Cir.) (Table), cert. denied, 493 U.S. 975 (1989), in which the United States proved, inter alia, that the Westies, associates of the Gambino family, had conspired to extort money from officials of ILA Locals 1909 and 1809 and in furtherance of that conspiracy had murdered ILA Local 1909 official Vincent Leone. BOWERS is an associate of the Genovese family.

19.     Defendant ROBERT E. GLEASON, son of former ILA President and Genovese family associate "Teddy" Gleason, is the Secretary-Treasurer of the ILA, former Secretary-Treasurer of the ILA's Atlantic Coast District Council and, at one point, was Secretary-Treasurer of ILA Local 1809. GLEASON is a member of Defendant MILA Board, and a

member of the Board of Trustees of one or more of the NYSA-ILA Funds. Through May 2003, GLEASON was the ILA-appointed trustee of Local 1814. GLEASON is an associate of the Genovese family.

20.     Defendant ALBERT CERNADAS is Executive Vice-President of the ILA and President of ILA Local 1235. CERNADAS is a member of Defendant MILA Board, and a member of the Board of Trustees of one or more of the NYSA-ILA Funds. CERNADAS is an associate of the Genovese family. CERNADAS has been indicted in the Eastern District of New York for mail and wire fraud conspiracy concerning the ILA. United States v. Coffey, et al., No. 04 Cr. 651 (E.D.N.Y.) (ILG). A copy of the Indictment is annexed as Exhibit 1.

21.     Defendant HAROLD J. DAGGETT is Assistant General Organizer of the ILA and President of Local 1804-1. DAGGETT is a member of Defendant MILA Board, and a member of the Board of Trustees of NYSA-FLA Funds. DAGGETT is an associate of the Genovese family. A criminal complaint has been filed against DAGGETT in the Eastern District of New York, and he has been indicted for extortion conspiracy and mail and wire fraud conspiracy concerning the ILA. United States v. Coffey, et al., No. 04 Cr. 651 (E.D.N.Y.) (ILG). See Exhibit 1; Exhibit 2, Complaint.

22.     Defendant ARTHUR COFFEY is a Vice-President of the ILA, Vice-President of the ILA's South Atlantic & Gulf Coast District, and President of ILA Locals 1922, 1922-1 and 2062. COFFEY was a member of Defendant MILA Board and a trustee of the ILA Local 1922 Health and Welfare Fund as well as the ILA-Employers Southeast Florida Ports Welfare Fund. COFFEY is an associate of the Genovese family. A criminal complaint has been filed against COFFEY in the Eastern District of New York, and he has been indicted for

extortion conspiracy and mail and wire fraud conspiracy concerning the ILA. United States v. Coffey, et al., No. 04 Cr. 651 (E.D.N.Y.) (ILG). See Exhibits 1 and 2.

23.    Benny Holland, Jr. is General Vice-President of the ILA and President Emeritus of the ILA's South Atlantic & Gulf Coast District. Holland is a member of Defendant MILA Board. Holland is named as a nominal Defendant in his official capacity as a fiduciary whose participation is necessary to effect the full relief sought in this action.

24.    Gerald Owens is General Organizer of the ILA and President of ILA Local 2019. Owens is a member of Defendant MILA Board and a member of the Board of Trustees of one or more of the NYSA-ILA Funds. Owens is named as a nominal Defendant in his official capacity as a fiduciary whose participation is necessary to effect the full relief sought in this action.

25.    The twenty-four Vice-Presidents of the ILA listed below are named as nominal Defendants in their official capacities as fiduciaries whose participation is necessary to effect the full relief sought in this action. According to testimony given by Gambino associate and former ILA Vice-President Frank Scollo in United States v. Gotti, et al., No. 02 Cr. 606 (E.D.N.Y.) (FB), the ILA's Vice-Presidents "follow the lead" of the "Big Six" ILA Executive Officers in all union matters of importance:

   a.    Horace T. Alston, Vice-President

   b.    Jorge L. Aponte Figueroa, Vice-President

   c.    Chauncey J. Baker, Vice-President

   d.    John D. Baker, Vice-President

   e.    John Bowers, Jr., Vice-President

  f.  Edward L. Brown, Sr., Vice-President

  g.  Timothy Brown, Vice-President

  h.  James A. Campbell, Vice-President

  i.  Ronald Capri, Vice-President

  j.  Charles Chillemi, Vice-President

  k.  Raymond Desgagnes, Vice-President

  l.  Michael Dickens, Vice-President

  m.  Clyde Fitzgerald, Vice-President

  n.  Perry C. Harvey, Vice-President

  o.  Stephen Knott, Vice-President

  p.  John H. Mackey, Vice-President

  q.  James T. McCleland, Jr., Vice-President

  r.  William R. McNamara, Vice-President

  s.  James H. Paylor, Jr., Vice-President

  t.  Louis Pernice, Vice-President

  u.  Kenneth Riley, Vice-President

  v.  Raymond Sierra, Vice-President

  w.  Harrison Tyler, Vice-President

  x.  Reuben Wheatley, Vice-President

## MILA Defendants

  26.  Defendant Management - International Longshoremen's Association

Managed Health Care Trust Fund ("MILA") provides health insurance, including prescription

drug coverage, nationally for ILA members. MILA is a nominal Defendant herein whose participation is necessary to effect the full relief sought in this action.

27.     Defendant MILA Board comprises union and employer representatives and governs MILA. The MILA Board is a nominal Defendant herein whose participation is necessary to effect the full relief sought in this action.

**LCN Defendants**

28.     PETER GOTTI is the boss of the Gambino family.

29.     ANTHONY CICCONE, also known as "Sonny," is a captain in the Gambino family.

30.     JEROME BRANCATO, also known as "Jerry," is a soldier in the Gambino family.

31.     JAMES CASHIN is a former ILA official and associate of the Genovese family.

**METRO**

32.     Defendant Metropolitan Marine Maintenance Contractors' Association, Inc. ("METRO") is an association of employers engaged in business affecting interstate commerce, including commerce on the Waterfront. METRO's principal office is located at 301 Route 17N, Rutherford, New Jersey 07070. Members of METRO directly or indirectly employ ILA members. METRO is a nominal Defendant herein whose participation is necessary to effect the full relief sought in this action.

## METRO-ILA Fund Defendants

33.     Pursuant to collective bargaining agreements, Defendant METRO and ILA Locals 1804-1 and Local 1814 have established certain funds for the benefit of members of Locals 1804-1 and 1814 (collectively the "METRO-ILA Funds").

34.     Defendant METRO-ILA Fringe Benefit Fund is an "employee welfare benefit plan" within the meaning of § 3(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(1), established for the purpose of providing medical and other benefits to eligible members and retirees of ILA Locals 1804-1 and 1814. On or about January 1, 2001, the METRO-ILA Welfare Fund, also an "employee welfare benefit plan" within the meaning of § 3(1) of ERISA, was merged into the METRO-ILA Fringe Fund. The METRO-ILA Fringe Fund is a nominal Defendant herein whose participation is necessary to effect the full relief sought in this action.

35.     Defendant METRO-ILA Pension Fund is an "employee pension benefit plan" within the meaning of § 3(2) of ERISA, 29 U.S.C. § 1002(2), established to provide retirement income to eligible retired members of ILA Locals 1804-1 and 1814. The METRO-ILA Pension Fund is a nominal Defendant herein whose participation is necessary to effect the full relief sought in this action.

36.     Defendant METRO-ILA Individual Account Retirement Fund (the "Individual Account Retirement Fund") is an "employee pension benefit plan" within the meaning of § 3(2) of ERISA, 29 U.S.C. § 1002(2), established to provide annuity benefits to eligible members of Locals 1804-1 and 1814 upon retirement. The METRO-ILA Individual

Account Retirement Fund is a nominal Defendant herein whose participation is necessary to effect the full relief sought in this action.

37.    The Boards of Trustees of the METRO-ILA Fringe Benefit Fund, METRO-ILA Pension Fund and METRO-ILA Individual Account Retirement Fund are nominal Defendants herein whose participation is necessary to effect the full relief sought in this action.

38.    Until recently, Genovese family soldier Pasquale Falcetti was a Trustee of the METRO-ILA Funds, and Genovese family associate Michael Ragusa was Executive Director of the METRO-ILA Fringe Benefit Fund. Jerome Brancato, son of Gambino family soldier Defendant JEROME BRANCATO, is the Executive Director of the METRO-ILA Pension Fund. The Defendant METRO-ILA Funds share offices with Defendant METRO at 301 Route 17N, Rutherford, New Jersey 07070.

## CO-CONSPIRATORS NOT NAMED AS DEFENDANTS

39.    The following members and associates of the Genovese family conspired with one or more of the Defendants to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise, as herein defined, and in acquiring or maintaining, directly or indirectly, an interest in, or control of, the Enterprise through a pattern of racketeering activity:

a.    Vincent Gigante, also known as "Chin," the boss of the Genovese family from the 1980s through the date of the filing of this Complaint;

b.    Ernest Muscarella, also known as "Ernie," who, between approximately the fall of 2000 and the date of the filing of this Complaint, was acting boss of the Genovese

family. Prior to becoming acting boss, Muscarella was the captain of a powerful Genovese family crew operating primarily in East Harlem and the Bronx (the "Harlem/Bronx crew");

    c.     Liborio Bellomo, also known as "Barney," who, between approximately 1988 and 1996, was acting boss of the Genovese family. Prior to that time, Bellomo was the captain of the Harlem/Bronx crew of the Genovese family;

    d.     Charles Tuzzo, also known as "Chuckie," a captain in the Genovese family;

    e.     Pasquale Falcetti, also known as "Patty," a soldier of the Genovese family in the Harlem/Bronx crew;

    f.     Michael Ragusa, also known as "Mickey," a soldier of the Genovese family in the Harlem/Bronx crew;

    g.     Thomas Cafaro, an associate of the Genovese family. Between approximately the 1970s and 1996, Cafaro was in the Harlem/Bronx crew of the Genovese family. After approximately 1996, Cafaro was in the Genovese family crew of Charles Tuzzo;

    h.     Andrew Gigante, an associate of the Genovese family. Andrew Gigante is the son of Genovese family boss, Vincent "Chin" Gigante;

    i.     George Barone, a soldier of the Genovese family;

    j.     Alan Longo, a captain in the Genovese family;

    k.     Lawrence "Larry" Ricci, a captain in the Genovese family.

    40.     In United States v. Bellomo, No. 02 Cr. 140 (S-2) (E.D.N.Y.) (ILG), co-conspirators Vicente Gigante, Ernest Muscarella, Liborio Bellomo, Charles Tuzzo, Pasquale Falcetti, Michael Ragusa, Thomas Cafaro, and Andrew Gigante were charged with, inter alia,

engaging in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c), including multiple acts under the following sections:

      (A) 18 U.S.C. § 1951 (extortion)

      (B) 18 U.S.C. §§ 1341 and 1346 (mail fraud)

      (C) 18 U.S.C. § 1956 (money laundering)

      (D) 18 U.S.C. § 1512 (witnesses tampering)

      (E) 18 U.S.C. § 1952 (interstate travel in aid of racketeering)

      (F) 18 U.S.C. § 1955 (gambling)

and multiple acts involving:

      (G) fraud in the sale of securities in violation of 15 U.S.C. §§ 78j(b) and 78ff; and

      (H) bribery in violation of the New York State Penal Law, §§ 180.15 and 20.00.

A copy of the indictment is annexed as Exhibit 3.

      41.     On April 7, 2003, Vincent Gigante pleaded guilty to obstruction of justice.

      42.     On April 7, 2003, Liborio Bellomo, Thomas Cafaro, Pasquale Falcetti, Ernest Muscarella and Michael Ragusa pleaded guilty to violating RICO.

      43.     On April 7, 2003, Charles Tuzzo and Andrew Gigante pleaded guilty to extortion conspiracy.

      44.     On April, 7, 2003, the United States filed a complaint against Liborio Bellomo, Thomas Cafaro, Pasquale Falcetti, Andrew Gigante, Ernest Muscarella, Michael Ragusa, and Charles Tuzzo, pursuant to RICO, alleging that they had conspired to conduct, and participated directly and indirectly in the conduct of, the affairs of an enterprise through a pattern of racketeering activity, as set forth in the Superseding Indictment in United States v. Bellomo.

See United States v. Bellomo, No. 03 Civ. 1638 (E.D.N.Y.) (ILG).  A copy of the complaint is annexed as Exhibit 4.  Subsequently, they entered into a Consent Judgment and Decree which provides that they are:

- Permanently enjoined from engaging in any activity whatsoever involving, or connected with, ILA, any of its Locals or other constituent labor organizations.

- Permanently enjoined from engaging in any commercial activity whatsoever involving, or connected with, the Port of Miami and Port Everglades in Florida, and all businesses and unions involved in commerce in this ports.

- Permanently enjoined from engaging in any commercial activity whatsoever involving, or connected with, the Port of New York and New Jersey and all businesses and unions involved in commerce in the ports.

- Permanently enjoined from membership in, or holding any position or office in, any labor union as that term is defined in 29 U.S.C. §§ 402 (i) and (j).

- Permanently enjoined from engaging in any activity whatsoever involving, or connected with, any of the following unions and their constituent labor organizations: The International Carpenters Union ("ICU"); The International Brotherhood of Teamsters ("IBT"); Local 32BJ of the Building Services Workers Union, Service Employees International Union ("Local 32BJ"); The Laborers' International Union of North America ("LIUNA"); or the Mason Tenders' District Council of Greater New York ("Mason Tenders").

- Permanently enjoined from having any involvement in the administration or management of any pension, health, welfare or benefit plan or fund established or maintained by an employee organization subject to and in accordance with Title 1 of ERISA.

- Permanently enjoined from having legal or beneficial interest, direct and indirect, including but not limited to, any ownership, partnership, landlord/tenant, employment, managerial, and/or financial interest, in any business or entity related to, or connected with the Port of New York and New Jersey, or the Port of Miami and Port Everglades in Florida.

A copy of the Consent Judgment and Decree is annexed as Exhibit 5.

45.    The following members and associates of the Gambino family conspired with one or more of the defendants to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise, as herein defined, and in acquiring or maintaining, directly or indirectly, an interest in, or control of, the Enterprise through a pattern of racketeering activity:

a.    Frank Scollo is an associate of the Gambino family, former President of Local 1814, former Vice-President of the ILA, and a former member of the Board of Trustees of MILA. On November 4, 2002, Scollo pleaded guilty to conspiracy to commit multiple acts of racketeering in violation of 18 U.S.C. § 1962(d), in United States v. Gotti, et al., No. 02 Cr. 606 ((E.D.N.Y.) (FB). A copy of the indictment in Gotti is annexed as Exhibit 6.

b.    Primo Cassarino is a soldier in the Gambino family. On March 17, 2003, Cassarino was convicted of violating RICO in United States v. Gotti, et al., No. 02 Cr. 606 (E.D.N.Y.) (FB), was found to have committed multiple racketeering acts as separate counts in the indictment, and was convicted of conspiring to violate RICO in violation of 18 U.S.C. § 1962(d). A copy of the verdict sheet in Gotti is annexed as Exhibit 7.

c.    Vincent Nasso, also known as "Dr. Nasso," is an associate of the Gambino family and was an owner and operator of GPP/VIP, Inc., a vendor of prescription pharmaceuticals. On August 13, 2003, Nasso pleaded guilty to wire fraud in United States v. Gotti, et al., No. 02 Cr. 606 (E.D.N.Y.) (FB), admitting that he had paid $400,000 to organized crime figures so that his company would be chosen to provide services for MILA.

      d.    .   Louis Valentino is an associate of the Gambino family and was Executive Director of MILA.

## WATERFRONT PROSECUTIONS

46.    In an effort to eradicate Waterfront corruption, the United States has prosecuted numerous cases against organized crime members and associates, including ILA officials.

47.   .  Currently, the United States is prosecuting ILA officials ALBERT CERNADAS, HAROLD J. DAGGETT and ARTHUR COFFEY, and Genovese family captain Lawrence Ricci, for extortion and fraud conspiracies concerning the ILA that are bases for the instant civil RICO action. See United States v. Coffey, et al., No. 04 Cr. 651 (E.D.N.Y.) (ILG). Coffey is just the latest case brought in this district in response to LCN Waterfront and ILA racketeering. In addition to Coffey, the United States has recently obtained Waterfront racketeering convictions in United States v. Bellomo, No. 02 Cr. 140 (S-2) (E.D.N.Y.) (ILG), and United States v. Gotti, et al., No. 02 Cr. 606 (E.D.N.Y.) (FB). The United States has also filed and, resolved by consent decree, civil RICO allegations against Genovese family members and associates in connection with Waterfront racketeering. See United States v. Bellomo, et al., No. 03 Civ. 1638 (E.D.N.Y.) (ILG).

48.    Unfortunately, the long record of Waterfront prosecutions emphasizes the durability of LCN influence on the ILA and the Waterfront.

49.    From 1977 to 1981, 129 individuals connected to the Waterfront were indicted, and 110 were convicted. Among those convicted were 52 union officials, several of whom were LCN members and associates. Those convicted included the highest-ranking

officials of ILA Locals 1814 and 1804-1, as well as the ILA. These Waterfront-related prosecutions included:

      a.    United States v. Clemente, No. 79 Cr. 142 (S.D.N.Y. 1980) (LBS), aff'd, 640 F.2d 1069 (2d Cir.), cert. denied, 454 U.S. 829 (1981), in which ILA International and Local officers Thomas Buzzanca, Vincent Colucci and Carol Gardner, and Genovese family soldiers Tino Fiumara and Michael Coppola, were convicted of RICO and RICO conspiracy involving Waterfront extortions and unlawful labor payments. Also convicted in this case were Manuel and Joseph Castelo, owners and officers of Castelo and Sons Ship Servicing, Inc.; Gerald Swanton, Vice-President of Netumar International, Inc.; and Robert Meli and George Zappola, employees of M & R Repair Company.

      b.    United States v. Scotto, No. 79 Cr. 32 (S.D.N.Y.) (CES), aff'd, 641 F.2d 47 (2d Cir. 1980), cert. denied, 452 U.S. 961 (1981), in which the ILA and Local 1814 officers Anthony Scotto and Anthony Anastasio were convicted of RICO and RICO conspiracy involving Waterfront-related extortion and receipt of unlawful labor payments.

      c.    United States v. Marino, 639 F.2d 882 (2d Cir.), cert. denied, 454 U.S. 825 (1981), in which Vincent Marino, President of Marine Repair Services, Inc., was convicted of making unlawful labor payments to ILA official Anthony Scotto.

      d.    United States v. Cappell, No. 78 Cr. 0842 (S.D.N.Y.), in which Mark O. Cappell, Vice-President of Prudential Lines, was convicted of conspiracy (18 U.S.C. § 371) and tax violations (26 U.S.C. § 7206).

      e.      United States v. Colletti, No. 79 Cr. 0745 (S.D.N.Y.), in which Michael Colletti, Manager of Supply Operations, Ford Export Corp., was convicted of conspiracy (18 U.S.C. § 371) and tax violations (26 U.S.C. § 7201).

      f.      United States v. Ecuadorian Line, Inc., No. 79 Cr. 0566 (S.D.N.Y.), in which the defendant shipping company was convicted of making unlawful labor payments to an ILA union officer (29 U.S.C. § 186).

      g.      United States v. Field, No. 79 Cr. 0538 (S.D.N.Y.), in which Fred Field, the ILA General Organizer and an officer of ILA Local 856, was convicted of six counts of wire fraud (18 U.S.C. § 1343).

      h.      United States v. Gordon, No. 79 Cr. 0706 (S.D.N.Y.), in which Sterling Gordon, President and owner of Coffee Holding Company, Inc., was convicted of conspiracy and mail fraud (18 U.S.C. §§ 371 & 1341).

      i.      United States v. Haggerty, No. 79 Cr. 0263 (S.D.N.Y.), in which Donald Haggerty, Operations Manager for Norton Lilly, was convicted of mail fraud (18 U.S.C. § 1341).

      j.      United States v. Held, No. 79 Cr. 0222 (S.D.N.Y.), in which Irving Held, an owner and officer of Sealand Terminal Corporation and several subsidiaries, and Carol Gardner, an ILA International and Local officer, were convicted of making and receiving illegal labor payments (29 U.S.C. § 186), respectively.

      k.      United States v. Hopkins, No. 79 Cr. 0256 (S.D.N.Y.), in which Robert Hopkins, Vice-President of Kerr Steamship Lines, was convicted of mail fraud (18 U.S.C. § 1341).

1.      <u>United States v. McGann</u>, No. 79 Cr. 0201 (S.D.N.Y.), in which Edward F. McGann, Vice-President of Grancolombiana Lines, Inc., was convicted of mail fraud (18 U.S.C. § 1341).

m.      <u>United States v. McGrath Services Corp.</u>, No. 79 Cr. 0594 (S.D.N.Y.), in which the defendant stevedoring corporation was convicted of conspiracy (18 U.S.C. § 371) and making unlawful payments to an ILA union officer (29 U.S.C. § 186).

n.      <u>United States v. Marano</u>, No. 80 Cr. 0149 (S.D.N.Y.), in which John R. Marano, an employer-owner of M & R Repair Company, was convicted of conspiracy and mail fraud (18 U.S.C. §§ 371 & 1341).

o.      <u>United States v. Martinelli</u>, No. 79 Cr. 0412 (S.D.N.Y.), in which Gian Marco Martinelli, an employee of Costa Lines, was convicted of mail fraud (18 U.S.C. § 1341).

p.      <u>United States v. Nelson</u>, No. 78 Cr. 0835 (S.D.N.Y.), in which Keith Nelson, an Executive Vice-President of Prudential Lines, was convicted of tax violations (26 U.S.C. § 7206).

q.      <u>United States v. O'Donnell</u>, No. 79 Cr. 0032 (S.D.N.Y.), in which William O'Donnell, an officer of Marine Repair Services, Inc., was charged with embezzlement from a common carrier (18 U.S.C. § 660).

r.      <u>United States v. O'Hearn</u>, No. 79 Cr. 0030 (S.D.N.Y.), in which Walter O'Hearn, an officer of McGrath Services Corp., was convicted of making unlawful payments to an ILA union officer (29 U.S.C. § 186).

s.     United States v. Pierson, No. 79 Cr. 0215 (S.D.N.Y.), in which Edward Pierson, an Assistant Vice-President of Moore McCormack, was convicted of mail fraud (18 U.S.C. § 1341).

t.     United States v. Pirrone, No. 79 Cr. 0707 (S.D.N.Y.), in which Joseph Pirrone, an officer of Vaniman International, was convicted of mail fraud (18 U.S.C. § 1341) and tax violations (26 U.S.C. § 7201).

u.     United States v. Quin Marine Services, Inc., No. 79 Cr. 0573 (S.D.N.Y.), in which Quin Marine Services, a stevedoring company that made unlawful labor payments to ILA union officers, was convicted of conspiracy and mail fraud (18 U.S.C. §§ 371 & 1341).

v.     United States v. Rosen, No. 79 Cr. 0650 (S.D.N.Y.), in which David Rosen, an officer of McGrath Services, Inc., was convicted of conspiracy (18 U.S.C. § 371) and making unlawful labor payments to an ILA union officer (29 U.S.C. § 186).

w.     United States v. Seregos, No. 79 Cr. 0564 (S.D.N.Y.), aff'd, 655 F.2d 33 (2d Cir. 1981), cert. denied, 455 U.S. 940 (1982), in which Nicholas Seregos, an officer of Jackson Engineering, was convicted of mail fraud and wire fraud (18 U.S.C. §§ 1341 & 1343).

x.     United States v. Spitz, No. 80 Cr. 0004 (S.D.N.Y.), in which Arnold Spitz, a consultant for Gydnia Lines, was convicted of mail fraud (18 U.S.C. § 1341) and tax violations (26 U.S.C. § 7201).

y.     United States v. Traficante, No. 78 Cr. 0840 (S.D.N.Y.), in which C. Thomas Traficante, an officer of Gydnia Lines, was convicted of mail fraud (18 U.S.C. § 1341).

  z.  <u>United States v. Weeks</u>, No. 79 Cr. 0333 (S.D.N.Y.), in which Richard N.

Weeks, President of Weeks Stevedoring, was convicted of mail fraud and conspiracy (18 U.S.C.

§§ 1341 & 371).

  50.  Despite these many successful criminal prosecutions (denominated

"UNIRAC" for union racketeering), the Gambino and Genovese families continued to dominate

the Waterfront. The U.S. Senate's Permanent Subcommittee on Investigations concluded in a

1984 report:

> UNIRAC, for all its successes, did not rid the waterfronts of all
> crime or all criminals. Corrupt practices, according to some
> witnesses before the Subcommittee, already had begun to return to
> the Atlantic and gulf coast docks. What is needed, then, is
> continued scrutiny of the maritime industry by government
> agencies.

<u>Waterfront Corruption</u>: Report of the Permanent Subcommittee on Investigations at 9 (March 27,

1984).

  51.  The President's Commission on Organized Crime ("PCOC") stated in a

1986 Report:

> Historically, the International Longshoremen's Association (ILA)
> has been virtually a synonym for organized crime in the labor
> movement . . . .

President's Commission on Organized Crime, Report to the President and the Attorney General,

<u>THE EDGE:</u> <u>Organized Crime, Business and Labor Unions</u> at 33 (March 1986). The PCOC

concluded that organized crime "exercises almost unfettered control . . . over the New York-New

Jersey Waterfront . . . ," <u>id</u>. at 39, and specifically found that "Locals 1814 and 1804-1 remain

firmly under the control of the Gambino and Genovese Families . . . ."

52.     In the 1988 hearings before the Permanent Subcommittee on

Investigations, several former "made" members of La Cosa Nostra confirmed that organized

crime continued to exercise control over the ILA and New York-New Jersey ILA Locals.  Angelo

Lonardo, former Underboss and Boss of the Cleveland LCN family, stated that the Gambino

family continued to control the ILA.  Hearings Before the Permanent Subcommittee on

Investigations at 99 (April 15, 1988).  Vincent "the Fish" Cafaro, a Genovese soldier, testified

that Douglas Rago, an ILA officer, was the Genovese family soldier who exercised the family's

control over the ILA in New York ports.  Id. at 238-39, 885; see id. at 722 ("The Genovese

organization's major threat is its influence over waterfront operations through labor unions . . .").

53.     On February 2, 1990, in United States v. Guido, et al., No. 90 Cr. 60

(E.D.N.Y.) (ILG), Umberto Guido, the head of METRO, a Local 1814 Trustee, and others were

convicted of receiving illegal payments from Local 1814's benefit funds in violation of 18 U.S.C.

§ 1954 over a twenty-year period.

54.     On or about February 14, 1990, the United States commenced an action in

the United States District Court for the Southern District of New York pursuant to the civil

provisions of the Racketeer Influenced and Corrupt Organizations Act, which detailed broad-

ranging and pervasive LCN influence and control over ILA Locals 824, 1588, 1804-1, 1809,

1814 and 1588.  United States v. Local 1804, International Longshoremens' Association, et. al.,

No. 90 Civ. 0963 (S.D.N.Y.) (LBS) (the "ILA Local Civil RICO").  The ILA was not a defendant

in the case.  Ultimately, each of the defendant ILA Locals in the ILA Local Civil RICO case

entered into a consent decree with the United States, resolving the United States' allegations

concerning the Locals.  A copy of the Amended Complaint in the action is annexed as Exhibit 8.

a.     On or about March 25, 1991, Local 1804-1 consented to appointment by

the court of a Monitor with authority to oversee a number of the local's operations. In addition,

the Consent Judgment provided that the Local 1804-1 Executive Board, and all current and future

officers, agents, representatives, employees and members of Local 1804-1, were to be

permanently enjoined:

> a) from committing any acts of racketeering activity, as defined in
> 18 U.S.C. § 1961 et seq., or knowingly associating with any
> member or associate of any Organized Crime family or La Cosa
> Nostra or any other criminal group or any person prohibited from
> participating in union affairs; and
> b) from obstructing, opposing, or otherwise interfering with the
> work of the court-appointed officers described herein . . . .

A copy of the Local 1804-1 Consent Judgment, signed by HAROLD J. DAGGETT, on his own

behalf and on behalf of Local 1804-1 as its Secretary-Treasurer, is annexed as Exhibit 9.

b.     On or about December 17, 1991, Local 1814 agreed to the imposition of a

court-appointed Monitor and a similar, permanent injunction against racketeering activity and

LCN association. A copy of the Local 1814 Consent Decree is annexed as Exhibit 10.

c.     On or about March 26, 1991, Locals 824, 1809 and 1909 entered into a

Consent Judgment with the United States. Pursuant to the Consent Judgment, the three locals

agreed to supervision of upcoming elections by the United States Department of Labor. In

addition, Local 1909 agreed to imposition of a court-appointed Employment Practices Monitor.

The Consent Judgment further provided:

> that persons holding office in Local 824, Local 1809, and Local
> 1909 shall not in the future knowingly associate with any member
> or associate of any Organized Crime Family of La Cosa Nostra or
> any other criminal group or any person prohibited from
> participating in union affairs, except that they may associate with

> any person in connection with their lawful duties and
> responsibilities as a union officer.

Defendant JOHN BOWERS, President of the ILA, signed the Consent Judgment on his own

behalf and as President of Locals 824, 1809 and 1909. Defendant ROBERT E. GLEASON,

Secretary-Treasurer of the ILA, signed the Consent Judgment on his own behalf and as Secretary-

Treasurer of Local 1809. A copy of the Consent Judgment is annexed as Exhibit 11.

     d.     On or about January 3, 1992, Local 1588 entered into a Consent Order

whereby Local 1588 acknowledged that there had been "allegations, sworn testimony, and

criminal convictions reflecting past problems with organized crime corruption of Local 1588"

and agreed to a permanent injunction against racketeering activity and association with LCN

members or associates. The Consent Order established and put in place an Ombudsman with

authority to enforce the Local's constitution and by-laws, as well as the terms of the Consent

Order. The Consent Order additionally provided for the supervision of upcoming Local elections

by the Department of Labor.

     e.     In addition to JOHN BOWERS, ROBERT E. GLEASON and HAROLD

J. DAGGETT, nearly all other individual defendants in the ILA Local Civil RICO case entered

into settlements with the United States, in some instances as ILA officers as well as on behalf of

themselves individually, including:

> (1)     George Barone, a soldier in the Genovese family, a former
> International Vice-President, Organizer of the ILA Atlantic Coast
> District Council, Business Agent for ILA Local 1804-1, and
> President of Miami, Florida Local 1922. In United States v.

Barone, et al., 78 Cr. 185 (S.D. Fl.) (WMH), aff'd sub nom.

United States v. Kopituk, 690 F.2d 1289 (11th Cir. 1982); cert.

denied, 463 U.S. 1209 (1983), Barone was convicted of conducting

and conspiring to participate in the conduct of an enterprise

through a pattern of labor racketeering (RICO, 18 U.S.C.

§ 1962(c)), RICO conspiracy (18 U.S.C.§ 1962(d)), extortion (18

U.S.C. § 1951), receiving unlawful labor payments (29 U.S.C.

§ 186(b)), and tax evasion.  Barone also had been convicted

previously of felonious assault.  Additionally, Barone and another

Genovese family member, Douglas Rago, were expelled from

Canada by the Canadian Government for their perpetration of a

scheme to defraud.

(2)    James CASHIN, a Genovese family associate and the former

Secretary-Treasurer of ILA Local 1804-1, who had succeeded his

father, Harry Cashin, in that position in approximately 1962.

CASHIN was convicted in June 1978 for assault with intent to kill.

After his release from prison, CASHIN became Vice-President of

Doreen Supply Company, Inc., which supplied cleaning chemicals

to certain Waterfront employers.

(3)    Thomas Buzzanca, a Genovese family soldier and the former

President of ILA Local 1804-1.  In United States v. Clemente, et

al., 79 Cr. 142 (S.D.N.Y.) (LBS), aff'd, 640 F.2d 1069 (2d Cir.),

cert. denied, 454 U.S. 829 (1981), Buzzanca was convicted, inter alia, of conducting and conspiring to participate in the conduct of an enterprise through a pattern of labor racketeering activity, (RICO 18 U.S.C. 1962(c)), RICO conspiracy (18 U.S.C. § 1962(d)), extortion (18 U.S.C. § 1951), receiving unlawful labor payments (29 U.S.C. § 186(b)), and tax evasion. Buzzanca later worked as a salesman for Doreen Supply Company, Inc.

(4)     Frank Lonardo, a cousin of former Underboss of the Cleveland Organized Crime family, Angelo Lonardo. Lonardo replaced his cousin Anthony Scotto in 1979 as the President of ILA Local 1814 and became General Organizer of the ILA and a MILA Trustee.

(5)     Anthony Pimpinella, a Gambino family soldier, Executive Vice-President of ILA Local 1814, the General Organizer of the International, Vice-President of the ILA Atlantic Coast District Council, and trustee of ILA-NYSA employee benefit funds.

(6)     Alfred Small, a Vice-President of ILA Local 1814 and an Organizer for the International.

(7)     Joseph Colozza, Vice-President of ILA Local 1814, an Organizer for the International, Vice-President of the ILA Atlantic Coast District Council, and trustee of several NYSA-ILA employee benefit funds.

(8)     Santo Calabrese, an Executive Board member of ILA Local 1814.

(9)    Ralph Perello, an Executive Board member of ILA Local 1814.

(10)   Richard Pierce, an Executive Board member of ILA Local 1814.

(11)   Gregory Lagana, Delegate of ILA Local 1814.  On February 6,

1990, Lagana pleaded guilty in People v. Lagana, Cr. No. 1272/90

(N.Y. Sup. Ct. Kings Co.), to the crime of bribe receiving by a

labor official in violation of N.Y. Penal Law § 180.05.  Lagana had

been accused of accepting a bribe in exchange for promising

Waterfront employment.

(12)   Anthony Ciccone, a Gambino family Captain, Vice-President of

the ILA Atlantic Coast District, and Special Administrator of ILA

Local 1814.

(13)   Louis Pernice, Secretary-Treasurer of ILA Local 1814.

(14)   C.F. Kenny, a Vice-President on the ILA Executive Council,

President of ILA Local 1804-1 and an Organizer of the ILA

Atlantic Coast District Council.

(15)   Harry Cashin, Vice-President of ILA Local 1804-1 and the brother

of Genovese family associate James Cashin.

(16)   Ronald Capri, Recording Secretary of ILA Local 1804-1.

f.    While each of the locals and a number of the individual defendants

eventually entered into settlements in the ILA Local Civil RICO, several individual defendants,

including Donald Carson, the former Executive Vice-President of the ILA, chose to await the

outcome of a ten-week trial.  At the conclusion of the trial, the court ruled that the New

York/New Jersey Waterfront constituted an "enterprise" within the meaning of the RICO statute and that the defendants who had not settled had conducted or participated in the conduct of the affairs of the Waterfront through a pattern of racketeering activity.  See United States v. Local 1804, International Longshoremen's Association, 812 F. Supp. 1303, 1344 (S.D.N.Y. 1993) (LBS).  In reaching its decision, the court ruled that under § 501 of the Labor-Management Reporting and Disclosure Act of 1959, "a union officer has an affirmative duty to investigate allegations of corruption by other union officers and to take such steps as necessary to redress such corruption."  Id. at 1339.

55.    In 1999, the leadership of Local 1588 was charged in federal district court in New Jersey, with conspiring to loot Local 1588 funds for the benefit of themselves and organized crime.  The superseding indictment charged that for many years, the defendant officers and employees of Local 1588 participated in a salary diversion scheme designed to benefit organized crime.  Under that scheme, the officers paid half of their salaries in cash to a Genovese family associate, Joseph Lore.  The indictment further charged that Lore and Local 1588 Office Manager Denise Bohn received kickbacks from vendors and contractors who provided various goods and services to Local 1588.  The indictment also charged Local President John Angelone, Vice-President Eugene G'Sell and Bohn with embezzling union funds by charging personal expenses to union credit cards.

a.    On June 6, 2000, G'Sell pleaded guilty to conspiring to embezzle from Local 1588, in violation of 29 U.S.C. § 501(c).  At the time of his plea, G'Sell admitted that, beginning from at least January 1994, he was responsible for delivering one-half of the salaries of various employees and officers of Local 1588 to Lore.  G'Sell further admitted that he converted

other union funds through special projects. G'Sell agreed that the loss to the Local from his offense was between $800,000 and $1,500,000.

        b.     John Angelone pleaded guilty to conspiring to embezzle from Local 1588. He agreed that the loss to the Local from his offense was between $500,000 and $800,000.

        56.     In March 2002, Nicholas Furina, a Genovese family associate, and various officials of Local 1588 were arrested on charges of Waterfront racketeering and extortion. In May 2002, a New Jersey state grand jury indicted Furina and the officials, including John Timpanaro, President of Local 1588. The indictment charged that the defendants constituted a Genovese family-affiliated racketeering enterprise. More specifically, the defendants were charged with extorting money from members of the Local by threatening to withhold jobs, employment and promotions if they failed to pay. They were also charged with accepting bribes from union members for job assignments and promotions.

        57.     In or about January 2002, Genovese family members and associates Liborio Bellomo, Thomas Cafaro, Pasquale Falcetti, Andrew Gigante, Vicente Gigante, Ernest Muscarella, Michael Ragusa and Charles Tuzzo were indicted in the Eastern District of New York on multiple counts of Waterfront racketeering in United States v. Bellomo, et al., No. 02 Cr. 140 (S-2) (E.D.N.Y.) (ILG). On April 7, 2003, each of the Defendants pleaded guilty to one or more counts.

        58.     On or about June 3, 2002, PETER GOTTI, ANTHONY CICCONE, and JEROME BRANCATO were indicted in the Eastern District of New York on multiple counts of Waterfront racketeering in United States v. Gotti, et al., No. 02 Cr. 606 (E.D.N.Y.) (FB). On March 17, 2003, the defendants were found guilty of the charges.

59.     By Opinion and Order dated January 29, 2003, the Honorable John A. Martin, United States District Judge for the Southern District of New York, ruled that Local 1588 had violated the terms of its January 3, 1992 Consent Order in the ILA Local Civil RICO case and ordered that an Administrator be appointed "[w]ith broad powers to direct the operations of the union and to supervise the election of new officers . . . ."

a.      In its decision, the Court found that the ILA and, in particular, ILA President JOHN BOWERS, had failed to take action when confronted with organized crime activity at Local 1588.  The ILA opposed the appointment of the Administrator, arguing that it had in fact taken steps to address the rampant criminal conduct at Local 1588 by appointing an ILA official as trustee of the local in December 2002.  Addressing this contention, the Court stated:

> The Union also contends that there is no need for a court appointed Administrator for Local 1588 because the International has appointed a Trustee to protect the rights of its members.  While willingness of an International to take effective action to deal with the problems in a Local might in some circumstances persuade the Court that there is no need for court intervention to protect the rights of union members, the actions of the International with respect to Local 1588 are less than impressive.  A clear insight into the problem of entrusting the protection of the Local to the care of the International is found in the June 27 letter of President Bowers appointing the committee to investigate Local 1588.

> That letter begins:

> As you are aware, two local presidents of Local 1588 have recently been indicted on charges involving the rights of Local 1588 members.  (Emphasis added.)

> One of the "recently" indicted presidents was John Angelone, who had been arrested on racketeering charges more than three years before the committee was appointed and who had pleaded guilty to

the charges on which he was indicted more than 2 ½ years before President Bowers gave any thought to trying to protect the rights of the members of Local 1588.

More significant than President Bowers' failure to appoint a committee to investigate Local 1588 for more than 2 ½ years after its entire leadership was indicted and convicted on labor racketeering charges, is the fact that no one from the International ever questioned Angelone about this illegal activity from the time the charges became public in May of 1999 until he resigned as President of Local 1588 in January, 2002. Nor was any attempt made by the International to remove Angelone as President of the Local from the time of his plea until after the Waterfront Commission issued a "Section 8 Letter" advising him that, as a result of his conviction and sentence, he was required to resign as President. Indeed, in a conversation tape-recorded by law enforcement officials, Angelone was overheard saying that Thomas Gleason, counsel to the International, had told him not to resign "until the Section 8 Letter."

Given the International's total lack of concern about the corruption in Local 1588 until it learned that it might be the subject of a government lawsuit, the Court has no reason to believe that the recent flurry of activity represents a genuine concern for the welfare of the Union's members or a desire to rid the Union of organized crime's influence.

b.       In so ruling, the Court noted that just three weeks before ILA President

BOWERS called for the appointment of the committee to investigate Local 1588, an article had

appeared in the New York Times reporting that "prosecutors were considering instituting a

lawsuit to take control of the ILA because it was under the control of the Gambino and Genovese

crime Families." A copy of the Court's Opinion and Order is annexed as Exhibit 12.

60.       The ILA's failure to remove 1588's corrupt union leaders, which is only

set-in-relief by its belated appointment of an ineffectual trustee, was in accord with longstanding

practice. As set forth by the Senate Permanent Subcommittee on Investigation in its report on

Waterfront Corruption:

> In none of the UNIRAC convictions of ILA officers did [then ILA
> president] Teddy Gleason direct that a union official found guilty
> of labor racketeering be removed from office or from a position of
> fiduciary trust.

> Several convicted ILA officials whose appeals had been exhausted
> or who went to jail upon conviction - Anthony Scotto, Fred R.
> Field, Jr., Anthony Anastasia (sic), Thomas Buzzanca, Vincent
> Colucci, Carol Gardner - had been removed from office. But in
> none of these instances did Gleason initiate the removal. As he
> testified, it was their going to prison that triggered their leaving
> office. . . .

> The fact that a man had a criminal record that included felonies did
> not necessarily bar him from holding union office in the ILA,
> Gleason said, adding:

> You have a lot of industries, where you give a guy a chance to
> rehabilitate himself. Are you going to force him out, are you going
> to force him out continually, to live a life of crime? He might
> make some mistakes, he might make some mistakes.

> 61.    The Report recounts the following exchange during Gleason's testimony

before the Permanent Subcommittee:

> Senator Nunn. Do you think these people have been rehabilitated,
> they have just been convicted again for all sorts of crimes under the
> UNIRAC investigation? Are you saying ILA is running a
> rehabilitation program for convicted felons? Rehabilitate them to
> put them in high international office?

> GLEASON. Maybe we will have to, Senator.

> Senator NUNN. Have to?

> GLEASON: Maybe we will have to.

> Senator NUNN. Have to what?

GLEASON.  Run a rehabilitation center like you said.

Waterfront Corruption at 87-88.

62.    As of the date of the filing of this Complaint, the ILA continues to be a vehicle for organized crime influence in the nation's ports.  Confronted with evidence of mob influence and control in the highest offices of the ILA, including the evidence which resulted in the convictions in Gotti and the guilty pleas in Bellomo, the ILA has done nothing of significance to address long standing corruption within the ILA.  At its most recent Convention, held the week of July 21, 2003, the Defendants BOWERS, GLEASON, CERNADAS, DAGGETT and COFFEY were re-elected to their positions despite the evidence that they are organized crime associates and had engaged in racketeering activity set forth in this Complaint.  Although the ILA adopted a "Code of Ethics" and established an office of "Ethical Practices Counsel" after the convictions in Gotti and Bellomo, these measures have brought no actual reform to the union.  High-ranking ILA officials implicated in wrongdoing in the Gotti and Bellomo cases have remained in their positions with impunity.  Although Defendants ALBERT CERNADAS, HAROLD J. DAGGETT and ARTHUR COFFEY have been suspended with pay from their positions on the ILA Executive Council, the suspensions were not effected through pro-active union action but in response to the indictment in United States v. Arthur Coffey, et al., No. 04 Cr. 651 (E.D.N.Y.) (ILG).  While the ILA Ethical Practices Counsel has authority to investigate certain allegations of corruption, he has no authority to take disciplinary action.  Instead, he only has authority to recommend that the ILA Executive Council take action.  Thus, the members of the Executive Council, including those who are Defendants in this case, have the sole right to determine whether they may be subject to discipline.

63.     After fifty years of documented corruption, it is clear that only broad-reaching, Court-imposed relief can remedy the effects of organized crime's influence on the ILA.

## THE ENTERPRISE

64.     At all times relevant hereto, the ILA and certain of its subordinate components, namely, the Atlantic Coast District, the South Atlantic & Gulf Coast District, Locals 1, 824, 1235, 1588, 1804-1, 1814, 1922, 1922-1, and 2062; certain current and former ILA officials; certain welfare benefit and pension benefit funds managed for the benefit of ILA members, namely, MILA, the METRO-ILA Funds, the ILA Local 1922 Health and Welfare Fund, the ILA-Employers Southeast Florida Ports Welfare Fund; certain businesses operating on or about the Waterfront; an "employer association" operating on or about the Waterfront, namely METRO; certain members and associates of the Genovese and Gambino crime families; and certain businesses operating in the Port of Miami; constituted an enterprise, that is, a group of individuals and entities associated in fact (hereinafter, the "Waterfront Enterprise" or "Enterprise"), as defined in 18 U.S.C. § 1961(4). The enterprise constituted an ongoing organization whose members functioned as a continuing unit for the purpose of achieving the objectives of the enterprise. This enterprise was engaged in, and its activities affected, interstate and foreign commerce.

## Purpose Of The Enterprise

65.     The Defendants' common purpose was to exercise corrupt control and influence over labor unions and businesses operating on the Waterfront, the Port of Miami and elsewhere in order to enrich themselves and their associates. In order to achieve this objective, the Defendants have established and maintained control and influence over labor unions and

businesses.  To ensure the continued effectiveness of this corrupt system and as part of the

overall plan and pattern of control, the Gambino and Genovese families have generally

maintained and recognized their respective areas of control and domination on the Waterfront,

the Port of Miami and elsewhere.

**Roles Of The Defendants**

   66. The Defendants participated in the operation and management of the

Enterprise.  Defendants PETER GOTTI, ANTHONY CICCONE, JEROME BRANCATO and

JAMES CASHIN, the Co-conspirator Genovese family members and associates not named as

defendants, and Defendants JOHN BOWERS, ROBERT E. GLEASON, ALBERT CERNADAS,

HAROLD J. DAGGETT and ARTHUR COFFEY, were leaders of the Enterprise who directed

other members of the Enterprise in carrying out unlawful and other activities in furtherance of the

conduct of the Enterprise's affairs.

## STATEMENT OF CLAIMS

## I. FIRST CLAIM FOR RELIEF: CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(c) IN VIOLATION OF 18 U.S.C. § 1962(d)

   67. The United States repeats and realleges the allegations set forth in

paragraphs 1 through 66.

   68. Since in or about year 1995 and continuing to the present, in the Eastern

District of New York and elsewhere, Defendants JOHN BOWERS, ROBERT E. GLEASON,

ALBERT CERNADAS, HAROLD J. DAGGETT, ARTHUR COFFEY, PETER GOTTI,

ANTHONY CICCONE, JEROME BRANCATO and JAMES CASHIN, together with others,

known and unknown, being persons employed by and associated with the Waterfront Enterprise

which was engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally combined, conspired, confederated, and agreed to commit an offense against the United States to wit: to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Waterfront Enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(1) and (5), consisting of multiple acts indictable under the following sections:

> (A) 18 U.S.C. § 1951 (extortion)
>
> (B) 18 U.S.C. §§ 1341 and 1346 (mail fraud)
>
> (C) 18 U.S.C. § 1343 (wire fraud)
>
> (D) 18 U.S.C. § 1956 (money laundering)

69.     It was part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the Waterfront Enterprise.

70.     It was further part of the conspiracy that the Defendants sought to control and dominate the Waterfront and the Port of Miami, certain businesses and unions operating on the Waterfront and at the Port of Miami, and to conduct and participate in the conduct of the affairs of the Waterfront Enterprise.

71.     It was further part of the conspiracy that, to control the Waterfront and the Port of Miami, the Genovese and Gambino families placed organized crime members, associates, or relatives, into positions with the ILA, including high-ranking positions on the ILA's governing Executive Council, and into positions as trustees of ILA pension, welfare and benefit funds. These individuals have included current ILA President JOHN BOWERS, current ILA Secretary-

Treasurer ROBERT GLEASON, current ILA Executive Vice-President ALBERT CERNADAS,

current ILA Assistant General Organizer HAROLD J. DAGGETT, ILA Vice-President

ARTHUR COFFEY, former ILA Vice-President Frank Scollo, and former ILA Vice-President

Frank Lonardo, all of whom are or have been members of the MILA Board and other ILA funds.

72.    It was further part of the conspiracy that Defendant ILA Officials JOHN

BOWERS, ROBERT E. GLEASON, ALBERT CERNADAS, HAROLD J. DAGGETT, and

ARTHUR COFFEY, together with Defendants ANTHONY CICCONE , JEROME

BRANCATO, and JAMES CASHIN, and others, obtained money and property from the ILA

membership by rigging the July 2000 ILA elections through extortionate and fraudulent means so

as to place associates of the Genovese and Gambino families on the Executive Council of the

ILA.

73.    It was further part of the conspiracy that Defendants JOHN BOWERS,

ROBERT E. GLEASON, ALBERT CERNADAS, HAROLD J. DAGGETT, ARTHUR

COFFEY, ANTHONY CICCONE and JAMES CASHIN, with others, obtained money and

property from the beneficiaries of MILA through extortionate and fraudulent means by awarding

the MILA PBM contract to a company associated with the Gambino and Genovese families.

74.    It was further part of the conspiracy that Defendants JOHN BOWERS,

ROBERT E. GLEASON, ALBERT CERNADAS, HAROLD J. DAGGETT and JAMES

CASHIN, with others, obtained money and property from the beneficiaries of MILA through

fraudulent means by awarding the MILA mental health contract to a company that paid CASHIN,

a Genovese family associate, as a consultant.

75. It was further part of the conspiracy that Defendants HAROLD J. DAGGETT and JAMES CASHIN, with others, obtained money and property through fraudulent means from the beneficiaries of one or more of the METRO-ILA Funds by awarding the PBM contract to a company associated with organized crime; by seeking to appoint as an investment advisor of the METRO-ILA Funds a person associated with organized crime; and by awarding a mental health benefits contract to a company that paid CASHIN, an associate of the Genovese family, as a consultant.

76. It was further part of this conspiracy that in exchange for obtaining and keeping their high-paying positions with the ILA, ILA officials, including Defendants JOHN BOWERS, ROBERT E. GLEASON, ALBERT CERNADAS, HAROLD J. DAGGETT and ARTHUR COFFEY, breached the fiduciary duties that they owed to the ILA membership by acting on behalf of parties whose interests are adverse to the ILA, including organized crime figures.

77. It was further part of this conspiracy that in exchange for obtaining and keeping their high-paying positions with the ILA, ILA officials, including Defendants JOHN BOWERS, ROBERT E. GLEASON, ALBERT CERNADAS, HAROLD J. DAGGETT and ARTHUR COFFEY, breached the fiduciary duties that they owed, respectively, in transactions involving MILA, the Metro-ILA Funds, the ILA-Employers Southeast Florida Ports Welfare Fund, and the ILA Local 1922 Health and Welfare Fund, by failing to act solely in the interest of the participants and beneficiaries of such employee benefit plans and by acting on behalf of parties whose interests were adverse to the interests of such employee benefit plans and their participants and beneficiaries when entering into contracts for pharmacy benefits and mental

health care benefits with companies associated with organized crime figures or who paid an organized crime figure as a consultant.

78.     It was further part of this conspiracy that Defendants JOHN BOWERS, ROBERT E. GLEASON and HAROLD J. DAGGETT violated the terms of the Consent Decrees that they had entered into in the ILA Local Civil RICO case by associating with organized figures and committing and otherwise conspiring with organized crime figures in the commission of racketeering acts.

79.     It was further part of this conspiracy that certain of the Defendants and other co-conspirators obtained money and property from businesses operating on the piers in New York, New Jersey and the Port of Miami by exercising control over these businesses through extortionate and fraudulent means.  The conspiracy included efforts to give container repair work to companies affiliated with organized crime and to otherwise facilitate organized crime control of companies operating on the piers.  In exchange for the limit on competition and other assistance from LCN and complicit ILA officials, these companies hired friends and relatives of LCA members and associates, and often paid them exorbitant wages.

80.     It was further part of the conspiracy that Defendants PETER GOTTI, ANTHONY CICCONE and JEROME BRANCATO laundered the proceeds of their racketeering acts in violation of 18 U.S.C. § 1956.

**Collateral Estoppel**

81.     On March 17, 2003, Defendants PETER GOTTI, ANTHONY CICCONE, and JEROME BRANCATO were convicted of violating and conspiring to violate RICO, 18 U.S.C. § 1962(c) and § 1962(d) in United States v. Gotti, et al., No. 02 Cr. 606 (FB).

82.    Defendants PETER GOTTI, ANTHONY CICCONE, and JEROME

BRANCATO are estopped from denying the essential allegations of these offenses. 18 U.S.C.

§ 1964(d).

## THE SCHEMES TO CONTROL THE WATERFRONT ENTERPRISE

### A.    RIGGED "ELECTION" OF HAROLD J. DAGGETT AND OTHERS TO HIGH-RANKING ILA OFFICES

83.    Approximately in and between 1999 and 2000, the Gambino and

Genovese families conspired to dictate, through the use of organized crime intimidation, which

individuals would hold certain high-ranking positions within the ILA.

84.    In or about June of 1999, George Barone, a Genovese family member,

former ILA official, and convicted racketeer, arranged a meeting with ILA President JOHN

BOWERS to discuss who would replace BOWERS as ILA President upon BOWERS'

retirement.

85.    Barone had learned that BOWERS favored Benny Holland and wanted to

make it plain to BOWERS that the Genovese family supported DAGGETT, whom Barone had

placed in union positions during DAGGETT's union career and who could be counted on to

advance Genovese family interests as ILA President. At the time, DAGGETT was President of

ILA Local 1804-1 and Secretary-Treasurer of the ILA's Atlantic Coast District Council.

86.    Barone arranged the meeting through ARTHUR COFFEY, then President

of ILA Locals 1922, 1922-1 and 2062, which are located in Miami, Florida. COFFEY is the

nephew of long-time Genovese family member Douglas Rago, a Waterfront racketeering partner

of Barone. With the support of Barone and Rago, COFFEY had become President of the Miami locals, succeeding Barone after Barone was encarcerated for labor racketeering.

87.    The meeting, which was scheduled during a time when BOWERS was in Miami for a union-related function, took place at Smith and Wollensky's restaurant in Miami. During the meeting, BOWERS agreed to support DAGGETT provided that Barone agreed to be personally responsible for DAGGETT and that BOWERS' son, JOHN BOWERS, Jr., would be taken care of.

88.    By communicating with Barone, BOWERS violated the terms of the March 26, 1991 Consent Judgment that he had signed in the ILA Local Civil RICO on behalf of himself and as President of ILA Locals 824, 1809 and 1909.

89.    In or about the Spring of 2000, Frank Lonardo, an associate of the Gambino family controlled by ANTHONY CICCONE, had decided to resign from the position of ILA General Organizer.

90.    The Genovese family decided to use Lonardo's resignation as an opportunity to place DAGGETT in the powerful General Organizer position.

91.    The ultimate plan was to put DAGGETT on the ILA Executive Council so that DAGGETT could be in a position to succeed ILA President and fellow Genovese family associate, JOHN BOWERS.

92.    Elections of ILA International Officers are held at "Regular" Conventions of the ILA, which occur once every four years.

93.    In a non-Convention year, vacancies on the ILA Executive Council are filled by the Executive Council from the membership of the Executive Council.

94.     Lonardo had been re-elected to the General Organizer position the previous year, 1999, at the ILA's Regular Convention. As a result, the ILA Executive Council determined to replace Lonardo at a non-convention year election scheduled for July 2000 in Lake Tahoe, Nevada.

95.     Once on the Executive Council, DAGGETT would be eligible to replace BOWERS as President during a non-Convention year election, much as he would replace Lonardo.

96.     Replacing BOWERS with DAGGETT during a non-Convention year would ensure DAGGETT's selection.

97.     In and around this time, Genovese family soldier Pasquale Falcetti, in a meeting arranged through ARTHUR COFFEY, asked Barone to use his influence with BOWERS to put DAGGETT in the General Organizer position.

98.     BOWERS, however, was concerned about making DAGGETT the General Organizer. This was because Gerald Owens, who was already the ILA Assistant General Organizer, was black, a large number of ILA members were black, and the union's black caucus had come to BOWERS and asked that Owens be given the General Organizer's job.

99.     BOWERS informed Barone of his concerns through an intermediary, JAMES CASHIN, another Genovese family associate and a former ILA official.

100.    Barone told CASHIN that he would support Owens for General Organizer and DAGGETT for Assistant General Organizer, and he instructed CASHIN to inform the ILA leadership that he supported DAGGETT for Assistant General Organizer.

101.   In order to place DAGGETT on the Executive Council, the Genovese family needed an "accommodation" from the Gambino family. Outgoing General Organizer Frank Lonardo was a Gambino family associate, and Gambino family captain ANTHONY CICCONE wanted to replace Lonardo with another Gambino associate.

102.   CICCONE agreed to make the accommodation, as discussed in a May 24, 2000 conversation between CICCONE and Gambino family soldier Primo Cassarino. As part of the accommodation, Gambino family associate Louis Pernice would be elevated to a position on the Executive Board of the Atlantic Coast District. The accommodation was also the subject of a meeting between Genovese family captain Alan Longo and Gambino family soldier JEROME BRANCATO.

103.   CICCONE enlisted the assistance of ILA Vice-President Frank Scollo, who had taken Lonardo's place as President of Local 1814, to ensure that election scheme was carried out.

104.   Scollo had known CICCONE for over 40 years at that point. Scollo was aware that CICCONE was a member of the Gambino family and had always feared him. CICCONE informed Scollo of the accommodation and directed Scollo to make it happen and report back.

105.   Scollo was aware that, by dealing with CICCONE, Scollo was violating the terms of the December 17, 1991 Consent Decree that he had signed on behalf of himself and as an officer of ILA Local 1814 in the 1990 ILA Local Civil RICO case.

106. CICCONE, too, was violating the terms of the December 17, 1991

Consent Decree that he had signed on behalf of himself and as a member of Local 1814's

Executive Board.

107. On July 19, 2000, the Executive Council of the ILA held its election in

Lake Tahoe, Nevada to fill vacancies in its top leadership positions. That same day, the

Executive Board of the Atlantic Coast District filled vacancies.

108. Immediately after the election, Frank Scollo called CICCONE to report the

results. Cassarino answered the call, stating that "he," meaning CICCONE, was not there but

that Cassarino would deliver the message. Scollo then reported the results:

> It's four of them. . . Richie Hughes, ACD Secretary-Treasurer;
> Louis Pernice, DC General Vice-President; The International, Jerry
> Owens, General Organizer; Harold J. Daggett gets the Assistant
> General Organizer.

109. The official minutes of the ILA Executive Council and the Atlantic Coast

District Executive Board confirm the "election" results that Scollo reported.

110. On March 17, 2003, Defendants ANTHONY CICCONE and JEROME

BRANCATO were convicted of violating and conspiring to violate RICO in United States v.

Gotti, et al., No. 02 Cr. 606 (FB), found to have committed racketeering acts of conspiracy to

extort, extortion and wire fraud with respect to the scheme to rig the ILA elections, and convicted

of committing these acts as a separate counts in the indictment.

111. Defendants ANTHONY CICCONE and JEROME BRANCATO are

estopped from denying the essential allegations of these offenses. 18 U.S.C. § 1964(d).

### B.   **RIGGED MILA BENEFITS CONTRACTS**

112.   In 1996, the ILA entered into a Master Contract for the period October 1, 1996 through September 30, 2001, which adopted a health care plan for longshoremen on the Atlantic and Gulf Coasts.

113.   Pursuant to the Master Contract, the ILA and companies employing ILA labor (hereinafter "Management") and the ILA established MILA.

114.   MILA is governed by a Board of Trustees. The MILA Board comprises 36 trustees, 18 of whom are ILA representatives and 18 of whom are Management representatives.

115.   The MILA Board has two Co-Chairmen. At times relevant to this Complaint, David J. Tolan, former Senior Vice-President, Labor Relations of Sea-Land Service, Inc., was the Management Co-Chairman. Defendant JOHN BOWERS, President of the ILA, was the union Co-Chairman. Defendants ALBERT CERNADAS, Executive Vice-President of the ILA, ROBERT E. GLEASON, Secretary-Treasurer of the ILA, HAROLD J. DAGGETT, Assistant General Organizer of the ILA, and ARTHUR COFFEY, an ILA Vice-President, were MILA trustees.

116.   MILA has an Executive Director who oversees the day-to-day operations of MILA. From approximately 1998 through 2003, the MILA Executive Director was Louis Valentino.

117.   MILA provides health insurance to the majority of ILA members. This insurance includes prescription drug coverage pursuant to MILA's National Pharmacy Program and mental health care benefits.

### Scheme To Rig The MILA PBM Contract

118.    At the inception of the National Pharmacy Program, the MILA Board of Trustees initiated a process for the selection of a Pharmacy Benefit Manager ("PBM") to manage the National Pharmacy Program.  On or about May 7, 1997, MILA sent out a Request for Proposal ("RFP") to approximately 21 vendors, of which 16 responded.

119.    The strengths and weaknesses of the 16 applicants were evaluated by two consultants, Actuarial Sciences Associates ("ASA") and The Segal Company ("Segal") which had been engaged by the Management and ILA Trustees respectively.

120.    Eventually, the field of prospective PBMs narrowed down to two: GPP/VIP, Inc. and Express Scripts, Inc.

121.    GPP/VIP, Inc. is a corporation owned by Joel Grodman, the president of General Prescription Programs, Inc. ("GPP"), and Dr. Vincent Nasso, an account executive employee of GPP who also runs his own mail order facility called Value Integrated Pharmacy Services, Inc. ("VIP") on Long Island.  GPP/VIP, Inc. was specifically formed to provide PBM service to MILA using GPP's retail network as a subcontractor.

122.    At that time, Express Scripts was a large, full-service company serving millions of individuals and managing billions in annual drug expenditures.

123.    The Management Trustees expressed significant concerns about GPP/VIP's financial resources and whether it had the organization and size required to service the needs of approximately 60,000 current and former ILA workers and dependents.  The Management Trustees thus recommended that GPP/VIP be eliminated from consideration in favor of Express Scripts.

124.　The ILA Trustees favored GPP/VIP and expressed two concerns with respect to Express Scripts. One was that Express Scripts wanted to take over licenses maintained by pharmacies established in two medical centers that served the Port of New York/New Jersey. The second was that Express Scripts wanted to manage these pharmacies. Although Express Scripts agreed to compromise on both these issues, the ILA trustees remained opposed to Express Scripts.

125.　Eventually, a compromise was reached: GPP/VIP was chosen to serve North Atlantic ports from Boston to Hampton Roads, Virginia and Express Scripts was chosen to serve South Atlantic ports from North Carolina to the Mexican border.

126.　In approximately 1998, during the MILA PBM selection process, Genovese family member Larry Ricci met with George Barone in Florida to enlist his assistance in rigging the process. Specifically, Ricci wanted Barone to use his influence with HAROLD J. DAGGETT to persuade DAGGETT to support whichever company ALBERT CERNADAS proposed as PBM. Ricci would use his influence over CERNADAS to persuade CERNADAS to support the award of the contract to a company favorable to Genovese family interests.

127.　Barone agreed, with the understanding that he and other members of the Genovese family would make money from the deal. Accordingly, Barone informed DAGGETT through Genovese family associate JAMES CASHIN that DAGGETT was to support whichever company CERNADAS supported.

128.　Barone also instructed ARTHUR COFFEY to vote for whichever company CERNADAS supported. At the time, COFFEY was a MILA Trustee and President of ILA Locals 1922, 1922-1 and 2062.

129.    During deliberations over the selection of the PBM, CERNADAS was the most vocal proponent of GPP/VIP.

130.    Vincent Nasso, co-owner of GPP/VIP, was an associate of Defendant ANTHONY CICCONE and had agreed to pay CICCONE $400,000 for the selection of GPP/VIP as PBM.

131.    CICCONE had agreed to pay some of this money to the Genovese family in exchange for its assistance in influencing the selection of GPP/VIP as PBM.  Ultimately, CICCONE gave approximately $75,000 to the Genovese family.

132.    In a survey of MILA's constituents, Express Scripts received higher marks for service than GPP/VIP.  Moreover, GPP/VIP's administrative charges were higher than Express Scripts.'  Nevertheless, when Express Scripts resisted a full-scale audit, MILA terminated its contract, and, effective January 1, 2000, GPP/VIP, Inc. became the sole PBM for MILA's National Pharmacy Program for the entire range of ports.

133.    In a June 11, 2001 letter to MILA's Pharmacy Resource Committee, GPP/VIP stated that it needed to request an additional 50 cents per member per month for the maintenance of the prescription drug program and an additional 15 cents claim to maintain an open formulary.  The letter, signed by Vincent Nasso and Joel Grodman, said that GPP/VIP had "severely underestimated and did not anticipate the cost of handling all the unique aspects of the MILA program . . . ."

134.    In anticipation of GPP/VIP's contract expiring on December 31, 2001, MILA issued a new RFP for a PBM in or about August, 2001.

135.   By this time, Frank Scollo had succeeded Frank Lonardo as President of Local 1814, Vice-President of the ILA and MILA Union Trustee.

136.   Scollo knew that CICCONE was interested in GPP/VIP staying on as PBM, and he kept CICCONE abreast of developments in the PBM selection process through direct communication and through Primo Cassarino.

137.   CICCONE also communicated with MILA Executive Director Louis Valentino for the purpose of influencing the award of the PBM contract.

138.   Scollo advised CICCONE that Vincent Nasso needed to submit a proposal in response to the new RFP.

139.   Seven vendors responded to the new RFP, including GPP/VIP and Advance PCS, the largest private PBM in the United States.

140.   An analysis done by MILA's consultants established that Advance PCS offered cost savings over GPP/VIP of approximately $4 million over the next three years.

141.   At an October 25, 2001 meeting, the MILA Board unanimously agreed to offer the new PBM contract to Advance PCS.

142.   Although he knew that CICCONE wanted the Board to vote for GPP/VIP, Scollo voted for Advance PCS because the cost differential between Advance PCS and GPP/VIP was simply too great.

143.   During the negotiation of the contract with Advance PCS, the Union Trustees and, in particular, CERNADAS, raised concerns about the company. According to CERNADAS, one concern was that Advance PCS wanted brand-to-brand switches, i.e., the right to provide the same type of medicine prescribed by a doctor to a member but a different brand.

Second, the Union Trustees objected to Advance PCS wanting the exclusive right to select an auditor.

144. Although Advance PCS eventually agreed to the demands of the ILA trustees, the Union Trustees withdrew their support for Advance PCS and again supported GPP/VIP, recommending that GPP/VIP remain PBM through 2003. In the meantime, MILA asked GPP/VIP to continue to act as PBM through June, 2002.

145. Ultimately, the Management and ILA Trustees deadlocked, and the matter was submitted for arbitration, resulting in the award of the PBM contract to Advance PCS.

146. On March 17, 2003, Defendant ANTHONY CICCONE was convicted of violating and conspiring to violate RICO in United States v. Gotti, et al., No. 02 Cr. 606 (FB); found to have committed racketeering acts of conspiracy to extort, extortion, and wire fraud with respect to the scheme to rig the MILA PBM contract; and convicted of committing these acts as a separate counts in the indictment.

147. Defendant ANTHONY CICCONE is estopped from denying the essential allegations of these offenses. 18 U.S.C. § 1964(d).

**Scheme To Rig The MILA Mental Health Benefits Contract**

148. During 1998, MILA evaluated contractors for its mental health and substance abuse benefits plan.

149. At the October 20, 1998 meeting of the MILA Board of Trustees, MILA received bids for the MILA mental health care benefits contract from five companies. By December, seven companies had submitted bids for the contract, and the bids had been evaluated and ranked by the Board's consultants as follows: 1) Magellan; 2) MCC; 3) United Behavioral;

4) Value Options; 5) Health Management Center, Inc.; 6) ULLICO; and 7) Empire Blue Cross
Blue Shield.

150.     One of the seven bidders, Health Management Center, Inc., paid Genovese
family associate and former ILA Executive Council member, JAMES CASHIN, as a consultant.

151.     CASHIN had obtained permission from Genovese soldier George Barone
to obtain the MILA contract and to inform MILA Trustees that Barone had given CASHIN
permission to obtain the contract.

152.     In or about the time Health Management Center, Inc. submitted its bid,
CASHIN and the company had a dispute concerning CASHIN's compensation, and CASHIN
sought out another company that could bid on the contract but would pay him more for his
services in securing the contract.

153.     By early 1999, CASHIN had negotiated an arrangement with a company
named Compsych whereby Compsych agreed to pay CASHIN approximately $5,000 a month as
a consultant.

154.     Shortly thereafter, at a January 29, 1999 meeting of the MILA Board,
ROBERT GLEASON asked the Board's consultants to discuss a proposal that had been
submitted by Compsych. One of the consultants, ASA, rated Compsych as non-competitive.
The other consultant, Segal, noted that it had not known that Compsych's bid would be discussed
at the meeting. Segal nevertheless ranked Compsych as competitive.

155.     In April 1999, Compsych re-submitted its bid and the MILA Board
deemed the bid competitive. The MILA Board subsequently awarded the contract to Compsych
in August 1999.

156.     Minutes of the MILA Board establish that CASHIN addressed the Board
personally with respect to Compsych's merits.

157.     When the mental health care benefits program was set to expire in late
2001, ILA Trustees strongly supported awarding the contract to Compsych again,
notwithstanding the fact that Compsych had asked for a 5 percent increase in its fees.

158.     BOWERS, CERNADAS and DAGGETT were particularly vocal in their
support at a November 2001 meeting of the MILA Board and opposed the recommendation of
Management Trustees that the new contract be put out for bid.  DAGGETT noted that the Metro-
ILA Funds had selected Compsych.  Ultimately, MILA renewed Compsych's contract.

## C.     FRAUD ON THE METRO-ILA BENEFIT FUNDS

159.     The Metropolitan Marine Maintenance Contractor's Association
("METRO") and the ILA jointly administer certain ILA pension, welfare and other benefit funds
(the "METRO-ILA Funds"), including funds held for the benefit of members of ILA Local 1804-
1.

160.     At all times relevant to this Complaint, Defendant HAROLD J.
DAGGETT was a Trustee of the METRO-ILA Funds.

### Fund Investment Advisor Kickback Scheme

161.     In or about October and November, 1995, Thomas Cafaro, an associate of
the Genovese family, and Liborio Bellomo, acting boss of the Genovese family, advised Peter
Tarangelo, another associate of the Genovese family, that if Tarangelo could identify someone
who could act as an investment advisor to the METRO-ILA Funds, they would ensure that
Tarangelo's hand-picked advisor would get the fund investment contract.

162.    As part of the scheme, Cafaro, Bellomo and Tarangelo would each receive a kickback from the fee charged by the advisor.

163.    Cafaro and Bellomo gave Tarangelo a list of unions, including Local 1804-I, with whom the Genovese family had influence, and told Tarangelo to send solicitations to the unions.

164.    Tarangelo enlisted the assistance of the owner of Wall Street Capital Management to solicit the unions and manage the benefit funds.

165.    Commencing in or about November 1995 through approximately February 1996, proposals on Wall Street Capital Management letterhead were sent to the contacts on the Bellomo list.

166.    Cafaro and Bellomo arranged for Tarangelo to meet METRO President Joseph Barbera, and HAROLD J. DAGGETT, then the Secretary-Treasurer of Local 1804-1.

167.    On May 23, 1996, Tarangelo met DAGGETT in a room at a hotel in Newark where Local 1804-1 was having a meeting. Andrew Gigante was present at the 1804-1 meeting.

168.    Tarangelo provided DAGGETT with a copy of the Wall Street Capital Management proposal, and DAGGETT thanked Tarangelo. During the discussion, DAGGETT told Tarangelo to say "hello" to his "friend" - a reference to Bellomo.

169.    That same day, Tarangelo met with Joseph Barbera at the METRO offices in New Jersey. This meeting was followed by another meeting in or about May or June of 1996, at which Tarangelo and a representative of Centurion Capital Management, a firm affiliated with

Wall Street Capital Management, again presented Tarangelo's proposal. Genovese soldier Pasquale Falcetti also attended this meeting.

170. Until Bellomo was arrested in or about June 1996, Tarangelo understood that the METRO-ILA Funds would award the contract to Wall Street Management. A number of months after Bellomo's arrest, Tarangelo was advised that Wall Street Capital Management would not get the contract.

**Rigged PBM Contract**

171. On or about June 30, 1998, the Board of Trustees of the METRO-ILA Welfare Fund awarded its pharmacy benefits manager ("PBM") contract to GPP/VIP.

172. The award came at approximately the same time that MILA awarded its PBM contract to GPP/VIP.

173. The records of the METRO-ILA Welfare Fund indicate that there was little, if any, evaluation of the merits of awarding the contract to GPP/VIP.

174. Prior to the award of the PBM contract to GPP/VIP, the METRO-ILA Welfare Fund had used Diversified Pharmaceutical Services as its PBM. DAGGETT, as a Trustee of the METRO-ILA Welfare Fund, supported switching the contract for these services to GPP/VIP, knowing that the company was controlled by organized crime.

175. The records of the METRO-ILA Welfare Fund show that DAGGETT did not disclose the fact that GPP/VIP was controlled by organized crime, nor that he had supported the award of the contract to GPP/VIP for this reason.

**Rigged Mental Health Care Benefits Contract**

176.    On or about August 18, 1999, the Board of Trustees of the METRO-ILA
Welfare Fund awarded the fund's mental heath care benefits contract to Compsych.

177.    The award of the contract to Compsych came at approximately the same
time that MILA awarded its mental health care services contract to Compsych.

178.    DAGGETT supported the award of METRO-ILA Welfare Fund contract
to Compsych because JAMES CASHIN, a Genovese family associate and former officer of the
ILA and Local 1804-1, was a "consultant" with the company.

179.    The records of the METRO-ILA Welfare fund show that DAGGETT did
not disclose the fact that he supported the award of the contract to Compsych because it was
paying an associate of organized crime.

### D.    FRAUD ON THE LOCAL 1922 AND SOUTHEAST FLORIDA PORTS WELFARE FUNDS

180.    In 1999, at approximately the same time that the METRO-ILA Welfare
Fund awarded its mental health care benefits contract to Compsych, the Local 1922 Health and
Welfare Fund and the ILA-Employers Southeast Florida Ports Welfare Fund also awarded mental
health care contracts to Compsych.

181.    Defendant ARTHUR COFFEY, a Trustee of both funds, supported the
selection of Compsych at the direction of George Barone, the Genovese soldier to whom
COFFEY answered.

182.    Barone directed Coffey to support Compsych because the company was
paying CASHIN, who, like COFFEY, was an associate of the Genovese family in the same crew
as Barone.

183.   COFFEY did not disclose that he was a Genovese associate who had been instructed by a Genovese soldier that the contracts be awarded to Compsych.

E.   **CONTROL OVER LOCAL 1**

184.   From approximately June 2000 through August 2001, Defendant ANTHONY CICCONE, together with others, engaged in an ongoing scheme to use fear and intimidation to control the union-related activities of Louis Saccenti, a delegate for Local 1 Checkers' Union. In so doing, CICCONE conspired to deprive the union membership of its democratic rights and its right to loyal representation by Saccenti.

185.   ILA Local 1 represents "checkers" - individuals who check containers, including containers that come in or go out of the Howland Hook Terminal in Staten Island, New York and the Red Hook Terminal in Brooklyn, New York.

186.   In or about 2000 and 2001, Saccenti attempted to make changes in work rules at the Howland Hook and Red Hook Terminals.

187.   Saccenti did so without CICCONE's approval, and Scollo considered the changes "detrimental" to the membership of Local 1814. Scollo responded by calling Gambino family soldier Primo Cassarino on several occasions to complain and to enlist CICCONE's assistance.

188.   At CICCONE's direction, Scollo attempted to prevent Saccenti from making work rule changes. Specifically, Scollo informed August Decrezenso, a Local 1 Shop Steward, that CICCONE's orders were that Saccenti was to make no rule changes without first notifying Scollo.

189.    Saccenti continued to effect rule changes, announcing at one point that "all bets are off." CICCONE then directed Primo Cassarino and Gambino family soldier Richard Bondi to go to Saccenti's home for the express purpose of intimidating Saccenti.

190.    In or about the Summer of 2000, Saccenti decided to fill a temporarily vacant shop steward's position at the Red Hook Terminal without consulting CICCONE.

191.    The position was held by Joseph Pimpinella, brother of former ILA General Organizer and Gambino family associate Anthony Pimpinella. Joseph Pimpinella had decided to go on vacation, and Saccenti filled the position with an individual named Ronnie Doyle.

192.    Scollo reported this development to Cassarino so that CICCONE would "take care" of Saccenti.

193.    Cassarino advised CICCONE of the development, and CICCONE stated that he wanted to "grab hold" of Saccenti.

194.    CICCONE and Scollo were concerned that they would lose power if Saccenti were allowed to replace Pimpinella.

195.    CICCONE believed that Saccenti was in "cahoots" with Local 1 President Stephen Knott, and he directed Cassarino to tell Knott not to do anything with respect to the shop steward position until he heard from CICCONE.

196.    Cassarino then instructed Scollo to speak to Knott and to stop Saccenti from putting Doyle in the shop steward position.

197.    On March 17, 2003, Defendant ANTHONY CICCONE was convicted of violating and conspiring to violate RICO in United States v. Gotti, et al., No. 02 Cr. 606 (FB);

found to have committed racketeering acts of conspiracy to extort, attempted extortion and wire fraud with respect to Local 1; and convicted of committing these acts as a separate counts in the indictment.

198.     Defendant ANTHONY CICCONE is estopped from denying the essential allegations of these offenses. 18 U.S.C. § 1964(d).

### F.     FRAUD ON THE LOCAL 1814 MEMBERSHIP

199.     In 2000 and 2001, Frank Scollo enlisted the assistance of ANTHONY CICCONE to resolve a problem that Scollo had with another official of ILA Local 1814, Philip Scala.

200.     Scala was an ILA representative and a Local 1814 delegate. Since the ILA special elections in July 2000, Scala had repeatedly failed to report to work.

201.     Scollo believed that Scala was angry that he had not received a position on the Executive Board of the Atlantic Coast District Council during the special elections.

202.     Scollo wanted to fire Scala, but knew he could not do so without CICCONE's approval.

203.     Scollo spoke with Primo Cassarino who advised Scollo to speak with CICCONE.

204.     Scollo spoke with CICCONE who suggested that CICCONE, Scala and Scollo meet.

205.     Although CICCONE, Scala and Scollo met, Scala remained unhappy.

206.     Eventually, Scala resigned from his position with the ILA, leaving the Local 1814 delegate position vacant.

207.    Primo Cassarino recommended that Scollo fill the position with Patsy Pozzolano, brother-in-law of a Gambino family associate Anthony Pansini.

208.    Scollo understood that Pozzolano needed to be approved by CICCONE before Pozzolano could receive the position. In fact, CICCONE demanded to meet with Pozzolano first.

209.    CICCONE approved Pozzolano, and Pozzolano became the Local 1814 delegate.

210.    On March 17, 2003, Defendant ANTHONY CICCONE was convicted of violating and conspiring to violate RICO in United States v. Gotti, et al., No. 02 Cr. 606 (FB); found to have committed racketeering acts of wire fraud with respect to the Local 1814 membership; and convicted of committing these acts as a separate counts in the indictment.

211.    Defendant ANTHONY CICCONE is estopped from denying the essential allegations of these offenses. 18 U.S.C. § 1964(d).

## G.    EXTORTION OF HOWLAND HOOK MARINE TERMINAL

212.    The Howland Hook Marine Terminal in Staten Island is a major facility for loading and unloading cargo. In or about 1996, the terminal was operated by Howland Hook Container Terminal, Inc. Carmine Ragucci, who had been influential in the opening of the Howland Hook Marine Terminal, was a partner in Howland Hook Container Terminal, Inc. and its CEO.

213.    In or about 1997, Ragucci began to make payments to ANTHONY CICCONE to buy labor peace at the terminal.

214.  CICCONE instructed Scollo to accept the payments from Ragucci and deliver them to him. In exchange, Scollo was to "go along with Carmine's wishes" at the terminal.

215.  Scollo met periodically with Ragucci to collect envelopes containing the payments. After collecting the payments, he delivered them either to CICCONE directly or to Anthony Pimpinella - a former General Organizer of the ILA and Gambino family associate.

216.  Ragucci continued to make payments, roughly on a quarterly basis, through approximately June or July of 2001, when he left his position at Howland Hook Marine Terminal. Scollo collected the payments for CICCONE and delivered them directly to CICCONE or, beginning in or about 1998, to Primo Cassarino.

217.  On March 17, 2003, Defendant ANTHONY CICCONE was convicted of violating and conspiring to violate RICO in United States v. Gotti, et al., No. 02 Cr. 606 (FB); found to have committed racketeering acts of conspiracy to extort and extortion with respect to the Howland Hook Marine Terminal; and convicted of committing these acts as a separate counts in the indictment.

218.  Defendant ANTHONY CICCONE is estopped from denying the essential allegations of these offenses. 18 U.S.C. § 1964(d).

**H.     EXTORTION OF BRIDGESIDE DRAYADGE**

219.  In 1994 and 1995, Carmine Ragucci entered into a contract with Frank Molfetta whereby Molfetta would perform truck broker-dispatcher services at the Howland Hook Marine Terminal in Staten Island, New York once the terminal was operational.

220.     As truck broker-dispatcher, Molfetta would act as an intermediary between shipping companies and truckers who would transport cargo containers between ships and rail lines.

221.     Under the terms of the contract, Molfetta was to pay Ragucci $150,000 up-front. Afterward, Molfetta would pay an additional $100,000. The contract provided that Ragucci would repay the $150,000 to Molfetta. In exchange for the payments, Molfetta would have, inter alia, exclusive rights to perform truck-broker dispatcher services at the terminal.

222.     Molfetta paid the $150,000 to Ragucci in 1994.

223.     In 1996, Molfetta started operating Bridgeside Drayage at the terminal under the terms of the contract with Ragucci.

224.     Contrary to the terms of the contract, Ragucci did not give Molfetta's company exclusive rights at the terminal, and Molfetta refused to pay the additional $100,000 owed under the contract.

225.     In or about late 1999, Ragucci informed Molfetta that ANTHONY CICCONE wanted to meet with Molfetta.

226.     Molfetta and CICCONE met at a diner in Staten Island. During their meeting, Molfetta disclosed the terms of the contract with Ragucci. CICCONE then instructed Molfetta not to pay Ragucci. CICONNE told Molfetta that he should not have made a deal with Ragucci. Molfetta understood that he would now be making payments to CICCONE.

227.     At a subsequent meeting, CICCONE told Molfetta that Molfetta would need to pay CICCONE $2,500 to $2,000 per month, starting in February 2000. Molfetta said that he could pay only $1,500. CICCONE agreed, but told Molfetta that he would have to make

payments effective January 2000. There was no discussion as to when, if ever, the payments would end.

228.    Molfetta agreed to make the payments because he feared CICCONE. Thereafter, he met CICCONE on a regular basis to make the payments. The payments were made in cash only so that there would be no record of the transactions.

229.    On March 17, 2003, Defendant ANTHONY CICCONE was convicted of violating and conspiring to violate RICO in United States v. Gotti, et al., No 02 Cr. 606 (FB); found to have committed racketeering acts of conspiracy to extort and extortion with respect to the Bridgeside Drayadge; and convicted of committing these acts as a separate counts in the indictment.

230.    Defendant ANTHONY CICCONE is estopped from denying the essential allegations of these offenses. 18 U.S.C. § 1964(d).

## I.    MONEY LAUNDERING AND MONEY LAUNDERING CONSPIRACY

231.    In or about and between September 2000 and November 2001 Defendants PETER GOTTI, ANTHONY CICCONE and JEROME BRANCATO, together with others, laundered and conspired to launder the proceeds of, inter alia, the Defendants' kickback scheme involving MILA and GPP/VIP and Defendants' extortion schemes involving the Howland Hook Terminal and Bridgeside Drayadge.

232.    On March 17, 2003, Defendants PETER GOTTI, ANTHONY CICCONE and JEROME BRANCATO were convicted of violating and conspiring to violate RICO in United States v. Gotti, et al., No. 02 Cr. 606 (FB); found to have committed racketeering acts of

money laundering conspiracy and money laundering; and convicted of committing these acts as separate counts in the indictment.

233.    Defendants PETER GOTTI, ANTHONY CICCONE and JEROME BRANCATO are estopped from denying the essential allegations of these offenses. 18 U.S.C. § 1964(d).

### J.    EXTORTION OF RIGHT TO EMPLOYMENT OF HIRING AGENT

234.    In or about 1996, Thomas Ragucci became the hiring agent for Howland Hook Container Terminal Inc., the company responsible for operating the Howland Hook Marine Terminal. Ragucci's brother, Carmine Ragucci, was CEO of the company.

235.    As hiring agent, Thomas Ragucci was responsible for hiring longshoremen who would load and unload ships at the terminal.

236.    In approximately July 2001, O.O.C.L., a shipping conglomerate with a majority ownership interest in Howland Hook Container Terminal, Inc., bought Carmine Ragucci's stake in the company.

237.    Carmine Ragucci stopped working at the terminal on or about July 1, 2001. Beginning in and around this time, through approximately October 2001, Frank Scollo had conversations and meetings with ANTHONY CICCONE and Primo Cassarino about removing Thomas Ragucci from his position as hiring agent.

238.    CICCONE wanted to replace Thomas Ragucci with Robert Anastasio, nephew of Gambino family member and convicted Waterfront racketeer Anthony "Todo" Anastasio, and he directed Scollo to speak with Ragucci.

239.    Scollo told Ragucci in approximately August 2001 that CICCONE, Scollo's "boss," wanted Ragucci to leave his position as a hiring agent.

240.    Ragucci understood that CICCONE was a member of the Gambino family and was intimidated by Scollo's message. Ragucci was concerned that CICCONE would retaliate if he did not step down as hiring agent.

241.    On March 17, 2003, Defendant ANTHONY CICCONE was convicted of violating and conspiring to violate RICO in United States v. Gotti, et al., No. 02 Cr. 606 (FB); found to have committed racketeering acts of conspiracy to extort and attempted extortion with respect to the scheme to remove Thomas Ragucci from his position at the Howland Hook Marine Terminal; and convicted of committing these acts as a separate counts in the indictment.

242.    Defendant ANTHONY CICCONE is estopped from denying the essential allegations of these offenses. 18 U.S.C. § 1964(d).

### K.    EXTORTION OF LONGSHOREMAN

243.    In or about July 2001, the Defendant ANTHONY CICCONE, together with others, conspired to extort money from Leonardo Zinna, a longshoreman.

244.    On March 17, 2003, Defendant ANTHONY CICCONE was convicted of violating RICO in United States v. Gotti, et al., No. 02 Cr. 606 (FB); found to have committed the racketeering act of conspiracy to extort Leonardo Zinna; and convicted of committing this act as a separate count.

245.    Defendant ANTHONY CICCONE is estopped from denying the essential allegations of this offense. 18 U.S.C. § 1964(d).

## L.   EXTORTION OF INJURED LONGSHOREMAN

246.   In or about and between January 2001 and January 2002, both dates being approximate and inclusive, Defendant ANTHONY CICCONE and others, conspired to extort money from the settlement of a claim for compensation for an injury of Nicola Marinelli, a longshoreman.

247.   On March 17, 2003, Defendant ANTHONY CICCONE was convicted of violating and conspiring to violate RICO in United States v. Gotti, et al., No. 02 Cr. 606 (FB); found to have committed racketeering acts of conspiracy to extort and extortion with respect to Nicola Marinelli's workman's compensation claim; and convicted of committing these acts as a separate counts in the indictment.

248.   Defendant ANTHONY CICCONE is estopped from denying the essential allegations of these offenses. 18 U.S.C. § 1964(d).

## II.   SECOND CLAIM FOR RELIEF: CONSPIRACY TO VIOLATE 18 U.S.C. 1962(b) IN VIOLATION OF 18 U.S.C. § 1962(d)

249.   The United States repeats and realleges the allegations set forth in paragraphs 1-66; 70-80; and 83-248.

250.   Since in or about year 1995 and continuing to the present, in the Eastern District of New York and elsewhere, Defendants JOHN BOWERS, ROBERT GLEASON, ALBERT CERNADAS, HAROLD J. DAGGETT, ARTHUR COFFEY, PETER GOTTI, ANTHONY CICCONE, JEROME BRANCATO and JAMES CASHIN, together with others, known and unknown, being persons employed by and associated with the Waterfront Enterprise which was engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally combined, conspired, confederated, and agreed to commit an offense

against the United States to wit: to violate 18 U.S.C. § 1962(b), that is, to acquire or maintain, directly and indirectly, an interest in, or control of, the Waterfront Enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(1) and (5), consisting of multiple acts indictable under the following provisions of federal law:

      (A) 18 U.S.C. § 1951 (extortion)

      (B) 18 U.S.C. §§ 1341 and 1346 (mail fraud)

      (C) 18 U.S.C. § 1343 (wire fraud)

      (D) 18 U.S.C. § 1956 (money laundering).

251.    It was part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the Waterfront Enterprise.

252.    It was further part of the conspiracy that the Defendants sought to control and dominate the Waterfront and the Port of Miami, certain businesses and unions operating on the Waterfront and at the Port of Miami, and to acquire or maintain, directly and indirectly, an interest in, or control of, the affairs of the Waterfront Enterprise.

253.    By reason of the aforementioned circumstances and events, the Defendants, through the Waterfront Enterprise, have presented, continue to present, and will continue to present an imminent threat to violate 18 U.S.C. § 1962(d).

**Collateral Estoppel**

254.    On March 17, 2003, Defendants PETER GOTTI, ANTHONY CICCONE, and JEROME BRANCATO were convicted of violating and conspiring to violate RICO, 18

U.S.C. §§ 1962(c) and 1962(d) in <u>United States v. Gotti, et al.</u>, No. 02 Cr. 606 (FB) in violation
of 18 U.S.C. § 1962(d).

      255.   Defendants PETER GOTTI, ANTHONY CICCONE and JEROME
BRANCATO are estopped from denying the essential allegations of these offenses. 18 U.S.C.
§ 1964(d).

**DEMAND FOR RELIEF**

      WHEREFORE, the United States of America demands, pursuant to Section 1964
of Title 18 of the United States Code, the following relief:

A.    <u>A Preliminary Injunction</u>:

    1.    Enjoining and restraining the Defendants JOHN BOWERS, ROBERT E.
        GLEASON, ALBERT CERNADAS, HAROLD J. DAGGETT, ARTHUR
        COFFEY, PETER GOTTI, ANTHONY CICCONE, JEROME BRANCATO and
        JAMES CASHIN, and all other persons in active concert or participation with
        them in LCN affairs, from:

    (a)    participating in any way in the affairs of the ILA or any of its subordinate labor
        organizations; from having any dealings, directly or indirectly, with the ILA or
        any of its subordinate labor organizations; and from having any dealings, directly
        or indirectly, with any officer, agent, employee or representative of the ILA or any
        of its subordinate labor organizations relating to the affairs of the ILA or any of its
        subordinate labor organizations;

    (b)    participating in any way in the affairs of any ILA-affiliated pension or welfare
        plan; from having any dealings, directly or indirectly, with any ILA-affiliated

pension or welfare plan; and from having any dealings, directly or indirectly, with any trustee, officer, agent, fiduciary, representative, administrator or employee of any ILA-affiliated pension or welfare plan relating to the affairs of the plan;

(c)    occupying a position of trust within the meaning of 29 U.S.C. § 501 in any labor organization, as that term is defined in 29 U.S.C. §§ 402 (i) and (j); and

(d)    having any involvement in the administration or management of any pension or welfare plan subject to Title I of ERISA, 29 U.S.C. §§ 1001, et seq.

2.    Enjoining and restraining all the Defendants, including nominal Defendants, the ILA, ILA Officers named as nominal defendants, MILA, the MILA Board, the METRO-ILA Funds, the Boards of Trustees of the METRO-ILA Funds, METRO and any of their successors, and all persons in active concert or participation with them, from committing any acts of racketeering activity, as defined in 18 U.S.C. § 1961(1), and from associating, directly or indirectly, with any LCN member or associate or any persons in active concert or participation with any LCN member or associate.

3.    Appointing one or more Court-Appointed Officer(s) pendente lite for the ILA, MILA and the METRO-ILA Funds whose responsibilities would include the following:

(a)    To discharge those duties under the ILA Constitution which relate to disciplining corrupt or dishonest officers, agents, employees, or members of the ILA and its subordinate labor organizations, provided that, in the exercise of those duties, the Court-Appointed Officer(s) may petition the Court to be relieved from any

provision of the ILA Constitution that impede or prevent the Court-Appointed Officer(s) from disciplining corrupt or dishonest officers, agents, employees, or members of the ILA or its subordinate labor organizations;

(b) To review the proposed actions of the Executive Council of the ILA insofar as they relate to expenditures of union funds, appointments to union office, contracts or proposed contracts other than collective bargaining agreements, hiring of key employees, or changes in the ILA Constitution, and to petition the Court for an order restraining any such proposed action or to obtain any other appropriate relief which is reasonably necessary to protect the rights of ILA members;

(c) To review the proposed actions of the MILA Board insofar as they relate to expenditures of MILA funds, hiring of key employees, contracts and proposed contracts, or changes in the MILA Agreement and Declaration of Trust or other organizing or governing documents, and to petition the Court for an order restraining any such proposed action or obtain any other appropriate relief which is reasonably necessary to protect the rights of MILA beneficiaries; and

(d) To review the proposed actions of the Boards of Trustees of the METRO-ILA Funds insofar as they relate to expenditures of funds, hiring of key employees, contracts and proposed contracts, or changes in the Funds' Agreements and Declarations of Trust or other organizing or governing documents, and to petition the Court for an order restraining any such proposed action or obtain any other appropriate relief which is reasonably necessary to protect the rights of the beneficiaries of the METRO-ILA Funds.

4.   Enjoining and restraining the Defendants, including the nominal Defendants, from

obstructing, or otherwise interfering with, the duties of the Court-Appointed

Officer(s).

5.   Granting plaintiff United States of America such further preliminary relief as the

Court determines may be necessary and proper in order to prevent, pendente lite,

continued violations of 18 U.S.C. § 1962 involving corrupt or otherwise unlawful

control over, and exploitation of, the ILA, MILA, the MILA Board, the METRO-

ILA Funds, the Boards of Trustees of the METRO-ILA Funds, and METRO.

B.   A Permanent Injunction:

1.   Enjoining and restraining any Defendant found to have violated 18 U.S.C. § 1962

from:

(a)   committing any act of racketeering activity, as defined in 18 U.S.C. § 1961(1);

(b)   participating in any way in the affairs of the ILA or any of its subordinate labor

organizations; from having any dealings, directly or indirectly, with the ILA or

any of its subordinate labor organizations; and from having any dealings, directly

or indirectly, any officer, agent, employee or representative of the ILA or any of

its subordinate labor organizations relating to the affairs of the ILA or any of its

subordinate labor organizations;

(c)   participating in any way in the affairs of any ILA-affiliated pension or welfare

plan; from having any dealings, directly or indirectly, with any ILA-affiliated

pension or welfare plan; and from having any dealings, directly or indirectly,  with

any trustee, officer, agent, fiduciary, representative, administrator or employee of any ILA-affiliated pension or welfare plan relating to the affairs of the plan;

(d)    occupying a position of trust within the meaning of 29 U.S.C. § 501 in any labor organization, as that term is defined in 29 U.S.C. §§ 402 (i) and (j);

(e)    having any involvement in the administration or management of any pension or welfare plan subject to Title I of ERISA, 29 U.S.C. §§ 1001, et seq.;

(f)    knowingly associating, directly or indirectly, with any member of any criminal group, including any LCN family, or any persons associated with or otherwise in active concert or participation with any criminal group, including any LCN family; and from knowingly permitting any member or associate of the LCN, or other criminal group or person barred from participating in any labor organization or pension or welfare plan as defined herein, to exercise any control or influence, directly or indirectly, in any way of degree, in the conduct of the affairs of the ILA and its subordinate labor organizations;

(g)    participating in any way in the affairs of, investing in or acquiring an interest in, or otherwise having any dealings with, directly or indirectly, the Waterfront Enterprise or any entity that is part of the Waterfront Enterprise; and

(h)    obstructing, or otherwise interfering with, the duties of any officer appointed by the Court in this action, including any Court Appointed Officer(s) or person appointed by a Court-Appointed Officer.

2.    Removing and enjoining Defendants JOHN BOWERS, ROBERT E. GLEASON,
ALBERT CERNADAS, HAROLD J. DAGGETT and ARTHUR COFFEY from
holding:

(a)    membership, or any office or position, in the ILA or any of its subordinate labor
organizations; and

(b)    any office or position with any ILA-affiliated pension or welfare plan.

3.    Enjoining the nominal Defendants, including, but not limited to the ILA, MILA,
the MILA Board, the METRO-ILA Funds, the Boards of Trustees of the METRO-
ILA Funds, and METRO, and their officers, agents, servants, employees, and
attorneys, and those persons in active concert or participation with them from:

(a)    committing any act of racketeering activity, as defined in 18 U.S.C. § 1961(1);

(b)    knowingly associating, directly or indirectly, with any member of any criminal
group, including any LCN family, or any persons associated with or otherwise in
active concert or participation with any criminal group, including any LCN
family; and from knowingly permitting any member or associate of the LCN, or
other criminal group or person barred from participating in any labor organization
or pension or welfare plan as defined herein, to exercise any control or influence,
directly or indirectly, in any way or degree, in the conduct of the affairs of the ILA
and its subordinate labor organizations; and

(c)    obstructing, or otherwise interfering with, the duties of any officer appointed by
the Court in this action, including any Court-Appointed Officer(s) or person
appointed by a Court-Appointed Officer(s).

4.   That this Court order that new elections for the ILA Executive Council be
conducted and that such elections be run by a Court-Appointed Officer(s)
accordance with rules to be established by the Court-Appointed Officer(s) and that
the election costs be borne by the ILA and conducted at such time and in such a
manner as to ensure that the election processes are not vulnerable to intimidation
or other improper influences, but rather reflect the decision of the union members
who are found to be eligible to vote.

5.   That until such time as free and fair elections can be held pursuant to the
preceding paragraph, the Court-Appointed Officer(s) for the ILA be empowered to
prevent racketeering activity and to discharge any of the duties and responsibilities
of the ILA Executive Council (other than negotiating and entering into collective
bargaining agreements) when the Court-Appointed Officer(s) deems it necessary
to protect the rights of the members of the ILA and its subordinate labor
organizations.

6.   A Court-Appointed Officer(s) shall be appointed to oversee the operations of the
ILA, MILA, the MILA Board, the METRO-ILA Funds, and the Boards of
Trustees of the METRO-ILA Funds until such time as these entities are free from
corruption, domination, control, and LCN infiltration, and such Court-Appointed
Officer(s) shall institute and implement such procedures and to have such powers
as are necessary to prevent acts of racketeering activity, including authority to:

(a)   review and reject the proposed actions of the Executive Council of the ILA insofar
as they relate to expenditures of union funds, appointments to union office,

contracts or proposed contracts other than collective bargaining agreements, or changes in the ILA Constitution, and to petition the Court for an order restraining any such proposed action or to obtain any other appropriate relief which is reasonably necessary to protect the rights of ILA members;

(b)     review and reject the proposed actions of the MILA Board insofar as they relate to expenditures of MILA funds, hiring of employees, contracts and proposed contracts, or changes in the MILA Agreement and Declaration of Trust or other organizing or governing documents, and to petition the Court for an order restraining any such proposed action or obtain any other appropriate relief which is reasonably necessary to protect the rights of MILA beneficiaries;

(c)     review and reject the proposed actions of the Boards of Trustees of the METRO-ILA Funds insofar as they relate to expenditures of funds, hiring of employees, contracts and proposed contracts, or changes in the Funds' Agreements and Declarations of Trust or other organizing or governing documents, and to petition the Court for an order restraining any such proposed action or obtain any other appropriate relief which is reasonably necessary to protect the rights of the beneficiaries of the METRO-ILA Funds; and

(d)     apply to the Court for such orders and other relief as may be necessary and appropriate in order to carry out the mandate of the Court.

7.     That this Court enjoin and restrain the Defendants from interfering or obstructing in any way with the execution of the duties of the aforesaid Court-Appointed Officer(s).

8.      That this Court order all of the individual Defendants who are found to have violated 18 U.S.C. § 1962 to disgorge the proceeds of those violations and that such proceeds to be distributed to the victims of those violations and used to fund costs incurred by the Court-Appointed Officer(s).

9.      That this Court issue a judgment declaring that the Waterfront Enterprise, the ILA, MILA, MILA Board, the METRO-ILA Funds, the Boards of Trustees of the METRO-ILA Funds and METRO have been controlled and exploited by LCN members and associates through violation of 18 U.S.C. § 1962.

C.      Other Relief:

1.      That the costs of all officers appointed by the Court pursuant to preliminary or permanent injunctive relief be borne by the respective Defendant(s), including the nominal defendants, who are hereby jointly and severally liable for such costs.

2.      That this Court award the United States of America the costs of this suit, together with such other and further relief as may be necessary and appropriate to prevent

and restrain future violations of 18 U.S.C. § 1962 and to end LCN control over,

and exploitation of, the Waterfront Enterprise.

Dated: Brooklyn, New York
July 6, 2005

> ROSLYNN R. MAUSKOPF
> United States Attorney
> Eastern District of New York
> Attorney for Plaintiff
> One Pierrepont Plaza, 14th Fl.
> Brooklyn, New York 11201

By:

> RICHARD K. HAYES
> KATHLEEN A. NANDAN
> Assistant U.S. Attorneys
> (718) 254-7000