# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

UNITED STATES OF AMERICA

                Plaintiff,


      -against-                        <u>MEMORANDUM AND ORDER</u>
                                             05 - CV - 3212

INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, et al.,

                Defendants.

-------------------------------------------------x

GLASSER, United States Senior District Judge:

      In this civil Racketeer Influenced and Corrupt Organizations Act of 1970

("RICO") action, the defendants identified in the margin[1] have moved to dismiss the

Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule

12(b)(6)") for failure to state a claim on which relief can be granted.[2]  The ILA also

moves, pursuant to Federal Rule of Civil Procedure 12(f) ("Rule 12(f)"), to strike certain

---

[1]      The moving defendants are the International Longshoremen's Association, AFL-CIO ("ILA"); Management-ILA Managed Health Care Trust Fund and its Board of Trustees; Metropolitan Marine Maintenance Contractors Association; the METRO-ILA Fringe Benefit Fund and its Board of Trustees, the METRO-ILA Pension Fund and its Board of Trustees, and the METRO-ILA Individual Account Retirement Fund and its Board of Trustees (collectively, "METRO-ILA Funds"); John Bowers, Sr.; Robert Gleason; Gerald Owens; Harold Daggett; Anthony Ciccone; James Cashin; Richard Hughes; Horace T. Alston, Chauncey J. Baker, John D. Baker, John Bowers, Jr., Timothy Brown, James A. Campbell, Ronald Capri, Charles Chillemi, Raymond Desgagnes, Michael Dickens, Stephen Knott, John H. Mackey, Louis Pernice, Raymond Sierra, Harrison Tyler, and Reuben Wheatley (collectively, "Sixteen Nominal ILA Vice President Defendants"); Arthur Coffey; and James T. McCleland, Jr., James H. Paylor, Jr., Edward L. Brown, Sr., William R. McNamara, Perry C. Harvey, Kenneth Riley, and Clyde Fitzgerald (collectively, "MILA Trustees").

[2]      In addition to moving to dismiss the Amended Complaint pursuant to Rule 12(b)(6), defendant Gleason also moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(b) ("Rule 56").  However, Mr. Gleason withdrew his motion for summary judgment at oral argument, and the Court therefore need not address it.  <u>See</u> Transcript of Oral Argument in <u>United States v. Int'l Longshoremen's Assoc., AFL-CIO</u>, 05-CV-3212 ("Tr."), at 120-21.

1

allegedly immaterial historical allegations from the Amended Complaint, a motion in which some other defendants join. The defendants raise a number of challenges to the sufficiency of the Amended Complaint, arguing primarily that the Government has failed to adequately plead the necessary elements of a civil RICO conspiracy in several ways, including failure to allege a cognizable association-in-fact RICO enterprise and failure to adequately allege the predicate acts of extortion, mail fraud, and wire fraud. For the reasons stated below, the ILA's motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6) is granted. All other pending motions are denied as moot.

## BACKGROUND

I.    Allegations in the Amended Complaint

This action is the latest episode in a decades-long effort by the United States to curtail the influence of the La Cosa Nostra organized crime families over the vehicles of interstate commerce operating along the waterfront areas in the Port of New York and New Jersey and the Port of Miami.[3] The Government's prolix, 85-page Amended Complaint, with its hundreds of pages of attached exhibits, alleges in essence that from 1995 onward, the Genovese and Gambino crime families conspired with their associates

---

[3]    The Amended Complaint defines the "Waterfront" as "the Port of New York and New Jersey and all businesses and unions involved in commerce in the Port, whether located on Port property or not, including but not limited to container repair and storage businesses, chassis repair and storage businesses, trucking businesses, trucking dispatching businesses, shipping lines and terminals, the International Longshoreman's [sic] Association, AFL-CIO. . . and all ILA locals and other ILA subordinate labor associations," Am. Compl. ¶ 1, and defines the "Port of Miami" as the "businesses and unions involved in commerce in the Port, whether located on port property or not, including but not limited to container repair and storage businesses, chassis repair and storage businesses, trucking businesses, trucking dispatching businesses, shipping lines and terminals, the ILA and all ILA subordinate labor organizations." Id. ¶ 3. The Amended Complaint does not define the Waterfront to include the Port of Miami; however, since the Amended Complaint alleges a single RICO conspiracy to exercise control and domination over the Waterfront and the Port of Miami, the Court shall hereinafter use the term "Waterfront" to include both the Waterfront as defined in the Amended Complaint as well as the Port of Miami, as defined.

2

occupying high-ranking positions in legitimate Waterfront operations, particularly the ILA and several associated labor organizations, to extend and maintain the influence of organized crime through a pattern of racketeering activity including extortion, money laundering, and mail and wire fraud. The Amended Complaint is burdened with lengthy discussions of the history and operations of La Cosa Nostra generally, as well as discussions of Government investigations and prosecutions of organized crime activity on the Waterfront going back several decades. While the Government argues that all of this historical material is necessary to place the allegations regarding the charged conspiracies in their proper context, the Court shall ignore much of this material and focus its discussion of the relevant facts on the allegations comprising the charged offenses as well as the relatively recent related civil and criminal litigation that directly preceded this action.[4]

A.    The Defendants

The Amended Complaint separates the numerous defendants into three classifications: the Nominal Defendants, who are not charged with wrongdoing but are named as defendants, presumably pursuant to Federal Rule of Civil Procedure 19(a) ("Rule 19"),[5] "for purposes of effecting the full relief sought in this action," Gov. Mem. at

---

[4]    Unless expressly stated otherwise, all of the statements of fact recounted herein are drawn, often verbatim, from the Amended Complaint, the allegations of which, as discussed at further length in Discussion Part I(B), *infra*, must be taken as true for purposes of the pending motions.

[5]    Rule 19 provides that "[a] person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." The Government does not cite a specific source of authority for naming the multitude of parties not alleged to have violated RICO as nominal defendants in this action, leaving the Court to infer Rule 19 as the only

4, the ILA Officer Defendants, and the La Cosa Nostra ("LCN") Defendants. The ILA Officer Defendants and the LCN Defendants, who are alleged to have conspired together to conduct the pattern of racketeering activity set forth in the Amended Complaint, are sometimes referred to collectively as the "Racketeering Defendants." Before proceeding to recount the factual allegations underlying the Government's claims, it shall be useful to provide an overview of the numerous defendants identified in this action.

### 1. The Nominal Defendants

The International Longshoremen's Association is a labor union that represents approximately 59,000 longshoremen and other laborers working in ports around the United States.[6] Am. Compl. ¶ 15. The ILA is divided into two regions, the Atlantic Coast District and the South Atlantic & Gulf Coast District, each of which is comprised of an unspecified number of local unions. Id. Each ILA local and district organization is governed by a group of officers, and the entire organization is governed by the ILA Executive Council, which is comprised of the President, Secretary-Treasurer, Executive Vice-President, General Vice-President, General Organizer, Assistant General Organizer, and twenty-six Vice-Presidents. Id. ¶¶ 15-16. Executive Council Members are elected at the ILA's Conventions, which occur every four years; if a vacancy occurs on the Executive Council during a non-Convention year, the remaining Executive

---

plausible source of authority for that practice. The Court briefly inquired at oral argument as to whether the nominal defendants in this action are properly named under Rule 19, but no nominal defendant has objected on the ground that its being named as a nominal defendant in this action does not fall within the proper scope of Rule 19's application, so the Court need not pursue that question further. See Tr. at 9-10.

[6] The number of workers that the ILA represents is not alleged in the Amended Complaint, but is stated in a 2004 ILA annual report form to the Department of Labor that is attached as Exhibit B to the ILA's memorandum of law in support of its motion to dismiss. As discussed in Discussion Part I(A), infra, the Court finds that this document was necessarily relied on by the Government in the Amended Complaint and that the Court can therefore consider its contents while resolving this 12(b)(6) motion.

Council members elect an individual to occupy the vacant position until the next Convention, either from the general ILA member population, if the vacant position is not the Presidency, or from the remaining Executive Council members, if the President is being replaced.  Id. ¶¶ 95-96.[7]  The duties of these positions are generally self-evident, so the Court shall not dwell on their descriptions except to note that the Executive Vice-President "shall act on behalf of the President whenever the International President shall be ill, absent, incapacitated, or unable to serve," and that the General Organizer, Assistant General Organizer, and the Vice-Presidents "shall. . . assist [the International President] during the session of the Convention and in other such manner and form as the International President may. . . request or direct. . . ."  Am. Compl. ¶ 16 (quoting ILA Constitution Article IX, §§ 2, 4).  The Executive Council possesses the ultimate authority to impose disciplinary measures, ranging from fines to the suspension or cancellation of individual membership or an organizational charter, upon all ILA members and subordinate labor organizations.  Id. ¶ 16 (citing ILA Constitution Art. XVIII).[8]  The top six Executive Council officers– i.e., the President, Secretary-Treasurer, Executive Vice-President, General Vice President, General Organizer, and Assistant General Organizer– are well-compensated:  in 2004, the annual salaries associated with those positions

---

[7]        As discussed below, see infra Discussion Part I(A), Paragraph 96 of the Amended Complaint incorrectly states that the replacement for any vacancy during a non-Convention year must be drawn from the remaining Executive Council members.  Because the ILA Constitution was relied upon by the Government in drafting the Amended Complaint, the Court may notice and correct that error in resolving this motion.

[8]        As discussed below, see infra Discussion Part I(A), the ILA maintains that the Government's allegation that the Executive Council retains the ultimate decision-making authority with respect to disciplinary measures is inaccurate, arguing that any decision by the Executive Council is appealable to the ILA's Appellate Officer for final resolution.  For the reasons stated below, the Court concludes that the evidentiary authority submitted by the ILA in support of that factual assertion cannot be considered for purposes of this 12(b)(6) motion, and that the Court must therefore assume the truth of the allegations regarding the Executive Council's authority contained in the Amended Complaint.

ranged from $257,120 for the General Vice-President to $413,556 for the President. Am. Compl. ¶ 17.[9]  In addition, Executive Council members typically hold office at the local or district level and receive a salary associated with that office as well.  Id.

The Management-International Longshoremen's Association Managed Health Care Trust Fund ("MILA") is a benefit fund that provides health insurance nationally for ILA members.  MILA was established by the ILA and companies employing ILA labor ("Management") in 1996, pursuant to a Master Contract between the ILA and Management providing for health benefits for longshoremen on the Atlantic and Gulf Coasts.  Id. ¶¶ 115-116.  MILA provides health care benefits, including prescription drug coverage and mental health benefits, to the majority of ILA Members.  Id. ¶ 120.  MILA is governed by its Board of Trustees ("MILA Board"), id. ¶¶ 27-28,  which is comprised of 18 ILA representatives and 18 Management representatives, and has two Co-Chairmen.  Id. ¶¶ 117-118.

The Metropolitan Marine Maintenance Contractors' Association ("METRO") is an association of employers engaged in interstate commerce on the Waterfront, who directly or indirectly employ ILA members.  Id. ¶ 33.  METRO and ILA Locals 1804-1 and 1814 have established three funds for the benefit of the members of those locals—the METRO-ILA Fringe Benefit Fund, the METRO-ILA Pension Fund, and the METRO-ILA Individual Account Retirement Fund (collectively, the "METRO-ILA Funds"),[10] each

---

[9]       The Amended Complaint does not allege the annual salaries for the 24 ILA Vice-Presidents, but the ILA's 2004 LM-2 report indicates that most of the Vice-Presidents earned an annual salary of $119,364, with a few earning salaries somewhat higher than that but less than $200,000 in every case.  See ILA Ex. B, Schedule 9 (relied upon by the Government in drafting the Amended Complaint).

[10]       The Amended Complaint alleges that each of the METRO-ILA Funds are employee funds within the meaning of the applicable section of the Employee Retirement Income Security Act ("ERISA").  Id. ¶¶ 35-37.

of which are governed by a Board of Trustees.  METRO, the METRO-ILA Funds, and the Board of Trustees of each METRO-ILA Fund are named as nominal defendants in this action; Locals 1804-1 and 1814 are not named.  Id. ¶¶ 34-38.

Finally, the Amended Complaint names ILA Executive Vice-President Richard Hughes, General Vice-President Benny Holland, General Organizer Gerald Owens, and twenty-four Vice-Presidents[11] as nominal defendants.  Id. ¶¶ 21, 24-26.  Hughes, Holland, and Owens are also nominal defendants in their capacities as members of nominal defendant MILA Board.  Id. ¶¶ 21, 24-25.  The Amended Complaint alleges that the Vice-Presidents "'follow the lead' of the 'Big Six' ILA Executive Officers in all union matters of importance."  Id. ¶ 26.

### 2. The LCN Defendants

The Amended Complaint identifies four individuals alleged to be members or associates of organized crime who were active participants in the alleged RICO conspiracies.  Peter Gotti is alleged to be the boss of the Gambino organized crime family.  Id. ¶ 29.  Gotti has entered into a consent decree with the Government resolving the claims against him in this action, and is therefore no longer an active defendant.  See Consent Degree and Judgment, dated April 11, 2006 (docket no. 79).  Pursuant to that decree, Mr. Gotti is permanently enjoined from, inter alia, participating in the affairs of the ILA or the Waterfront Enterprise in any way.  Id. ¶¶ 3-4.  Anthony Ciccone is alleged

---

[11]      The ILA Vice-President nominal defendants are Horace T. Alston, Jorge L. Aponto Figueroa, Chauncey J. Baker, John D. Baker, John Bowers, Jr., Edward L. Brown, Sr., Timothy Brown, James A. Campbell, Ronald Capri, Charles Chillemi, Raymond Desgagnes, Michael Dickens, Clyde Fitzgerald, Perry C. Harvey, Stephen Knott, John H. Mackey, James T. McClelend, Jr., William R. McNamara, James H. Paylor, Jr., Louis Pernice, Kenneth Riley, Raymond Sierra, Harrison Tyler, and Reuben Wheatley.  Id. ¶ 26(a)-(x).

to be a captain in the Gambino family, and Jerome Brancato is alleged to be a soldier in the same family. Am. Compl. ¶¶ 30-31, 104-105. James Cashin is a former ILA official and an alleged associate of the Genovese organized crime family. Id. ¶ 32.

### 3. The ILA Officer Defendants

The Amended Complaint charges several ILA Executive Council members with active participation in the alleged RICO conspiracies. Foremost among these is John Bowers, Sr., whom the Amended Complaint alleges has been President of the ILA since 1987 and was Executive Vice-President for twenty-four years before ascending to the Presidency.[12] Am. Compl. ¶ 18. The Amended Complaint further alleges that Bowers presently holds or has held a number of other high-ranking offices in various ILA district and local union organizations, id., and that he was a Co-Chairman of nominal defendant MILA Board at all times relevant to this action. Id. ¶ 118. Finally, the Amended Complaint alleges that Bowers is an associate of the Genovese family, and that he was an unindicted co-conspirator in United States v. Coonan, No. 87-CR-249 (S.D.N.Y.) (WK), which involved allegations of extortion and murder of ILA Local 1909 and 1809 officials by associates of the Gambino family. Id.

The second ILA Officer Defendant identified in the Amended Complaint is Robert E. Gleason, the Secretary-Treasurer of the ILA, whom the Government alleges is a Genovese family associate and "son of former ILA President and Genovese family associate 'Teddy' Gleason." Id. ¶ 19. The Government further alleges that Gleason is a

---

[12]     At oral argument on the pending motions, counsel for the ILA informed the Court that Mr. Bowers had stepped down from the Presidency at the ILA's Convention in July 2007. See Tr. at 7. The Government did not dispute that assertion, but added that Mr. Bowers continues to hold office as the President Emeritus of the ILA. See id. at 93-94. For purposes of the pending motions, however, the Court shall assume the truth of the allegations in the Amended Complaint.

member of nominal defendant MILA Board, and has held other positions of trust within the ILA and related organizations.  Id. ¶¶ 19, 118.

Harold J. Daggett is the Assistant General Organizer of the ILA,[13] as well as President of ILA Local 1804-1 and, until recently, a member of nominal defendant MILA Board.  Id. ¶¶ 22, 118.  Daggett is alleged to be an associate of the Genovese family.  Id. ¶ 22.  In 2004, Daggett was indicted on charges of extortion conspiracy and mail and wire fraud conspiracy in United States v. Coffey, No. 04-CR-651 (E.D.N.Y.) (ILG).  Mr. Daggett was tried before a jury in this Court, where he was ultimately acquitted on November 8, 2005.  See Am. Compl. ¶ 22; Ex. 1-2 (Superseding Indictment and Complaint in Coffey).  The details of the Coffey case are discussed in Background Part II(D), infra.

Arthur Coffey is a Vice-President of the ILA Executive Council and holds various positions in several ILA district and local organizations, including as a member of nominal defendant MILA Board.[14]  Am. Compl. ¶¶ 23, 118.  Coffey was indicted on charges of extortion conspiracy and mail and wire fraud conspiracy in United States v. Coffey.  Id.; see also id. Ex. 1, 2 (Superseding Indictment and Complaint in Coffey). He was tried jointly with Harold Daggett before a jury in this Court, and was likewise

---

[13]     At oral argument, AUSA Hayes asserted that Mr. Daggett is now the Executive Vice-President of the ILA, "one heartbeat away from being the President. . . ."  Tr. at 111.  Although none of the defendants disputed Mr. Hayes's assertion, the Court must assume the truth of the factual allegations stated in the Amended Complaint for purposes of this motion; the Government may not constructively amend those allegations at oral argument.

[14]     At oral argument, counsel for the ILA asserted the Mr. Coffey no longer holds any elected position in the ILA because he was not reelected to his local posts or to his position as a Vice-President on the ILA Executive Council at the most recent ILA convention.  Tr. at 9.  Although the Government did not dispute that assertion, the Court will assume the truth of the factual allegations in the Amended Complaint for purposes of resolving the present motions.

acquitted on November 8, 2005.  Am. Compl. ¶ 23; <u>see</u> Background Part II(D), <u>infra</u>.

ILA Officer Defendant Albert Cernadas executed a consent decree resolving the claims against him in this action prior to the filing of the Amended Complaint.  <u>Id.</u> ¶ 20. Prior to executing the consent decree, Cernadas was the Executive Vice-President of the ILA and, <u>inter alia</u>, a member of nominal defendant MILA Board.  <u>Id.</u> ¶¶ 20, 118. Pursuant to the terms of the consent decree, Cernadas resigned from all of his ILA-related positions and is permanently enjoined from holding any position in the ILA or the Waterfront Enterprise.  <u>Id.</u>; <u>see also</u> Am. Compl. Ex. 13 (Cernadas consent decree). Cernadas was indicted in <u>Coffey</u> for mail and wire fraud conspiracy in violation of 18 U.S.C. § 371, charges arising in connection with acts undertaken in his capacity as an officer of the ILA.  <u>See</u> Am. Compl. ¶ 20, Ex. 1 (<u>Coffey</u> Superseding Indictment).  On September 12, 2005, Cernadas pleaded guilty before this Court to the charges against him in that case.  Am. Compl. ¶ 20; <u>see</u> Background Part II(D), <u>infra</u>.

B.      The Alleged RICO Conspiracies

The Amended Complaint alleges two counts of RICO conspiracy– conspiracy to violate 18 U.S.C. § 1962(c)[15] ("§ 1962") in violation of § 1962(d)[16] (Count 1), <u>see</u> Am. Compl. ¶¶ 70-83, and conspiracy to violate § 1962(b) in violation of § 1962(d) (Count

---

[15]      18 U.S.C. § 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

[16]      18 U.S.C. § 1962 (d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

2).[17]  See Am. Compl. ¶¶ 252-56.  Both counts are alleged against all of the Racketeering

Defendants "together with others, known and unknown," id. ¶¶ 71, 253, and rely on the

same alleged predicate acts to establish the requisite patterns of racketeering.  Both

counts also rely on the same allegations regarding the composition and purpose of the

Waterfront Enterprise.  Indeed, the section of the Amended Complaint captioned

"Second Claim for Relief" does little more than incorporate by reference the allegations

made in earlier sections of the Amended Complaint, including the lengthy recitations of

alleged predicate acts in the section captioned "First Claim for Relief," and assert that

the same acts also constitute a conspiracy to violate § 1962(b).  See id. ¶¶ 252-258.  The

Court may therefore discuss the factual allegations underlying the Government's claims

without distinguishing between the two RICO conspiracy counts.

> 1.    The Waterfront Enterprise

At the heart of the Government's theory of this case is the "Waterfront

Enterprise," an alleged association-in-fact RICO enterprise that is comprised of the

members of the Gambino and Genovese families operating on the Waterfront and their

associates and co-conspirators in the ILA and other legitimate Waterfront organizations.

The Amended Complaint defines the Waterfront Enterprise as an aggregation of

> the ILA and certain of its subordinate components, namely, the Atlantic
> Coast District, the South Atlantic & Gulf Coast District, Locals 1, 824, 1235,
> 1588, 1804-1, 1814, 1922, 1922-1, and 2062; certain current and former ILA
> officials; certain welfare benefit and pension benefit funds managed for the
> benefit of ILA members, namely, MILA, the METRO-ILA Funds, the ILA
> Local 1922 Health and Welfare Fund, the ILA-Employers Southeast Florida

---

[17]    18 U.S.C. § 1962(b) provides that "[i]t shall be unlawful for any person through a pattern
of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or
indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect,
interstate or foreign commerce."

> Ports Welfare Fund; certain businesses operating on or about the
> Waterfront; an "employer association" operating on or about the
> Waterfront, namely METRO; certain members and associates of the
> Genovese and Gambino crime families; and certain businesses operating in
> the Port of Miami. . . .

Am. Compl. ¶ 67. The Government alleges that each of the Racketeering Defendants

"were leaders of the Enterprise who directed other members of the Enterprise in

carrying out unlawful and other activities in furtherance of the conduct of the

Enterprise's affairs." Id. ¶ 69. In a section captioned "Purpose of the Enterprise," the

Government alleges that

> [t]he Defendants' common purpose was to exercise corrupt control and
> influence over labor unions and businesses operating on the Waterfront, the
> Port of Miami and elsewhere in order to enrich themselves and their
> associates. In order to achieve this objective, the Defendants have
> established and maintained control and influence over labor unions and
> businesses. To ensure the continued effectiveness of this corrupt system and
> as part of the overall plan and pattern of control, the Gambino and Genovese
> families have generally maintained and recognized their respective areas of
> control and domination on the Waterfront, the Port of Miami and elsewhere.

Id. ¶ 68. At oral argument, counsel for the Government clarified that, notwithstanding

the caption's suggestion that paragraph 68 alleges the common purpose of the

enterprise, the purpose identified in paragraph 68 is alleged to be shared only by the

Racketeering Defendants, and not by the nominal defendants or, presumably, any

member of the Waterfront Enterprise not named as a defendant in this action. See Tr.

at 101-02.

2.      The Alleged Pattern of Racketeering Acts

The Government alleges fifteen acts of racketeering undertaken by some or all of

the Racketeering Defendants between 1995 and 2002, which it argues establish the

"pattern of racketeering" necessary for RICO liability. The Court shall briefly

summarize each of the alleged acts, taking the allegations in the Amended Complaint as true.

<blockquote>a.     Rigged Election of Harold J. Daggett and Others to High-Ranking ILA Offices[18]</blockquote>

The Government alleges that in June 1999, George Barone, "a Genovese family member, former ILA official, and convicted racketeer," met with ILA President John Bowers at a restaurant in Miami to discuss who would replace Bowers as ILA President upon Bowers's retirement. Am. Compl. ¶ 87. Barone had learned that Bowers favored Benny Holland as his replacement, and wanted to make it clear to Bowers that the Genovese family preferred Harold Daggett, whom Barone had placed into other ILA district and local positions and believed could be relied upon to advance Genovese family interests as ILA President. Barone arranged the meeting with Bowers through defendant Arthur Coffey, who at the time was President of ILA Locals 1922, 1922-1, and 2061, all based in Miami. During the meeting, Bowers agreed to support Daggett as his successor in exchange for a promise from Barone that Bowers's son, John Bowers, Jr., would be "taken care of" by the ILA and the Genovese family following Bowers's retirement. Id. ¶ 90.

The conspiracy to place Daggett in a position to replace Bowers took a step forward in 2000, when ILA General Organizer Frank Lonardo decided to resign from his position. Because 2000 was a non-Convention year, the Genovese family and its co-conspirators planned to place Daggett into the vacant General Organizer position by means of an Executive Council election held in Lake Tahoe in July 2000. Placing

---

[18]     The factual allegations summarized in this section are stated in paragraphs 86-114 of the Amended Complaint.

Daggett on the Executive Council would enable him to be elevated to the position of ILA President by the Executive Council should Bowers retire in a non-Convention year. Having arranged a meeting through Arthur Coffey, Genovese family soldier Pasquale Falcetti asked George Barone to instruct Bowers to support Daggett for the vacant General Organizer position. Bowers, however, using James Cashin as an intermediary, informed Barone that he could not support Daggett for that position because he was under pressure from the ILA's black caucus to support Assistant General Organizer Gerald Owens, who is an African-American, for the General Organizer position. Barone replied through Cashin that he would support Owens for the position of General Organizer and Daggett for the position of Assistant General Organizer.[19] Ciccone then instructed ILA Vice-President Frank Scollo, with whom he had a longstanding acquaintance, to ensure that Daggett was placed in the Assistant General Organizer position.[20]

On July 19, 2000, the ILA Executive Council held its non-Convention election in Lake Tahoe, at which Daggett was elected to the position of Assistant General Organizer. Immediately after the election, Scollo called Ciccone to report the result of the election, but spoke with Cassarino because Ciccone was unavailable.

_____

[19] The Government alleges that the Genovese family's plan to place Daggett on the ILA Executive Council required an "accommodation" from the Gambino family, because outgoing General Organizer Frank Lonardo was a Gambino family associate and Gambino family captain Anthony Ciccone wished to replace him with another Gambino associate. Ciccone and Gambino family soldier Primo Cassarino reached an agreement with the Genovese family pursuant to which Daggett would be elected to the ILA Executive Council in exchange for Gambino family associate Louis Pernice's being elevated to a position on the Atlantic Coast District's Executive Council. The Government alleges that Genovese family captain Alan Longo and defendant Jerome Brancato, a Gambino family soldier, were also involved in negotiating the accommodation. Am. Compl. ¶¶ 104-105.

[20] The Amended Complaint notes that the communication between Scollo and Ciccone regarding ILA matters was in violation of the consent decrees that both had signed in the Local Civil RICO Case. Id. ¶¶ 108-109; see infra Background Part II(E).

14

The Amended Complaint states that Ciccone and Jerome Brancato were convicted in United States v. Gotti, 02-CR-606 (E.D.N.Y.), of conspiracy to extort, extortion, and wire fraud in connection with the scheme to rig the election of Harold Daggett to the ILA Executive Council, thereby presumably alleging that the allegations in the Amended Complaint regarding that scheme state the same predicate acts. See Background Part II(A), infra.

<b>b.      Scheme to Rig the MILA PBM Contract[21]</b>

On or about May 7, 1997, MILA sent a Request for Proposal to approximately 21 vendors, seeking bids on a contract for a Pharmacy Benefit Manager ("PBM") to administer its prescription drug plan. Sixteen vendors responded, and MILA eventually narrowed the field to two finalists— Express Scripts, Inc. ("Express Scripts"), and GPP/VIP, Inc. ("GPP/VIP"). Express Scripts was "a large, full-service company serving millions of individuals and managing billions in annual drug expenditures." Id. ¶ 125. GPP/VIP, on the other hand, was a start-up owned by Joel Grodman, the president of General Prescription Programs, Inc. ("GPP"), and Dr. Vincent Nasso, an account executive employee of GPP who ran his own mail order facility called Value Integrated Pharmacy Services, Inc. ("VIP"). Grodman and Nasso created GPP/VIP specifically for the purpose of providing PBM service to MILA using GPP's retail network as a subcontractor.

Despite its smaller size and relative lack of experience, GPP/VIP had one substantial advantage over Express Scripts in the competition for the MILA PBM

---

[21]      The factual allegations summarized in this section are alleged in Paragraphs 121-150 of the Amended Complaint.

contract: Vincent Nasso was an associate of Anthony Ciccone, and had agreed to pay Ciccone $400,000 for the selection of GPP/VIP as the MILA PBM. In his efforts to rig the PBM contract bidding in favor of GPP/VIP, Ciccone once again conspired with the Genovese family, which had made plans through its own network of members and associates to influence the contract award. Genovese family member Larry Ricci had asked George Barone to persuade Harold Daggett, in his capacity as a MILA Trustee, to vote for whichever PBM candidate Albert Cernadas supported; Ricci planned to use his own influence over Cernadas to award the contract to a company favorable to the Genovese family's interests. Barone agreed and instructed both Daggett and Arthur Coffey to support whichever PBM candidate that Cernadas supported. Ciccone then paid $75,000 to the Genovese family, and Cernadas "was the most vocal proponent of GPP/VIP" at the MILA deliberations, swaying the ILA Trustees in GPP/VIP's favor notwithstanding the fact that the Management Trustees and their actuarial consultants preferred Express Scripts. The ILA Trustees and the Management Trustees ultimately reached a compromise, appointing GPP/VIP as the MILA PBM for the North Atlantic ports from Boston to Hampton Roads, Virginia, and Express Scripts as PBM for the South Atlantic ports from North Carolina to the Mexican border. After obtaining the MILA PBM contract for the northern ports, GPP/VIP continued to conspire with organized crime and its associates on the MILA Board to expand the scope of its lucrative arrangement with MILA. Its opportunity to do so arose when, despite Express Scripts's having received better service reviews from MILA plan members than GPP/VIP, MILA terminated Express Scripts's contract, effective January 1, 2000, and placed GPP/VIP as PBM for the entire range of ports, because Express Scripts resisted a

full-scale audit by MILA.

In June 2001, GPP/VIP sent a letter to MILA's Pharmacy Resource Committee in which it requested premium increases amounting to an additional 65 cents per member per month, stating that it had "severely underestimated and did not anticipate the cost of handling all the unique aspects of the MILA program. . . ." Id. ¶ 136. Shortly thereafter, in August 2001, MILA sent out a new Request for Proposals, in anticipation of the expiration of GPP/VIP's contract on December 31, 2001. Ciccone favored renewing GPP/VIP's contract, and communicated with MILA Trustee Frank Scollo, both directly and through Primo Cassarino, and with MILA Executive Director Louis Valentino for the purpose of influencing the decision. Scollo advised Ciccone that GPP/VIP would need to submit a new proposal in response to MILA's request. Ultimately seven vendors, including GPP/VIP and Advance PCS, the largest private PBM in the United States, submitted proposals for the MILA contract. Because Advance PCS's proposal would save MILA approximately $4 million over 3 years in comparison to GPP/VIP, the MILA Board initially voted unanimously to award the PBM contract to Advance PCS. However, during subsequent negotiations with Advance PCS, the ILA Trustees, particularly Albert Cernadas, raised objections to some of Advance PCS's demands, particularly its desire for brand-to-brand switches[22] and the exclusive right to select its auditor. Although Advance PCS eventually withdrew the demands to which the ILA Trustees objected, the ILA Trustees withdrew their support of Advance PCS and supported a renewal of GPP/VIP's contract. Due to the impasse between the

---

[22] "[I]e., the right to provide the same type of medicine prescribed by a doctor to a member but a different brand." Id. ¶ 146.

Management Trustees and the ILA Trustees over which vendor to select, GPP/VIP's PBM contract was extended from December 31, 2001, through June 2002. Ultimately the matter was submitted for arbitration, which resulted in the award of the MILA PBM contract to Advance PCS.

The Amended Complaint states that Ciccone was convicted in United States v. Gotti, 02-CR-606 (E.D.N.Y.), of conspiracy to extort, extortion, and wire fraud in connection with the scheme to rig the award of the MILA PBM contract in favor of GPP/VIP, thereby presumably alleging that the allegations in the Amended Complaint regarding that scheme state the same predicate acts. See Background Part II(A), infra.

    c.    <u>Scheme to Rig the MILA Mental Health Benefits Contract</u>[23]

The Amended Complaint also alleges that organized crime conspired with the MILA Trustees to influence the award of the MILA mental health and substance abuse plan contract. In late 1998, MILA solicited bids for the contract from seven companies, including Health Management Center, Inc. ("HMS"), which paid James Cashin as a consultant. Cashin had obtained permission from George Barone to obtain the MILA mental health benefits contract and to inform the MILA Trustees that Barone had given him such permission, though the Amended Complaint does not allege that Cashin actually informed any of the MILA Trustees of that fact.

Before the MILA mental health contract was awarded, however, a dispute developed between Cashin and HMS regarding Cashin's compensation. Cashin's relationship with HMS was therefore terminated, and in early 1999, Cashin entered into

---

[23]     The factual allegations summarized in this section are alleged in Paragraphs 151-161 of the Amended Complaint.

a consulting relationship with another mental health services company called Compsych, which paid Cashin $5,000 per month for his services. Compsych then submitted a bid for the MILA mental health contract, which Robert Gleason asked the MILA Board to consider at a January 29, 1999 meeting. One of the MILA Board's actuarial consultants, Actuarial Sciences Associates, rated Compsych's bid non-competitive. The other consultant, The Segal Company, indicated that it had not been aware that the Compsych bid would be discussed at the meeting, but nevertheless rated the bid competitive. Compsych re-submitted its bid in April 1999, and the MILA Board deemed it competitive. MILA awarded the mental health benefits contract to Compsych in August 1999.[24]

The Amended Complaint further alleges that when Compsych's contract was due for renewal in 2001, the ILA Trustees, especially Bowers, Cernadas, and Daggett, were "particularly vocal" in their support for renewing Compsych's contract, despite the fact that it had requested a 5 percent increase in fees. Id. at 161. MILA ultimately renewed the contract.

The Amended Complaint does not state, expressly or implicitly, which type of racketeering act the Government believes its allegations regarding the rigging of the MILA mental health benefit plan constitute. However, in its memorandum of law in opposition to the defendants' motions, the Government identifies several mailings that it alleges were made pursuant to the MILA mental health care scheme, thereby apparently suggesting that these allegations constitute mail fraud. See Gov. Mem. at 99-

---

[24] The Amended Complaint alleges that Cashin personally addressed the MILA Board in support of Compsych's bid, but does not clearly state whether Cashin appeared at the January 29, 1999, meeting or at some subsequent meeting. See Am. Compl. ¶ 159.

100.

      d.      <u>Fund Investment Advisor Kickback Scheme</u>[25]

The Amended Complaint alleges three schemes by organized crime to interfere with the service contract selection process of the METRO-ILA Funds, and to defraud the beneficiaries of those funds, by awarding lucrative service contracts to associates of organized crime.  The first of these involves a conspiracy among Peter Tarangelo and Thomas Cafaro, both associates of the Genovese Family, Liborio Bellomo, acting boss of the Genovese family, and Harold Daggett to influence the METRO-ILA Funds' selection of an investment advisor.  In October or November of 1995, Cafaro and Bellomo advised Tarangelo that if he could identify someone who could act as an investment advisor to the METRO-ILA Funds, they would use their influence over the METRO-ILA Trustees to ensure that Tarangelo's hand-picked advisor would receive the fund advisement contract.  In return, Bellomo, Cafaro, and Tarangelo would receive a kickback from the advisor's fee.  In order to assist Tarangelo in his efforts, Cafaro and Bellomo gave him a list of ILA locals over which the Genovese family had influence, which included Local 1804-1, and told him to send solicitations to the unions.

Tarangelo eventually identified Wall Street Capital Management as his investment advisor of choice, and between November 1995 and approximately February 1996, proposals on Wall Street Capital Management's letterhead were sent to the contacts on the list that Bellomo and Cafaro provided to Tarangelo.  Cafaro and Bellomo arranged for Tarangelo to meet with Harold Daggett, then the Secretary-Treasurer of

---

[25]      The factual allegations summarized in this section are alleged in Paragraphs 164-173 of the Amended Complaint.

Local 1804-1, on May 23, 1996, in a Newark hotel where Local 1804-1 was having a meeting.[26]  During the meeting, Tarangelo provided Daggett with a copy of the Wall Street Capital Management Proposal, and Daggett asked Tarangelo to say "hello" to Daggett's "friend," which the Government alleges was a reference to Bellomo.  The same day, Tarangelo met with METRO President Joseph Barbera at METRO's offices in New Jersey; shortly thereafter, in May or June 1996, Tarangelo attended another meeting with Barbera, Genovese soldier Pasquale Falcetti, and a representative of Centurion Capital Management, which was an affiliate of Wall Street Capital Management.

Until Bellomo was arrested in June 1996, Tarangelo understood that the METRO-ILA Funds would award the investment advisement contract to Wall Street Capital Management.  Several months after Bellomo's arrest, however, Tarangelo was informed that Wall Street Capital Management would not receive the contract.

The Amended Complaint does not state, expressly or implicitly, which type of racketeering act the Government believes its allegations regarding the conspiracy to rig the METRO-ILA Funds investor advisement scheme constitute.  However, in its memorandum of law in opposition to the defendants' motions, the Government identifies several mailings that it alleges were made pursuant to that scheme, thereby apparently suggesting that these allegations constitute mail fraud.  See Gov. Mem. at 97-98.

---

[26]  The Government alleges that Andrew Gigante, who is the son of deceased Genovese family boss Vincent "Chin" Gigante and is identified in the Amended Complaint as an unnamed co-conspirator and a Genovese family associate, was present at the Local 1804-1 meeting in Newark, but does not allege that Gigante attended the meeting between Tarangelo and Daggett regarding the investment advisor scheme.  Am. Compl. ¶¶ 40(e), 170.

e.  **Rigged METRO-ILA Welfare Fund PBM Contract**[27]

On or about June 30, 1998, the Board of Trustees of the METRO-ILA Welfare Fund awarded its PBM contract to GPP/VIP– the same company that was awarded the MILA PBM contract at about the same time. Despite the fact that the METRO-ILA Welfare Fund had previously used Diversified Pharmaceutical Services as its PBM, the change was made with little, if any, evaluation of the merits of awarding the contract to GPP/VIP, and was supported by Harold Daggett in his capacity as a Trustee of the METRO-ILA Welfare Fund. Daggett allegedly knew that GPP/VIP was associated with organized crime, but did not disclose that fact to the METRO-ILA Welfare Fund Board of Trustees, and did not disclose the fact that he supported the award of the contract to GPP/VIP because of its association with organized crime.

The Amended Complaint does not state, expressly or implicitly, which type of racketeering act the Government believes its allegations regarding the conspiracy to rig the METRO-ILA Welfare Fund PBM contract constitute. However, in its memorandum of law in opposition to the defendants' motions, the Government identifies a mailing that it alleges was made in furtherance of that scheme, thereby apparently suggesting that these allegations constitute mail fraud. See Gov. Mem. at 100-101.

f.  **Rigged METRO-ILA Welfare Fund Mental Health Care Benefits Contract**[28]

On or about August 18, 1999, the Board of Trustees of the METRO-ILA Welfare

---

[27]  The factual allegations summarized in this section are alleged in Paragraphs 174-178 of the Amended Complaint.

[28]  The factual allegations summarized in this section are alleged in Paragraphs 179-182 of the Amended Complaint.

Fund awarded its mental health care benefits contract to Compsych– the same company that was awarded the MILA mental health care benefits contract at about the same time. The decision to award the mental health care benefits contract to Compsych was supported by Harold Daggett in his capacity as a Trustee of the METRO-ILA Welfare Fund because of James Cashin's consulting relationship with Compsych.[29]  Daggett allegedly knew that Cashin and Compsych were associated with organized crime, but did not disclose that fact to the METRO-ILA Welfare Fund Board of Trustees, and did not disclose the fact that he supported the award of the contract to Compsych for that reason.

The Amended Complaint does not state, expressly or implicitly, which type of racketeering act the Government believes its allegations regarding the conspiracy to rig the METRO-ILA Welfare Fund PBM contract constitute.  However, in its memorandum of law in opposition to the defendants' motions, the Government identifies several mailings that it alleges were made in furtherance of that scheme, thereby apparently suggesting that these allegations constitute mail fraud.  See Gov. Mem. at 101.

       g.      Fraud on the Local 1922 and Southeast Florida Ports Welfare Funds[30]

In 1999, at approximately the same time MILA and the METRO-ILA Welfare Fund awarded their mental health care benefits contracts to Compsych, the Local 1922 Health and Welfare Fund and the ILA-Employers Southeast Florida Ports Welfare Fund

---

[29]     Unlike the alleged rigging of the MILA health care benefits contract, the Amended Complaint does not allege that Cashin personally played an active role in pursuing the award of the METRO-ILA Welfare Fund mental health care benefits contract to Compsych, but only that Daggett favored Compsych because he knew of Cashin's relationship with that company.

[30]     The factual allegations summarized in this section are alleged in Paragraphs 183-186 of the Amended Complaint.

also awarded mental health care benefits contracts to Compsych.  The Government

alleges that Arthur Coffey, in his capacity as a Trustee of both funds, supported

awarding the contracts to Compsych at the direction of George Barone.  Barone ordered

Coffey to support Compsych because of the company's relationship with James Cashin.

Coffey did not inform the Board of Trustees of either fund of his own association with

organized crime, or that he supported Compsych at the direction of a Genovese family

soldier who favored Compsych because of its relationship with Cashin.

The Amended Complaint refers to the scheme to rig the Florida funds' mental

health benefits contracts in favor of Compsych as a "fraud," but does not clarify which

type of predicate racketeering act the Government believes its allegations regarding that

scheme constitute.  However, in its memorandum of law in opposition to the

defendants' motions, the Government identifies one mailing and one facsimile

transmission that it alleges were made in furtherance of that scheme, thereby apparently

suggesting that these allegations constitute mail fraud and wire fraud.  <u>See</u> Gov. Mem. at

102.  The Court notes that both the mailing and facsimile transmission identified in the

Government's memorandum of law were allegedly made in furtherance of the scheme to

award the Local 1922 benefits contract to Compsych; the Government does not identify

any use of the mails or wires made in furtherance of the scheme to award the ILA-

Employers Southeast Florida Ports Welfare Fund to Compsych.

<b>h.</b>   <u>Control Over Local 1</u>[31]

The Amended Complaint recounts various acts of extortion and fraud performed

---

[31]   The factual allegations summarized in this section are alleged in Paragraphs 187-201 of the Amended Complaint.

by Anthony Ciccone for the purpose of establishing and maintaining organized crime control over ILA Local 1, all of which involve Ciccone's intimidation of and interference with Louis Saccenti, a delegate for ILA Local 1. The Government alleges that by undertaking these acts, Ciccone "conspired to deprive the union membership of its democratic rights and its right to loyal representation by Saccenti." Am. Compl. ¶ 187.

In the summer of 2000, Louis Saccenti decided to fill a temporarily vacant shop steward's position at the Red Hook Terminal in Brooklyn, New York, without consulting Ciccone. The shop steward's position had been held by Joseph Pimpinella, the brother of former ILA General Organizer and Gambino family associate Anthony Pimpinella. Joseph Pimpinella was going on vacation, and Saccenti placed an individual named Ronnie Doyle in the shop steward's position in Pimpinella's absence. Local 1814 President Frank Scollo reported this development to Primo Cassarino, for the purpose of notifying Ciccone. Both Scollo and Ciccone were concerned that they would lose power if Saccenti were permitted to replace Pimpinella; Ciccone was also concerned that Saccenti was conspiring against him with ILA Local 1 President Stephen Knott. Ciccone therefore directed Knott not to fill the shop steward's position until he heard from Ciccone, and instructed Scollo to speak to Knott and to stop Saccenti from putting Doyle in the shop steward's position. The Amended Complaint does not indicate how this situation was resolved.

The Government also alleges a second conflict between Ciccone and Saccenti, which arose from Saccenti's efforts to change the work rules at two marine terminals in Brooklyn at which workers represented by ILA Local 1 were employed. ILA Local 1 represents "checkers"– individuals who check cargo containers that pass through the

Howland Hook terminal in Staten Island, New York, and the Red Hook Terminal in Brooklyn, New York. In 2000 and 2001, Saccenti attempted to make changes in work rules at those terminals that Scollo deemed "detrimental" to the interests of Local 1814. Am. Compl. ¶ 190. Scollo contacted Cassarino on several occasions, seeking Ciccone's assistance in dealing with Saccenti. At Ciccone's direction, Scollo informed August Decrezenso, a Local 1 Shop Steward, that Ciccone's orders were that Saccenti was to make no rule changes without first notifying Ciccone. Saccenti defied Ciccone's efforts to control him, continuing to make rule changes and at one point announcing that "all bets are off." Id. ¶ 192. Ciccone then directed Cassarino and Gambino family soldier Richard Bondi to go to Saccenti's home for the purpose of intimidating Saccenti. The Amended Complaint does not indicate whether the efforts to intimidate Saccenti were successful, or how the conflict was ultimately resolved.

The Amended Complaint states that Ciccone was convicted in <u>United States v. Gotti</u>, 02-CR-606 (E.D.N.Y.),[32] of conspiracy to extort, extortion, and wire fraud in connection with his efforts to control ILA Local 1, thereby presumably alleging that the allegations in the Amended Complaint regarding that scheme state the same predicate acts.

### i. <u>Fraud on the Local 1814 Membership</u>[33]

Ciccone and Scollo's joint efforts to exercise control over ILA officials were not limited to Local 1. In 2000 and 2001, Scollo enlisted Ciccone's assistance in resolving a

---

[32] <u>See</u> <u>infra</u> Background Part II(A).

[33] The factual allegations summarized in this section are alleged in Paragraphs 202-214 of the Amended Complaint.

problem with another ILA Local 1814 official, Philip Scala. At the time, Scala was an

ILA representative and a Local 1814 delegate. Following the ILA special elections in

July 2000, Scala had repeatedly failed to report to work; Scollo believed that this was

because Scala was angry that he had not been elected to a position on the Executive

Board of the Atlantic Coast District Council. Seeking permission to fire Scala, Scollo

contacted Cassarino and Ciccone, who suggested that Scala, Scollo, and Ciccone meet to

discuss the situation. The meeting that took place did not resolve Scala's grievances,

and Scala eventually resigned from the ILA, leaving the position of Local 1814 delegate

open. Primo Cassarino recommended that Scollo appoint Patsy Pozzolano, the brother-

in-law of Gambino family associate Anthony Pansini, to the position; however, Scollo,

despite being the Local 1814 President, could do so only if Ciccone approved Pozzolano's

appointment. Ciccone demanded to meet with Pozzolano and eventually approved him,

at which point Pozzolano became the Local 1814 delegate.

The Amended Complaint states that Ciccone was convicted in <u>United States v.</u>

<u>Gotti</u>, 02-CR-606 (E.D.N.Y.),[34] of wire fraud in connection with his involvement with

Local 1814, thereby presumably alleging that the allegations in the Amended Complaint

regarding that scheme states the same predicate act.

j.      <u>Extortion of Howland Hook Container Terminal, Inc.</u>[35]

The Howland Hook Marine Terminal on Staten Island, New York, is a major

facility for loading and unloading cargo. In 1996, the facility was operated by Howland

---

[34]      <u>See</u> <u>infra</u> Background Part II(A).

[35]      The factual allegations summarized in this section are alleged in Paragraphs 215-221 of
the Amended Complaint.

Hook Container Terminal, Inc., which was managed by its CEO, Carmine Ragucci.  In or about 1997, Ragucci began making payments to Ciccone to buy "labor peace" at the terminal.  Am. Compl. ¶ 216.  Ciccone instructed Scollo to accept the payments from Ragucci and deliver them to Ciccone, in exchange for which Scollo was to comply with Ragucci's wishes regarding labor issues at the terminal.  Scollo complied with these instructions, collecting envelopes containing the payments from Ragucci on a periodic basis and delivering them either to Ciccone or to Anthony Pimpinella.  Beginning in about 1998, Scollo also sometimes delivered the payments to Primo Cassarino.  Ragucci continued to make payments on a roughly quarterly basis until June or July of 2001, when he left his position at the Howland Hook Marine Terminal.

The Amended Complaint states that Ciccone was convicted in <u>United States v. Gotti</u>, 02-CR-606 (E.D.N.Y.),[36] of conspiracy to extort and extortion in connection with his extortion of Howland Hook Container Terminal, Inc., thereby presumably alleging that the allegations in the Amended Complaint regarding that scheme state the same predicate acts.

k.      <u>Extortion of Bridgeside Draydage</u>[37]

In 1994 and 1995, Carmine Ragucci entered into a contract with Frank Molfetta pursuant to which Molfetta would perform truck broker-dispatcher services at the Howland Hook Marine Terminal beginning when the terminal was operational in 1996. The contract promised to give Molfetta's company, Bridgeside Draydage, exclusive

---

[36]      <u>See</u> <u>infra</u> Background Part II(A).

[37]      The factual allegations summarized in this section are alleged in Paragraphs 222-33 of the Amended Complaint.

broker-dispatcher rights at the Howland Hook terminal, in exchange for $150,000 up-front and $100,000 to be paid later. Molfetta paid $150,000 to Ragucci in 1994, and Bridgeside Draydage began operating at Howland Hook in 1996. However, Molfetta refused to pay the additional $100,000 because, contrary to the terms of the contract, Ragucci did not grant Bridgeside Draydage exclusive broker-dispatcher rights.

In or about late 1999, Ragguci informed Molfetta that Anthony Ciccone wished to meet with him. At that meeting, Molfetta described the terms of his contract with Ragucci to Ciccone, and Ciccone instructed him not to pay Ragucci. Molfetta understood from that meeting that he would subsequently be making payments to Ciccone. At a later meeting in 1999, Molfetta and Ciccone settled on a $1,500 monthly payment, which commenced in January 2000.

The Amended Complaint states that Ciccone was convicted in United States v. Gotti, 02-CR-606 (E.D.N.Y.),[38] of conspiracy to extort and extortion in connection with his extortion of Bridgeside Draydage, thereby presumably alleging that the allegations in the Amended Complaint regarding that scheme state the same predicate acts.

l.        Money Laundering and Money Laundering Conspiracy[39]

The Government alleges that between September 2000 and November 2001, defendants Peter Gotti, Anthony Ciccone, and Jerome Brancato laundered and conspired to launder the proceeds of the kickback schemes involving MILA and GPP/VIP and the extortion schemes involving Howland Hook and Bridgeside Draydage.

---

[38]        See infra Background Part II(A).

[39]        The factual allegations summarized in this section are alleged in Paragraphs 234-236 of the Amended Complaint.

The Amended Complaint further notes that all three defendants were convicted of money laundering and money laundering conspiracy in <u>United States v. Gotti</u>, 02-CR-606.[40]

### m. Extortion of Right to Employment of Hiring Agent[41]

Beginning in 1996, Thomas Ragucci, the brother of Carmine Ragucci, was the hiring agent for Howland Hook Container Terminal, Inc., in which capacity he was responsible for hiring longshoremen to load and unload ships at the terminal. In approximately July 2001, Carmine Ragucci sold his ownership interest in Howland Hook Container Terminal, Inc., and resigned as CEO of the company. Between July 1 and October 1, 2001, Frank Scollo discussed the possibility of removing Thomas Ragucci from his position has hiring agent with Anthony Ciccone and Primo Cassarino. Ciccone wished to replace Thomas Ragucci with Robert Anastasio, nephew of Gambino family member Anthony "Todo" Anastasio. Ciccone instructed Scollo to speak with Ragucci about leaving the terminal; Scollo did so, informing Ragucci that Scollo's "boss" wanted Ragucci to leave his position. Ragucci knew that Ciccone was a member of the Gambino family and was intimidated by Scollo's message, believing that Ciccone might retaliate if Ragucci refused to resign.

The Amended Complaint does not allege how this situation was resolved, but it notes that Ciccone was convicted in <u>United States v. Gotti</u>, 02-CR-606 (E.D.N.Y.),[42] of

---

[40] <u>See</u> <u>infra</u> Background Part II(A).

[41] The factual allegations summarized in this section are alleged in Paragraphs 237-245 of the Amended Complaint.

[42] <u>See</u> <u>infra</u> Background Part II(A).

conspiracy to extort and attempted extortion, rather than actual extortion, with respect to the scheme to remove Thomas Ragucci from his position at the Howland Hook terminal, thereby presumably alleging that the allegations in the Amended Complaint regarding that scheme state the same predicate acts.

n.      Extortion of Leonardo Zinna[43]

The Amended Complaint alleges quite simply that "[i]n or about 2001, the Defendant Anthony Ciccone, together with others, conspired to extort money from Leonardo Zinna, a longshoreman."  Am. Compl. ¶ 246 (capitalization omitted).  The Amended Complaint further states that Ciccone was convicted in United States v. Gotti, 02-CR-606 (E.D.N.Y.),[44] of conspiracy to extort Leonardo Zinna, thereby presumably alleging that the allegations in the Amended Complaint regarding that scheme state the same predicate act.

o.      Extortion of Nicola Marinelli[45]

The Amended Complaint alleges a second conspiracy to extort an individual longshoreman that is equally devoid of details, stating only that "[i]n and about or between January 2001 and January 2002. . . Defendant Anthony Ciccone and others, conspired to extort money from the settlement of a claim for compensation for an injury of Nicola Marinelli, a longshoreman."  Am. Compl. ¶ 249 (capitalization omitted).  The

---

[43]      The factual allegations summarized in this section are alleged in Paragraphs 246-248 of the Amended Complaint.

[44]      See infra Background Part II(A).

[45]      The factual allegations summarized in this section are alleged in Paragraphs 249-251 of the Amended Complaint.

Amended Complaint further states that Ciccone was convicted in the <u>Gotti</u> prosecution[46] of conspiracy to extort and extortion of Nicola Marinelli, thereby presumably alleging that the allegations in the Amended Complaint regarding that scheme state the same predicate acts.

II.   <u>Prior Proceedings</u>

The Government attached as exhibits to the Amended Complaint various pleadings and other documents filed in three prior criminal actions—<u>United States v. Bellomo</u>, 02-CR-140 (E.D.N.Y.); <u>United States v. Gotti</u>, 02-CR-606 (E.D.N.Y.); and <u>United States v. Coffey</u>, 04-CR-651 (E.D.N.Y.)— and two prior civil actions—<u>United States v. Local 1804-1, Int'l Longshoremen's Assoc.</u>, 90-CV-963 (S.D.N.Y.), and <u>United States v. Bellomo</u>, 03-CV-1683 (E.D.N.Y.)— all of which involved many of the same defendants and factual allegations at issue in this case. In opposition to the defendants' motions to dismiss the Amended Complaint due to its alleged failure to plead certain essential elements of several of the predicate acts, the Government argues that it has satisfied the applicable pleading requirements by incorporating by reference the factual allegations contained in the exhibits. In order to place this litigation in its proper historical context and to grasp the foundation of the Government's arguments regarding the Amended Complaint's pleading of the predicate acts, it is necessary to examine the allegations and outcome in each of these prior actions in some detail.

A.   <u>*United States v. Gotti*</u>

In 2002, the United States unsealed an indictment charging several members and associates of the Gambino crime family, including, <u>inter alia</u>, Peter Gotti, Anthony

---

[46]      <u>See</u> <u>infra</u> Background Part II(A).

Ciccone, and Jerome Brancato, all of whom are defendants in this action, as well as Frank Scollo, Primo Cassarino, and Vincent Nasso, who are not named as defendants in this action but are identified as uncharged participants in one or more of the alleged predicate acts, with many of the racketeering acts that are alleged in this action. See Indictment in United States v. Gotti, 02-CR-606 (E.D.N.Y.), attached to the Amended Complaint as Exhibit 6 ("Gotti Indictment" or "Gotti Ind."). Scollo eventually pleaded guilty to RICO conspiracy in connection with his involvement in a number of the racketeering schemes alleged in Gotti, and Nasso pleaded guilty to three counts of wire fraud in connection with the rigging of the MILA PBM contract. All of the other Gotti defendants mentioned in this action– i.e., Peter Gotti, Anthony Ciccone, Jerome Brancato, and Primo Cassarino– were found guilty at trial of RICO conspiracy, substantive RICO violation, and various acts of extortion, wire fraud, and money laundering that were co-extensive with the predicate acts alleged in the RICO counts.

Although the Gotti Indictment charges many of the same defendants with many of the same acts alleged in this case, it takes a markedly different position with respect to the ILA, its officers and subordinate organizations, and the other nominal defendants. The Gotti Indictment identifies the relevant RICO enterprise as the Gambino crime family, and identifies all of the defendants in that case as members or associates of the Gambino family. See Gotti Ind. ¶¶ 1-16. Counts One and Two of the Gotti Indictment allege substantive RICO violation and RICO conspiracy, respectively, and identify 33 predicate racketeering acts, many of which are identical to the offenses alleged as predicate acts undertaken by the Waterfront Enterprise in this action. Specifically, the Gotti Indictment identifies the following schemes alleged as predicate acts in this action

as acts attributable to the Gambino family enterprise:  the rigged election of Harold Daggett and others to high-ranking ILA offices;[47] the scheme to rig the award of the MILA PBM contract in GPP/VIP's favor;[48] the extortion of ILA Local 1 delegate Louis Saccenti;[49] the fraud on the Local 1814 membership involving the resignation of Philip Scala and appointment of Patsy Pozzolano as union delegate;[50] the extortion of Howland Hook Container Terminal, Inc.;[51] the extortion of Bridgeside Draydage;[52] money laundering and money laundering conspiracy;[53] attempted extortion of Howland Hook Marine Terminal, Inc.'s right to employ Thomas Ragucci as a hiring agent;[54] the extortion of Leonardo Zinna;[55] and the extortion of Nicola Marinelli.[56]  Except with respect to the allegations regarding Frank Scollo's participation in the schemes of his Gambino family compatriots, however, the <u>Gotti</u> Indictment generally characterizes the

---

[47]     <u>See</u> Am. Compl. ¶¶ 86-114; <u>Gotti</u> Ind. ¶¶ 26-32.

[48]     <u>See</u> Am. Compl. ¶¶ 121-150; <u>Gotti</u> Ind. ¶¶ 33-40.

[49]     <u>See</u> Am. Compl. ¶¶ 187-201; <u>Gotti</u> Ind. ¶¶ 41-47.

[50]     <u>See</u> Am. Compl. ¶¶ 202-214; <u>Gotti</u> Ind. ¶¶ 48-52.

[51]     <u>See</u> Am. Compl. ¶¶ 215-221; <u>Gotti</u> Ind. ¶¶ 53-55.

[52]     <u>See</u> Am. Compl. ¶¶ 222-233; <u>Gotti</u> Ind. ¶¶ 56-58.

[53]     <u>See</u> Am. Compl. ¶¶ 234-236; <u>Gotti</u> Ind. ¶¶ 59-61.

[54]     <u>See</u> Am. Compl. ¶¶ 237-245; <u>Gotti</u> Ind. ¶¶ 66-69.  The <u>Gotti</u> Indictment refers to Thomas Ragucci as "John Doe No. 1," but the verdict sheet in the <u>Gotti</u> trial, attached to the Amended Complaint as Exhibit 7 ("<u>Gotti</u> Verdict Sheet"), makes clear that John Doe No. 1 is Thomas Ragucci.  <u>See</u> <u>Gotti</u> Verdict Sheet at 9.

[55]     <u>See</u> Am. Compl. ¶¶ 246-248; <u>Gotti</u> Ind. ¶ 70.  The <u>Gotti</u> Indictment refers to Leonardo Zinna as "John Doe No. 2," but the <u>Gotti</u> Verdict Sheet makes clear that John Doe No. 2 is Leonardo Zinna.  <u>See</u> <u>Gotti</u> Verdict Sheet at 10.

[56]     <u>See</u> Am. Compl. ¶¶ 249-251; <u>Gotti</u> Ind. ¶¶ 71-74.  The <u>Gotti</u> Indictment refers to Nicola Marinelli as "John Doe No. 3," but the <u>Gotti</u> Verdict Sheet makes clear that John Doe No. 3 is Nicola Marinelli.  <u>See</u> <u>Gotti</u> Verdict Sheet at 10.

ILA and its officials and subordinate labor unions as victims of, rather than participants in, the Gambino family's efforts to expand its influence on the Waterfront. For example, the section of the <u>Gotti</u> Indictment describing the scheme to elect Harold Daggett to the ILA Executive Council is captioned "Conspiracy to Extort the ILA," and alleges that Ciccone, Cassarino, Brancato, and Scollo "agreed to obtain property of ILA union members" by extortionate means. <u>Gotti</u> Indictment ¶ 27. Likewise, the scheme to rig the MILA PBM contract is captioned "Conspiracy to Extort MILA," and again alleges only that Gambino family members and associates were involved in the conspiracy. <u>Id.</u> at 13-14. All of the charged racketeering acts are attributed to the Gambino family enterprise, as the Waterfront Enterprise alleged in the Amended Complaint in this case is not mentioned in the <u>Gotti</u> Indictment.

B.   *United States v. Bellomo* Criminal Case

On February 2, 2002, the United States indicted eight members and associates of the Genovese crime family– Liborio Bellomo, Thomas Cafaro, Pasquale Falcetti, Andrew Gigante, Vincent Gigante, Ernest Muscarella, Michael Ragusa, and Charles Tuzzo– on charges of, <u>inter alia</u>, racketeering, racketeering conspiracy, extortion, mail fraud, and money laundering.[57] <u>See</u> Superseding Indictment (S-2) in <u>United States v. Bellomo</u>, 02-CR-140 (ILG), attached to the Amended Complaint as Exhibit 3 ("<u>Bellomo</u> Indictment" or "<u>Bellomo</u> Ind."). In <u>Bellomo</u>, like <u>Gotti</u>, the Government charged some of the racketeering acts now alleged as RICO predicates in this action, but did not ascribe them to the Waterfront Enterprise or assert that they were jointly undertaken by the Genovese

---

[57]   None of the <u>Bellomo</u> defendants are named as defendants in this action, but all of them are identified as uncharged co-conspirators. <u>See</u> Am. Compl. ¶ 40.

and Gambino families in conjunction with other co-conspirators. Rather, the <u>Bellomo</u> Indictment identifies the relevant RICO enterprise as the Genovese crime family, and charges that enterprise and its members and associates with responsibility for all of the illegal acts alleged therein. <u>See id.</u> ¶¶ 1-16. Like the <u>Gotti</u> Indictment, the charges in the <u>Bellomo</u> Indictment that pertain to the issues raised in this action portray the ILA and other Waterfront entities as the victims of organized crime, rather than co-conspirators with the Genovese family. For example, Racketeering Act 1 of Counts 1 (substantive RICO violation) and 2 (RICO conspiracy) charges that the <u>Bellomo</u> defendants conspired to obtain money from Waterfront business as well as ILA labor union positions, and the salaries and benefits associated with those positions, by extortionate means. <u>Id.</u> ¶ 19. Racketeering Act 2 charges that several of the defendants extorted money from an unidentified owner of a business operating on the Waterfront. Racketeering Act 3 charges Bellomo, Cafaro, Falcetti, and Ragusa with mail fraud and money laundering in connection with the METRO-ILA Funds investment advisor scheme, but unlike the Amended Complaint, it does not identify Harold Daggett or METRO President Joseph Barbera as co-conspirators.[58] <u>Bellomo</u> Ind. ¶¶ 21-23. In keeping with its general depiction of the ILA and related associations, including the METRO-ILA Funds, as victims rather than participants in organized crime's efforts to control the Waterfront, Racketeering Act 3 also alleges that the same defendants conspired to launder the proceeds of embezzlement from the METRO-ILA Pension and

---

[58] The <u>Bellomo</u> Indictment does not specifically identify the vaguely-worded charges of Racketeering Act 3 as the METRO-ILA investment advisor scheme, but the Government's memorandum of law in opposition to the defendants' motions to dismiss this action indicates that Racketeering Act 3 in the <u>Bellomo</u> Indictment is the same scheme alleged as the METRO-ILA investment advisor scheme in the Amended Complaint. <u>See</u> Gov. Mem. at 97 (citing <u>Bellomo</u> Ind. ¶ 22).

Welfare Benefit Funds— allegations that are not made in the Amended Complaint in this action.  Id. ¶ 23.

On April 7, 2003, all of the Bellomo defendants pleaded guilty before this Court to one or more of the charges alleged in the Bellomo Indictment.  Bellomo, Cafaro, Falcetti, Muscarella, and Ragusa pleaded guilty to violating RICO, Andrew Giganti and Tuzzo pleaded guilty to extortion conspiracy, and Vincent Gigante pleaded guilty to one count of obstruction of justice.

C.      *United States v. Bellomo Civil Case*

On April 7, 2003, the same day that the Bellomo defendants pleaded guilty to the criminal charges contained in the Bellomo Indictment, the Government filed a civil complaint against seven of those defendants— all except Vincent Gigante, who was identified as an uncharged co-conspirator— alleging a single claim of racketeering conspiracy in violation of 18 U.S.C. § 1962(d), which incorporated by reference all of the alleged predicate acts stated in the Bellomo Indictment.  See United States v. Bellomo, 03-CV-1683 (ILG) (E.D.N.Y.), Complaint ¶ 27, attached as Exhibit 4 to the Amended Complaint ("Bellomo Complaint" or "Bellomo Compl.").  Unlike the criminal indictment in Bellomo, the Bellomo Complaint identifies the relevant RICO enterprise as being comprised of not only the Genovese crime family, but also the ILA, its affiliated locals in New York, New Jersey, and Miami, individual officers, employees, agents, and representatives of the ILA and its affiliated entities, and the ILA's affiliated employee benefit plans,[59] Bellomo Compl. ¶ 22, and alleged that each of the defendants "sought to

---

[59]      Though including the ILA and its affiliated entities and agents, the "Enterprise" alleged in the Bellomo Complaint is still substantially narrower in scope than the Waterfront Enterprise alleged in the Amended Complaint in this action.  The Bellomo Enterprise does not include any members of the

control and dominate the Waterfront and the Florida Ports, as well as other businesses and unions operating elsewhere, and conduct and participate in the conduct in the affairs of the Enterprise" through the pattern of racketeering alleged in the <u>Bellomo</u> Indictment.  <u>Id.</u> ¶ 29.  Although the enterprise in the <u>Bellomo</u> civil action was defined to include the ILA and related organizations and individuals, the <u>Bellomo</u> complaint nevertheless depicts the Waterfront businesses and organizations, including the ILA , as victims of, rather than co-conspirators with, the agents of organized crime operating on the Waterfront.  For example, the <u>Bellomo</u> Complaint alleges that Gambino and Genovese families "have shared control of the Waterfront," which is defined to include the ILA and its subordinate labor organizations, <u>see</u> <u>id.</u> ¶ 1, "through the use of actual and threatened force, violence and fear, exercising influence over labor unions and businesses at commercial shipping terminals in New York and New Jersey," <u>id.</u> ¶ 4, and further alleges that the Government commenced that action "to enjoin the Defendants from engaging in a pattern of racketeering activity which would enable them to continue their criminal control over the Waterfront and the Florida Ports, the businesses and labor unions operating on the Waterfront and in the Florida Ports. . . ."  <u>Id.</u> ¶ 6.[60]

On May 27, 2003, all of the defendants in the <u>Bellomo</u> civil case entered into a Consent Judgment and Decree with the Government for the purpose of settling that action.  <u>See</u> Am. Compl. Ex. 5 ("<u>Bellomo</u> Consent Decree").  Pursuant to the terms of the

Gambino family, METRO, or any businesses operating on the New York/New Jersey Waterfront or the Port of Miami.  Moreover, because the defendants in the <u>Bellomo</u> civil action quickly entered into consent decrees quickly, and did not file a 12(b)(6) motion in that action, this Court was never called upon to evaluate the sufficiency of the <u>Bellomo</u> Complaint's pleading of the relevant enterprise.

[60]     The <u>Bellomo</u> Complaint contains two paragraphs numbered 6.  The quoted passage is from the first one.

<u>Bellomo</u> Consent Decree, the <u>Bellomo</u> defendants are permanently enjoined, <u>inter alia</u>, from engaging in any activity whatsoever involving the ILA or any of its locals or other constituent labor organizations, and from engaging in any commercial activity in the New York/New Jersey Waterfront and the Port of Miami or having any legal or beneficial interest in any entity that does business in those areas.  <u>Id.</u>; <u>see also</u> Am. Compl. ¶ 45.

        D.    *<u>United States v. Coffey</u>*

Although Frank Scollo was named in the <u>Gotti</u> Indictment, the Government did not pursue criminal charges against any other ILA official with respect to the alleged acts underlying the Amended Complaint in this action until 2004, when, in <u>United States v. Coffey</u>, 04-CR-651 (ILG) (E.D.N.Y.), it filed a sealed criminal complaint and ultimately obtained an indictment, in 2005, charging Arthur Coffey, Harold Daggett, Arthur Cernadas, and Lawrence Ricci with extortion conspiracy and mail fraud in connection with their involvement in the schemes to award PBM contracts to GPP/VIP and mental health care contracts to Compsych discussed above.  <u>See</u> Superseding Indictment (S-2) in <u>United States v. Coffey,</u> 04-CR-651 (E.D.N.Y.) ("Coffey Indictment"), attached to the Amended Complaint as Exhibit 1; <u>see also</u> Complaint in <u>United States v. Coffey</u> ("<u>Coffey</u> Complaint"), attached to Amended Complaint as Exhibit 2.  The <u>Coffey</u> Indictment charged that each defendant was a member or an associate of the Genovese family and alleged that Coffey, Cernadas, and Daggett had abused their positions as Trustees in one or more of the benefit funds associated with the ILA to rig the award of service contracts in favor of GPP/VIP and Compsych.  The <u>Coffey</u> Indictment did not charge a RICO violation, and therefore did not allege the existence of

a RICO enterprise.

Cernadas pleaded guilty to the <u>Coffey</u> Indictment on September 12, 2005, and was ultimately sentenced to two years' probation by this Court on February 22, 2006. The other three defendants pleaded not guilty and went to trial, which commenced on September 19, 2005. Coffey and Daggett were ultimately acquitted of all charges by the jury. Midway through the trial, Ricci failed to appear; his body was subsequently discovered in the trunk of a car approximately two weeks after the trial concluded. Am. Compl. ¶ 40(j).

     E.     *<u>United States v. Local 1804-1, Int'l Longshoremen's Assoc., AFL-CIO</u>*

Although the civil and criminal actions in <u>Gotti</u> and <u>Bellomo</u> are the direct predecessors to this action in terms of the identity of the defendants and the specific claims alleged, the closest parallel to the theory of the Government's case and the types of relief it seeks in this case is the civil action in <u>United States v. Local 1804-1, Int'l Longshoremen's Assoc., AFL-CIO</u>, 90-CV-963 (LBS) (S.D.N.Y.) ("ILA Local Civil RICO Case"). In that case, the Government filed a civil RICO complaint charging a number of ILA locals, the then-current and certain former members of their executive boards, and various ILA employees and organized crime figures, including many of the Racketeering Defendants in this case,[61] with four counts of substantive RICO violation and RICO

---

[61]    The defendants in the ILA Local Civil RICO Case were ILA Local 1804-1 and the following members and former members of its Executive Board: Joseph C.F. Kenny (President), <u>Harold Daggett</u> (Secretary-Treasurer), Harry Cashin (Vice-President), Ronald Capri (Recording Secretary), Thomas Buzzanca (former President), <u>James J. Cashin</u> (former Secretary-Treasurer), and <u>George Barone</u> (former Business Agent); ILA Local 1588 and the following members and former members of its Executive Board: Blase Terraciano (President), George Lachnicht (Vice-President), Dominick Sanzo (Secretary-Treasurer and Business Agent), and Donald J. Carson (former Secretary-Treasurer); ILA Local 1814 and the following members and former members of its Executive Board: Frank Lonardo (President), <u>Louis Pernice</u> (Secretary-Treasurer), Anthony Pimpinella (Executive Vice-President), Alfred Small (Vice-President), Joseph Colozza (Vice-President), Carlos Mora (Vice-President), Joseph Randazzo (Vice-

conspiracy.  The predicate acts alleged in the ILA Local Civil RICO Case are different in

the details than the predicate acts alleged in this action, but similar in the overall picture

they convey of the Waterfront unions and businesses having been infiltrated by agents

of organized crime for the purpose of pressing those legitimate businesses and

organizations into service as "cash cows" for the Mafia.  The ILA Local Civil RICO

Complaint alleged the existence of a "Waterfront Enterprise" that was comprised of

Waterfront businesses and organizations as well as organized crime families and their

agents; however, that complaint defined the Waterfront Enterprise somewhat

differently than does the Amended Complaint in this case.  The ILA Local Civil RICO

Complaint defined the Waterfront Enterprise as being comprised of

> certain members and associates of the Genovese and Gambino Families, the
> Genovese and Gambino Families themselves, acting through those members
> and associates, ILA Locals 1804-1, 1588, 1814, 1809, 1909, 824, certain other
> ILA locals, and certain of their respective Executive Board and their related

President), Leroy Gwynn (Executive Board Member), Gregory Lagana (Delegate), Santo Calabrese
(Executive Board Member), Ralph Perello (Executive Board Member), Richard Pierce (Executive Board
Member), Anthony Ciccone (Administrator), Anthony Scotto (former President), and Anthony Anastasio
(former Executive Vice-President); ILA Local 1809 and the following members of its Executive Board:
John Bowers (President), Robert Gleason (Secretary-Treasurer), Thomas Ryan (Vice-President), and John
Potter (Vice-President); ILA Local 824 and the following members or former members of its Executive
Board:  John Bowers (President), George Bradley (Secretary-Treasurer), and Thomas Ryan (Vice-
President); ILA Local 1909 and the following members of its Executive Board:  John Bowers (President),
Thomas Ryan (Vice-President), and John Potter (Secretary-Treasurer); the following members of the
Genovese Organized Crime Family, all named both individually and as class representatives of the
Genovese family:  Anthony Salerno, Venero Mangano, Tino Fiumara, John Barbato, Douglas Rago, James
Cashin, George Barone, Thomas Buzzanca, Vincent Colucci, Donal Carson, Anthony Gallagher, Michael
Coppola, Harold Daggett, Harry Cashin, Ronald Capri, and George Lachnicht;  the following members of the
Gambino Organized Crime Family, all named both individually and as class representatives of the
Gambino family:  John Gotti, Anthony Anastasio, Anthony Pimpinella, Joseph Colozza, Anthony Scotto,
Anthony Ciccone, Frank Scollo, Frank Lonardo, and Gregory Lagana; the following members of the
Westies Organized Crime Group, both individually and as class representatives of the Westies:  James
Coonanm James McElroy, Kevin Kelly, John Bowers, John Potter, and Thomas Ryan; and the following
Waterfront businesses and organizations, both individually and as class representatives of employers in
industries affecting Waterfront commerce:  Nodar Pump Repair, Inc., Doreen Supply Company, Inc., the
Metropolitan Marine Contractors' Association, and the New York Shipping Association.  See Amended
Complaint in ILA Local Civil RICO Case ("ILA Local Civil RICO Complaint"), attached to Amended
Complaint as Exhibit 8 (emphasis added to names of parties identified as defendants or uncharged co-
conspirators in this case).

> labor councils, and their Pension, Welfare, and Benefit Funds, certain present and former ILA International and local officials and employees, and certain businesses and employer associations operating on or about the Waterfront. . . .

ILA Local Civil RICO Compl. ¶ 69.  The common objective of the defendants as stated in that complaint was "the corrupt control and influence of Waterfront industry and labor unions in order to enrich themselves and their associates."  Id. ¶ 70.  Although a substantial degree of overlap exists between the Waterfront Enterprise as defined in the 1990 action and the enterprise alleged in the Amended Complaint in this action, the 1990 version of the Waterfront Enterprise included ILA Locals 1809 and 1909, which are not alleged in the Amended Complaint to be a part of the relevant RICO enterprise for purposes of this action; conversely, the Amended Complaint here identifies the ILA International; ILA Atlantic Coast District and South Atlantic & Gulf Coast District; Locals 1922, 1922-1, and 2062; and the ILA Local 1922 Health and Welfare Fund and the ILA-Employers Southeast Florida Ports Welfare Fund, none of which were identified as part of the Waterfront Enterprise as defined in the ILA Local Civil RICO Case, as part of that enterprise in this action.  Compare id. with Am. Compl. ¶ 67.

In the ILA Local Civil RICO Case, the Government sought preliminary and permanent injunctions against the defendants, the primary effects of which would be to: (1) enjoin the organized crime defendants and any other defendant found to have participated in racketeering activity from participating in any way in the management of the ILA Locals or any Waterfront business entity or organization; (2) enjoin the ILA officials and Executive Boards from committing any act of racketeering activity or associating with any member of La Cosa Nostra; (3) order that new elections be held for

the ILA Local Executive Boards named in the complaint, which would be overseen by a court-appointed trustee and conducted in such a manner as to ensure that they were not vulnerable to intimidation or other improper influences; and (4) appoint an administrator, who would remain in place "until such time as the Waterfront and the ILA Locals are free of the corruption, domination, control, and infiltration by La Cosa Nostra," to oversee the operations of the Waterfront, including but not limited to the ILA Locals and the Waterfront employers named in the complaint, for the purpose of preventing racketeering activity. ILA Local Civil RICO Compl. at 123 (Demand for relief subpart (e)). All of the ILA Locals named in the ILA Local Civil RICO Complaint eventually signed consent decrees with the Government settling the case against them. Each ILA Local agreed to an injunction prohibiting all of its present or future agents, employees, and members from committing any racketeering activity and from associating with any member or associate of organized crime. Most of the ILA Locals also agreed to the imposition of a court-appointed monitor, and three– Locals 824, 1809, and 1909– agreed to supervision of their upcoming elections by the United States Department of Labor. See Am. Compl. Ex. 9-11 (consent decrees in ILA Local Civil RICO Case). Several defendants and uncharged co-conspirators in the present action, including John Bowers, Sr., Harold Daggett, Robert Gleason, George Barone, James Cashin, Anthony Ciccone, and Louis Pernice, signed the consent decrees in their individual and official capacities as officers of one or more of the ILA Locals named in the 1990 action; other defendants failed to appear in that action and default judgments were entered against them. See id.; see also Am. Compl. ¶ 55.

Trial in the ILA Local Civil RICO Case commenced on April 15, 1991, against the

four defendants– Donald Carson, Anthony Gallagher, George Lachnicht, and Venero Mangano– who had neither settled nor defaulted.  Following a ten-week bench trial that took place over the course of eleven months, Judge Sand of the Southern District of New York issued a written opinion in which he found each of those defendants liable for the civil RICO violations at issue in that litigation.  See <u>United States v. Local 1804-1, Int's Longshoremen's Assoc.</u>, 812 F. Supp. 1303 (S.D.N.Y. 1993).  Most significantly for purposes of this action, Judge Sand found that the Waterfront Enterprise alleged in the ILA Local Civil RICO Complaint was a cognizable RICO enterprise, and that the Government had established a pattern of racketeering activity sufficient to establish its RICO claims.  Regarding the existence of the Waterfront Enterprise, Judge Sand acknowledged that the court's analysis of that issue was complicated by the fact that none of the defendants had challenged the Government's pleading or evidence in support of the existence of the Waterfront Enterprise at trial because most of the defendants, including all of the ILA Locals and the other institutional defendants, had settled the case or defaulted before trial, and the remaining defendants "took a position which assumed the existence" of that enterprise.  <u>Id.</u> at 1310.  Nevertheless, the court concluded that it could adequately assess the existence of the Waterfront Enterprise by making "independent inquiries into the evidence presented by the government. . . [and] careful scrutiny of the government's case."  <u>Id.</u> at 1311.  Surveying much of the same historical information regarding the Genovese and Gambino families' efforts to infiltrate and corrupt Waterfront labor unions and business for the purpose of extending organized crime's influence over Waterfront commerce that is recounted in the Amended Complaint in this action, Judge Sand found that "the piers of New York and

New Jersey have been fertile ground for organized crime for the better part of this century, and that control of union locals has been an integral part of organized crimes schemes to exploit the Waterfront." Id. at 1312. Finding that the Waterfront Enterprise was an "integrated market" that had historically been subject to Mafia infiltration and control, Judge Sand concluded that "there is sufficient evidence of the existence of an association in fact among the ILA, the ILA locals, the Waterfront employers, and members of the Gambino and Genovese crime families so that the 'Waterfront' can properly be characterized as a RICO enterprise." Id. at 1315. Judge Sand further found that the Government had "clearly sustained its burden of demonstrating 'a pattern of racketeering activity," reviewing the familiar elements of relatedness and continuity . Id. at 1316. He found that the alleged predicate acts were related by the "common thread" of "exploitation of the Waterfront enterprise by LCN figures and their ILA confederates through control of ILA Local 1588," id., and that the threat of continuity was established by virtue of the fact that "[i]n in context of organized crime enterprises, the Second Circuit has noted that 'continuity' may virtually be presumed." Id. (citing United States v. Indelicato, 865 F.2d 1370, 1383-84 (2d Cir. 1989)). The court then proceeded to determine that each of the defendants on trial were liable for violating RICO by committing at least two of the alleged predicate acts, the details of which are not relevant for present purposes.

## DISCUSSION

I.      Standard of Review

      A.      Government's Argument that Defendants' Motions be Treated as
             Constructive Motions for Summary Judgment

Before it can determine the appropriate standard of review to be applied to the defendants' motions, the Court must decide whether to treat those motions as motions to dismiss under Rule 12(b)(6) or motions for summary judgment under Rule 56(b). The Government, taking note of the fact that many of the defendants attached documents to their memoranda of law in support of their motions to dismiss that are not attached as exhibits to the Amended Complaint, argues that the defendants' purported 12(b)(6) motions "are actually motions for summary judgment only feebly disguised as motions to dismiss." Gov. Mem. at 132; see also id. at 166 n. 82 (arguing that "a number of defendants, the ILA prominent among them, have constructively moved for summary judgment."). The Government therefore urges the Court to construe the defendants' motions as motions for summary judgment under Rule 56(b), and to deny the motions as inappropriate at this point in the proceedings because the Government has not yet had an opportunity to conduct testimonial discovery. Aside from defendant Gleason, who expressly moved for summary judgment but withdrew that motion at oral argument, the defendants deny that their 12(b)(6) motions are constructive summary judgment motions, and argue that the documents attached to their motion papers may be considered by the Court on a 12(b)(6) motion under the applicable legal standards.

Rule 12(b) provides that, on a motion arising under Rule 12(b)(6),

[i]f. . . matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

"As indicated by the word 'shall,' the conversion of a Rule 12(b)(6) motion into one for

summary judgment under Rule 56 when the court considers matters outside the pleadings is 'strictly enforce[d]' and 'mandatory.'" <u>Global Network Commc'ns, Inc. v. City of New York</u>, 458 F.3d 150, 155 (2d Cir. 2006) (quoting <u>Amaker v. Weiner</u>, 179 F.3d 48, 50 (2d Cir. 1999); <u>Goldman v. Belden</u>, 754 F.2d 1059, 1066 (2d Cir. 1985)).  In <u>Global Network Communications</u>, the Second Circuit recognized that the 12(b)(6) conversion rule furthers the purposes of Rule 12(b)(6) and Rule 56, and "also solves the major problem that arises when a court considers matters extraneous to a complaint, namely, the lack of notice to the plaintiff that outside matters would be examined."  458 F.3d at 155.  However, a district court is not obliged to convert a 12(b)(6) motion to one for summary judgment in every case in which a defendant seeks to rely on matters outside the complaint in support of a 12(b)(6) motion; it may, at its discretion, exclude the extraneous material and construe the motion as one under Rule 12(b)(6).  <u>See</u> <u>Friedl v. City of New York</u>, 210 F.3d 79, 83 (2d Cir. 2000) ("'[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion,' a district court must <u>either</u> 'exclude the additional material and decide the motion on the complaint alone' or 'convert the motion to one for summary judgment under Fed.R.Civ.P. 56 and afford all parties the opportunity to present supporting material.'" (emphasis added) (quoting <u>Fonte v. Bd. of Managers of Cont'l Towers Condo.</u>, 848 F.2d 24, 25 (2d Cir. 1988)); <u>see generally</u> 5C Wright & Miller, <u>Federal Practice and Procedure:  Civil 3d</u> § 1366 (2004).  In this case, the Court chooses not to convert the defendants' pending motions to motions for summary judgment, for two reasons.  First, some of the extraneous material to which the Government objects falls into one of the exceptions to the general rule that a district court cannot consider matters outside the pleadings on a 12(b)(6) motion, so

that the Court can consider it without converting the motions. Second, while many of the exhibits and arguments that the defendants put forth are in fact inappropriate for consideration on a 12(b)(6) motion, the Court finds that even after excluding such material, the pending challenges to the sufficiency of the Amended Complaint raise substantial issues that should be considered before allowing this action to proceed further. Having decided against converting the pending 12(b)(6) motions to Rule 56(b) motions, the Court must determine which, if any, of the exhibits attached to the defendants' moving papers may be considered by the Court in resolving these motions.

The Government objects to the following defendants' exhibits as exceeding the scope of a 12(b)(6) motion: ILA Exhibits A, B, C, J, K, and L;[62] MILA Exhibits 1-3;[63] Gleason Exhibits D, E, and F;[64] and Bowers Exhibit 1.[65] Although, as a general matter, the court must rely only on the facts alleged in the Amended Complaint and accept those facts as true for purposes of resolving a Rule 12(b)(6) motion, see Discussion Part I(B), infra, in some cases it may consider documents outside the complaint, including documents attached to a defendant's 12(b)(6) motion papers. The Second Circuit has recognized that "the problem that arises when a court reviews statements extraneous to a complaint [in adjudicating a 12(b)(6) motion] generally is the lack of notice to the

---

[62] See Declaration of Stephanie J. Goldstein, dated May 19, 2006 (docket no. 95). Exhibits to the Goldstein Declaration shall hereinafter be referred to as "ILA Exhibits."

[63] See Affidavit of Donato Caruso, dated May 15, 2006 (docket no. 93). Exhibits to the Caruso Affidavit shall hereinafter be referred to as "MILA Exhibits."

[64] See Declaration of Francis J. Murray, dated May 18, 2006 (docket no. 91). Exhibits to the Murray Declaration shall hereinafter be referred to as "Gleason Exhibits."

[65] See Affidavit of Lee Renzin in Support of Defendant John Bowers's Motion to Dismiss the Amended Complaint (docket no. 99). The exhibit to the Renzin Affidavit shall hereinafter be referred to as "Bowers Exhibit 1."

plaintiff that they may be so considered," and that in some circumstances where this problem is not present, the district court may consider documents outside the complaint in resolving a 12(b)(6) motion to dismiss. Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991). "Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." Id. For that reason, in resolving a 12(b)(6) motion the district court's "consideration is limited to the factual allegations in plaintiffs' amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).[66] The last category noted in Brass was abrogated somewhat by the Second Circuit's subsequent clarification"that a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (emphasis in original). Moreover, the Second Circuit has held that an extraneous document is not incorporated by reference into the complaint where "[t]he amended complaint merely discussed these documents and presented short quotations from them. '[L]imited quotation does not constitute incorporation by reference.'" Cosmas v. Hassett, 886 F.2d

---

[66]     Federal Rule of Evidence 201 states that judicially noticeable facts are those which are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

8, 13 (2d Cir. 1989) (quoting Goldman v. Belden, 754 F.2d 1059, 1066 (2d Cir. 1985)).

With these principles in mind, the Court must examine each of the exhibits attached to the defendants' motion papers to which the Government objects in order to determine which, if any, of those exhibits may be considered on a 12(b)(6) motion.

ILA Exhibit A is a copy of a New York Daily News article, dated June 16, 2004, regarding the sentencing of Anthony Ciccone.  The ILA quotes a portion of this article in its memorandum in support of its argument that, contrary to the Government's assertions in the Amended Complaint, organized crime no longer enjoys the dominion over Waterfront operations that existed at the time of the prior prosecutions and investigations cited in the Amended Complaint.[67]  The ILA argues that the Court can refer to this document for "background" without converting the ILA's 12(b)(6) motion into a motion for summary judgment, citing the Second Circuit's ruling in Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999), that the court need not convert a 12(b)(6) motion into a summary judgment motion when "the court simply refers to supplementary materials, but does not rely on them or use them as a basis for its decision."  The problem with the ILA's argument is that it did not submit the Daily News article as mere "background," but rather for the purpose of challenging the factual accuracy of the Amended Complaint's allegations regarding the ongoing influence of organized crime on the Waterfront.  ILA Exhibit A falls within none of the categories of documents outside the complaint that may be considered in a 12(b)(6) motion identified by the Second Circuit in Bright, and the Court therefore shall not consider it in ruling on

---

[67]    The Daily News article quotes assistant police chief Kevin McGowan's statement describing Ciccone's sentencing as "the end of an era.  He's the last capo on the waterfront."  ILA Mem. at 2, 51 (citing Goldstein Decl. Ex. A).

the ILA's 12(b)(6) motion.

ILA Exhibit B is a copy of the ILA's 2004 Form LM-2, an annual report that it is required to file with the Department of Labor. The ILA cites this document for the proposition that "[t]he ILA represents approximately 59,000 members," ILA Mem. at 5, and argues that it is entitled to introduce this document because it was cited in the Amended Complaint. ILA Mem. at 5 n. 3 (citing <u>Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc.</u>, 165 F. Supp. 2d 514, 525 n. 7 (S.D.N.Y. 2001) (district court could consider several documents submitted by the defendants which were "referenced in the Amended Complaint, incorporated therein, or which were clearly in Nasik's possession and relied on by Nasik in filing suit.")); <u>see also</u> ILA Reply Mem. at 4. The ILA is correct. Paragraph 17 of the Amended Complaint refers to the ILA's "most recent annual filing with the Department of Labor," and reproduces salary information for six ILA Defendants contained in that report. Although the Government's limited quotation of the ILA's 2004 Form LM-2 might not rise to the level of incorporation by reference, the Government clearly possessed and relied on this document in drafting the Amended Complaint, and the Court may consider it for purposes of the presently pending motions.

ILA Exhibit C is a copy of the ILA's Constitution, as amended in July 2003. The ILA relies on this document to correct what it sees as an inaccuracy in the Amended Complaint regarding the replacement of ILA Executive Council officers in non-convention years. The Amended Complaint asserts that "[i]n a non-Convention year, vacancies on the ILA Executive Council are filled by the Executive Council from the membership of the Executive Council." Am. Compl. ¶ 96. The ILA argues that the

Government's characterization is incorrect, noting that under its Constitution, "only the President's position is filled from existing members of the Executive Council; any ILA member can be appointed to the other positions." ILA Mem. at 6 (citing ILA Constitution, Art. VIII, § 7). The ILA argues that its Constitution is incorporated into the Amended Complaint by reference. ILA Reply Mem. at 4. Whether the Amended Complaint's use of the ILA Constitution rises to the level of incorporation by reference is a close question, but at a minimum, the Government possessed and relied on the ILA Constitution in drafting the Amended Complaint. For example, paragraphs 95 and 96 of the Amended Complaint, which describe the procedure for Executive Council elections and replacement of Executive Council members in non-convention years, necessarily rely on the terms or effects of the ILA Constitution. The Court can conceive of no good-faith basis upon which the Government could make assertions of fact regarding the ILA's election procedures without relying on the ILA Constitution. Moreover, Paragraph 16 of the Amended Complaint quotes extensively from the ILA's Constitution in describing the positions of the ILA Executive Council members and the authority of the Executive Council. The Court therefore finds that it may consider the ILA Constitution in resolving the pending 12(b)(6) motions. It further finds that paragraph 96 of the Amended Complaint is inaccurate, insofar as it represents that replacements for Executive Council members, other than the President, in non-convention years must be drawn from the ranks of present Executive Council members.[68]

---

[68] Article VIII, Section 7 of the ILA Constitution states that the Executive Council shall chose "from among their numbers" a replacement President if the sitting president leaves office for any reason in a non-convention year; while the Executive Council also has the authority to select replacements for other Executive Council positions in such circumstances, there is no language requiring it to select the replacement from among current Executive Council members.

ILA Exhibit J is a copy of the ILA's Code of Ethics, dated January 1, 2004, and ILA Exhibit K is a letter from attorney Joseph D. McCann to AUSA Richard Hayes, dated June 30, 2005.  The Court shall discuss the two exhibits together because of the substantial overlap in the subject matter to which they relate.  The ILA relies on the Code of Ethics for various factual propositions in support of its arguments that 1) the equitable relief sought by the Government against the ILA is unwarranted, and 2) the Amended Complaint fails to establish open-ended continuity of the pattern of racketeering acts because the ILA has taken steps to eliminate the risk of ongoing Mafia influence over its operations.  Of particular significance, the ILA asserts on the basis of these exhibits that the Government's allegation in paragraph 64 of the Amended Complaint that the ILA's Ethical Practices Counsel, a position created by Article VIII of the Code of Ethics, "has no authority to take disciplinary action" against ILA members found to be involved in organized crime, but may only "recommend that the ILA Executive Council take action," and that members of the Executive Council therefore "have the sole right to determine whether they may be subject to discipline," is inaccurate.  The ILA further asserts that any decision by the Executive Council not to take disciplinary action against an ILA member, including an Executive Council member, would be appealable to the ILA's independent Appellate Officer, whose decision would be final.  ILA Mem. at 52.  In support of the latter assertion, the ILA does not cite any provision of its Constitution or Code of Ethics, but rather cites only the letter from McCann to Hayes in which Mr. McCann informs Hayes that

> [t]he permanent position of an independent Appellate Officer has been
> created.  This Appellate Officer will serve for the same term as the Ethical
> Practices Counsel, and will have jurisdiction to hear appeals from decision of

the ILA Executive Council on matters brought before it by the Ethical
Practices Counsel. Notably, the Appellate Officer will also have the authority
to hold *de novo* hearings and his/her decision would constitute the final
decision of the ILA.

ILA Ex. K at 2.

The Court finds that the Amended Complaint, which cites the ILA's Code of

Ethics as the basis of its allegations regarding the effectiveness of the ILA's reform

efforts, necessarily relies upon the Code of Ethics, and that the Court may therefore

consider the contents of that document for purposes of resolving this motion. However,

most of the ILA's reliance on the Code of Ethics is not for the purpose of correcting the

Government's supposed misrepresentations about the terms of the that document, but

rather for the purpose of arguing, as a factual matter, that the ILA's adoption of the

Code of Ethics eliminates the ongoing threat of organized crime activity on the

Waterfront that is alleged in the Amended Complaint. See ILA Mem. at 17-18 (section

headed "The Relief Requested is Duplicative," which argues that the Government "fails

to credit that the ILA took action prior to the filing of the Complaint" by adopting the

Code of Ethics "to address the issues now raised in the Government's Complaint"); id. at

51 (arguing that the Government has not established open-ended continuity because

"any Government theory about future organized crime involvement in the ILA is made

even more speculative by the affirmative steps taken by the ILA to eradicate corruption,"

referring specifically to the adoption of the Code of Ethics). Even though the Court is

permitted to consider the contents of the Code of Ethics, it is nevertheless bound to

accept the factual allegations in the Amended Complaint– including the allegations

regarding the risk of ongoing organized crime involvement in the ILA notwithstanding

the adoption of the Code of Ethics– for purposes of this motion. It therefore declines to consider the ILA's factual argument that the Code of Ethics is more effective at eliminating corruption in the ILA than the Amended Complaint suggests. The Court further finds that the Government's allegation that the ILA Ethical Practices Counsel lacks authority to take disciplinary action, but can only recommend to the Executive Council that action be taken, is a fair inference drawn from the terms of the Code of Ethics and the ILA Constitution, to which the Government is entitled at this stage of the proceedings. Am. Compl. ¶ 64; see ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (Rule 12(b)(6) requires "accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor.") (citing Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000)). Paragraph 5 of the Code of Ethics gives the Ethical Practices Counsel authority "to investigate and file charges against any officer, representative, employee or member of the ILA," while Paragraph 6 states that if the Ethical Practices Counsel determines that filing a disciplinary charge is necessary, "[t]he Ethical Practices Counsel shall then file the charge in accordance with Article XVIII of the ILA Constitution." Article XVIII of the ILA Constitution provides that disciplinary charges may be filed at the local level, but vests ultimate authority to discipline an ILA member or a local governing body in the Executive Council. See ILA Ex. C, Art. VIII §§ 1(e)-(f), 2. Thus, the Government's allegation that the Ethical Practices Counsel can only "recommend" that disciplinary action be taken against an ILA member for that member's involvement in organized crime, and that the decision whether to take such action rests ultimately in the discretion of the Executive Counsel, is a reasonable inference to be drawn from the language of the documents in question, and

the Court shall assume it to be true for purposes of the present motions.

The ILA also argues that the Government's characterization of the Executive Council's ultimate authority to decide disciplinary matters is factually incorrect because the ILA's Appellate Officer has jurisdiction to review disciplinary decisions by the Executive Council and to issue binding decisions. Notably, the ILA does not cite any provision of the Code of Ethics or the ILA Constitution for that proposition, but cites only the June 30, 2005, McCann letter. The McCann letter is not incorporated by reference into the Amended Complaint, and although the Government presumably possessed it at the time the Amended Complaint was filed, there is no indication that it relied on that letter in drafting the Amended Complaint. As the Second Circuit made clear in <u>Chambers</u>, mere possession is insufficient to permit the Court to consider the contents of a document not attached to or incorporated in the complaint; the further element of reliance must also be present. <u>See</u> <u>Chambers</u>, 282 F.3d at 153. The Court therefore shall not consider ILA Exhibit K for purposes of the present motions.

ILA Exhibit L is a joint press release of the United States Attorney for the Eastern District of New York and the Office of the Attorney General for the state of New York, which announces the indictments in the <u>Gotti</u> prosecution. The ILA cites this press release in support of its argument that the Government's position in <u>Gotti</u> and <u>Bellomo</u> portrayed the ILA and its officials as victims of organized crime, rather than co-conspirators, and is therefore inconsistent with the position taken in this action. ILA Mem. at 24. The ILA does not argue that the press release was incorporated by reference in the Amended Complaint or relied upon by the Government in drafting that document, but simply asserts that the Government's objection to the attachment of its

own press release to the ILA's motion papers "is hardly well taken."  ILA Reply Mem. at

4 n. 2.  Well taken or not, the ILA offers no support for the proposition that a plaintiff's

own prior statements that are not incorporated by or relied upon in the complaint may

be considered by the Court in addressing a 12(b)(6) motion, nor is the Court aware of

such a rule.  The scant Second Circuit authority on this point suggests that press releases

are not subject to judicial notice.  See Kramer v. Time Warner Inc., 937 F.2d 767, 774

(2d Cir. 1991) (in civil action for securities fraud, finding that documents required by

law to be filed with the SEC are properly subject to judicial notice, but "stress[ing] that

our holding relates to public disclosure documents required by law to be filed, and

actually filed, with the SEC, and not to other forms of disclosure such as press releases

or announcements at shareholder meetings.").  The Court therefore shall not consider

ILA Exhibit L in adjudicating the pending motions.

MILA Exhibit 1 is a copy of MILA's "Code of Conduct," which deals with

prohibiting association or involvement with organized crime by MILA trustees,

fiduciaries, employees, agents, and representatives.  MILA Exhibit 2 is an Amendment

to the MILA Trust and Plan that incorporates the Code of Conduct into the Trust and

Plan, clarifies that MILA Trustees are subject to removal for violations of the Code of

Conduct, and requires that each service contract into which MILA enters must include a

provision that permits MILA to cancel the contract immediately if MILA's Ethical

Practices Monitor has reason to believe that the counterparty to the agreement is

associated with organized crime.  MILA Exhibit 3 is an excerpt from the minutes of a

MILA Board of Trustees meeting held on January 11-12, 2005, in which the MILA Board

adopted a resolution to authorize MILA's Ethical Practices Monitor to investigate the

finalists competing for MILA PBM health care and mental health contracts.  MILA relies on all of these exhibits in support of its argument that the Government has failed to establish open-ended continuity with respect to the GPP/VIP scheme because MILA's implementation of the Code of Conduct "assure[s] a racketeer-free environment in the conduct of the affairs of MILA."  MILA Mem. at 25; see also MILA Reply Mem. at 12-13 ("Well before the commencement of this action, MILA put into effect protective measures that assure a racketeer-free environment in the conduct of the affairs of MILA.").  MILA makes no effort to argue that any of these exhibits are incorporated by reference or relied upon by the Government in drafting the Amended Complaint.  The Court therefore shall not consider these documents, or MILA's argument that additional factual matters not stated in the Amended Complaint belie the Government's allegations, for purposes of resolving the present motions.

Gleason Exhibits D and E are excerpts of the Coffey trial transcript, and Gleason Exhibit F is a letter from attorney Francis J. Murray of Murray & McCann to AUSA Richard Hayes, dated January 12, 2006, in which Mr. Murray urges Mr. Hayes, "in light of the testimony of George Barone" in the Coffey trial, to reclassify Mr. Gleason as a nominal defendant in the Amended Complaint.  Mr. Gleason does not cite Exhibits D and E for any purpose in his memorandum of law, nor did his attorney mention them at oral argument.  The Court therefore need not consider those exhibits regardless of whether they could be considered under any of the exceptions noted by the Second Circuit in Brass.  Mr. Gleason cites Exhibit F in support of his argument that George Barone's testimony at the Coffey trial establishes that Mr. Gleason "is not an associate of the Genovese Family, and that he does not owe his positions in the ILA or its various

trust and benefit funds to any organized crime influence." Memorandum of Law in Support of Defendant Robert Gleason's Motion to Dismiss the Amended Complaint, to Strike Scandalous Matter, and in the Alternative for Summary Judgment ("Gleason Mem.") at 8 (emphasis in original). The McCann letter cannot be considered by the Court for purposes of this 12(b)(6) motion for the same reasons as ILA Exhibit K, the Murray letter, discussed above. The Court shall therefore exclude it for purposes of the pending motions.

Bowers Exhibit 1 is a press release issued by the United States Attorney's Office for the Eastern District of New York on July 27, 2004, which announces the indictments of Harold Daggett and Arthur Coffey in the Coffey case. Bowers's memorandum of law quotes extensively from this press release in support of his argument that he was a victim of organized crime extortion, rather than a co-conspirator in a RICO enterprise. See Bowers Mem. at 6-7. He argues that the Court may consider the press release because it is subject to judicial notice and because the Government possessed and relied on that document in drafting the Amended Complaint. See id. at 7 n.6 (citing Nasik Breeding, 165 F. Supp. 2d at 525). However, Bowers cites no authority in support of the proposition that a Government press release is judicially noticeable, and as discussed above with respect to ILA Exhibit L, the available authority suggests that it is not. There is also no indication that the Government relied on the press release in the Amended Complaint. The Court therefore shall exclude Bowers Exhibit 1 from consideration on this motion.

Thus, in resolving the pending 12(b)(6) motions, the Court shall exclude the following exhibits: ILA Exhibits A, K, and L; MILA Exhibits 1-3; Gleason Exhibits D, E,

59

and F; and Bowers Exhibit 1.  The Court shall consider ILA Exhibits B, C, and J, and all

defendants' exhibits to which the Government did not object.  The Court shall also

exclude in its entirety the Declaration of Kathleen A. Nandan ("Nandan Decl."), dated

December 12, 2006 (docket no. 184), which was submitted by the Government in

opposition to defendant Gleason's motion for summary judgment and in opposition to

the other defendants' 12(b)(6) motions "to the extent that these motions rely on facts

and information that are not set forth in the Complaint in this action, as amended."

Nandan Decl. at 1.

 B. <u>Standard of Review for Rule 12(b)(6) Motions</u>

 A Rule 12(b)(6) motion subjects the complaint only to a superficial review, testing

whether the plaintiff has stated a plausible claim of entitlement to relief without

examining the evidence supporting those allegations.  The Second Circuit has

recognized that

> [t]he purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal
> sufficiency of the plaintiff's statement of a claim for relief without resolving
> a contest regarding its substantive merits.  The Rule thus assesses the legal
> feasibility of the complaint, but does not weigh the evidence that might be
> offered to support it.

<u>Global Network Communications</u>, 458 F.3d at 155 (emphasis omitted) (citing <u>AmBase</u>

<u>Corp. v. City Investing Co. Liquidating Trust</u>, 326 F.3d 63, 72 (2d Cir.2003); 5B Wright

& Miller, <u>Federal Practice and Procedure:  Civil 3d</u> § 1356 (2004)).  In evaluating the

Amended Complaint in light of the defendants' motions to dismiss, this Court "must

accept as true all of the factual allegations set out in plaintiff's complaint, draw

inferences from those allegations in the light most favorable to plaintiff, and construe

the complaint liberally."  <u>Gregory v. Daly</u>, 243 F.3d 687, 691 (2d Cir. 2001) (quoting

Conley v. Gibson, 355 U.S. 41, 45-46 (1957)); see also Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."); Roth v. Jennings, 489 F.3d 499, 510 (2d Cir. 2007) (citing Gregory).

The Court's review of the Amended Complaint, except for the allegations of mail and wire fraud,[69] is guided by the pleading standard set forth in Federal Rule of Civil Procedure 8 ("Rule 8"). Rule 8(a)(2) provides that a civil complaint "shall contain. . . a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court clarified the pleading requirements imposed by Rule 8(a)(2) and the standard of review to be applied under Rule 12(b)(6) to a pleading governed by Rule 8(a)(2) in its recent decision in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007). In Bell Atlantic, the Court held that the plaintiff's allegations of anticompetitive parallel conduct among regional telephone companies was insufficient to state a claim for antitrust conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, because "nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy." 127 S. Ct. at 1971. In reaching that holding, the Court distanced itself from its oft-quoted passage in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), which stated that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in

---

[69]     The portions of the Amended Complaint alleging mail and wire fraud are governed by the heightened pleading requirement of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)")"). See Moore v. PaineWebber, Inc., 189 F.3d 165, 173 (2d Cir. 1999) ("Federal Rule of Civil Procedure 9(b) states that in averments of fraud, 'the circumstances constituting fraud. . . shall be stated with particularity.' This provision applies to RICO claims for which fraud is the predicate illegal act.") (citing S.Q.K.F.C., Inc., v. Bell Atlantic Tricon Leasing Corp., 84 F.3d 629, 634 (2d Cir. 1996)).

support of his claim which would entitle him to relief."  The <u>Bell Atlantic</u> Court held that

the "no set of facts" passage in <u>Conley</u> is "best forgotten," 127 S. Ct. at 1969, and

articulated a "plausibility" standard for pleading under Rule 8(a)(2), pursuant to which

"[f]actual allegations must be enough to raise a right to relief above the speculative level,

on the assumption that all the allegations in the complaint are true. . . ."  <u>Id.</u> at 1965

(citations omitted).  The Court emphasized that the plausibility standard was not a

heightened pleading requirement, explaining that "[a]sking for plausible grounds to

infer an agreement does not impose a probability requirement at the pleading stage; it

simply calls for enough fact to raise a reasonable expectation that discovery will reveal

evidence of illegal agreement."  <u>Id.</u>  Later in the same Term, the Court tacitly reaffirmed

its assertion that the <u>Bell Atlantic</u> plausibility criterion does not impose a heightened

pleading standard on Rule 8(a)(2) pleadings, holding in <u>Erickson v. Pardus</u>, 127 S. Ct.

2197, 2200 (2007) (per curiam), that "[s]pecific facts are not necessary" under Rule

8(a)(2), and that the complaint "need only 'give the defendant fair notice of what the. . .

claim is and the grounds upon which it rests.'"  <u>Id.</u> (quoting <u>Bell Atlantic</u>, 127 S. Ct. at

1964).

   In <u>Iqbal v. Hasty</u>, 490 F.3d 143, 155-56 (2d Cir. 2007), the Second Circuit

acknowledged that the Supreme Court's decision in <u>Bell Atlantic</u> created "considerable

uncertainty concerning the standard for assessing the adequacy of pleadings," noting the

apparent inconsistencies between the Court's articulation of the plausibility standard

and its explicit abrogation of <u>Conley</u>, on one hand, and its insistence that it was not

imposing a new or heightened specificity requirement on Rule 8 pleading, on the other.

The <u>Iqbal</u> court rejected as "too cavalier" the suggestion that the Supreme Court

intended its discussion of pleading standards in <u>Bell Atlantic</u> to apply only to Sherman Act § 1 cases, or only to antitrust cases, noting that the passage in <u>Conley</u> rejected by <u>Bell Atlantic</u> had been cited more than 10,000 times "in a wide variety of contexts." <u>Id.</u> at 157 n.7. <u>Iqbal</u> concluded that the <u>Bell Atlantic</u> Court "is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." <u>Id.</u> at 157-58 (emphasis omitted). In the relatively short time since <u>Bell Atlantic</u> and <u>Iqbal</u>, Judge Garaufis of this District has applied the plausibility standard in the context of two civil RICO proceedings. <u>See</u> <u>Republic of Colombia v. Diageo North America Inc.</u>, No. 04-CV-4372, 2007 WL 1813744, at *8-9 (E.D.N.Y. June 19, 2007); <u>Valle v. YMCA of Greater New York</u>, No. 06-CV-2083, 2007 WL 2126269, at *1 (E.D.N.Y. July 24, 2007).

II.      Sufficiency of the Amended Complaint Under Rule 12(b)(6)

Many of the defendants moved separately under Rule 12(b)(6) to dismiss the Amended Complaint against them individually; however, the ILA's motion, in which a number of other defendants expressly joined, primarily addresses the fundamental viability of the RICO claims alleged in the Amended Complaint <u>in toto</u>, rather than as applied to any particular defendant. Because the shortcomings in the Amended Complaint raised by the ILA compel the Court to dismiss the Amended Complaint in its entirety, the Court need not consider the individual 12(b)(6) motions made by the other defendants.

As noted above, the Amended Complaint charges the Racketeering Defendants with two RICO violations: conspiracy to violate 18 U.S.C. § 1962(c) in violation of

§ 1962(d) (Count 1), and conspiracy to violate § 1962(b) in violation of § 1962(d) (Count 2).  The Supreme Court has recognized that "[t]he elements predominant in a [§ 1962] subsection (c) violation are:  (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity" Salinas v. United States, 522 U.S. 52, 62 (1997); see also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985), while the Second Circuit has established a more detailed test containing essentially the same elements, holding that in order to state a claim under §1962(b) and (c), a plaintiff must "allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise'" (7) the activities of which affect interstate or foreign commerce."  Moss v. Morgan Stanley Inc., 719 F.2d 5, 17 (2d Cir. 1983); see also Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Invs. Ltd., 154 F. Supp. 2d 682, 690 (S.D.N.Y. 2001) (quoting Moss).  In Salinas, the Court held that the Government need not prove that each defendant committed or agreed to commit two specific predicate acts in order to establish liability for RICO conspiracy under 18 U.S.C. § 1962(d), recognizing that "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense."  Salinas, 522 U.S. at 63.  The Salinas Court further held that in order for liability to attach, "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.  He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion."  Id. at 65.

The ILA raises a number of challenges to the sufficiency of the Amended Complaint, which fall into four broad categories:  1) challenges to the Amended Complaint's allegations of conspiracy; 2) challenges to the pleading of the Waterfront Enterprise; 3) challenges to the pleading of the predicate acts; and 4) challenges to the pleading of a pattern of racketeering.  The Court finds that it need not address all of the arguments raised by the ILA, for its challenges to the Amended Complaint's pleading of the Waterfront Enterprise and the predicate acts are sufficient to require dismissal. Before proceeding to those issues, however, the Court must first examine another defect in the pleading of the Amended Complaint that became apparent in the Government's memorandum in opposition to the present motions and at oral argument.

A.      Propriety of Pleading Essential Elements by Incorporation of Attached
        <u>Pleadings from Prior Criminal and Civil Cases</u>

In <u>United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.</u>, 793 F. Supp. 1114, 1130 (E.D.N.Y. 1992) (Glasser, J.), another civil RICO action involving allegations of organized crime infiltration of a labor union and a number of corporations and individuals employing the union's members, this Court held that the "lack of clarity" created by the Government's failure to clearly allege which of the 39 defendants was responsible for each of the 195 alleged acts of racketeering "plagues almost every page of the complaint. . . [and would] have certainly required dismissal of many of the alleged racketeering acts under Rule 8(a) simply for failure to put each defendant on notice as to the claim against him" had the Court not permitted the Government to file a 70-page supplemental pleading connecting each defendant with the specific acts in which he, she, or it was allegedly involved.  Regrettably, the Amended Complaint in this action

suffers from a similar degree of incoherent pleading, albeit manifested somewhat differently than the Private Sanitation complaint. As noted above and set out in the margin below,[70] the Government attached a total of 13 exhibits to the Amended Complaint, totaling over 400 pages and including a number of pleadings in previous civil and criminal actions going back 17 years to the ILA Local Civil RICO Case in 1990. At oral argument, in response to the Court's observation that the 85-page Amended Complaint apparently fails to plead many fundamental elements of the alleged predicate acts, including the use of threatened or actual force and the identity of the victim with respect to several of the extortion acts, or a use of the mails or wires with respect to most of the mail or wire fraud acts, counsel for the Government explained that the specific allegations regarding those acts were incorporated into the Amended Complaint by reference to the indictments and complaints in Bellomo, Gotti, and Coffey. See Tr. at 113-19; see also id. at 123-24 (use of wires incorporated by reference from the Gotti Indictment), 134 (specifics of extortion incorporated by reference to Gotti and Coffey),

---

[70]        Exhibits to Amended Complaint

1.        Superseding Indictment (S2) in United States v. Coffey, 04-CR-651.
2.        Complaint in United States v. Coffey, 04-CR-651.
3.        Superseding Indictment (S2) in United States v. Bellomo, 02-CR-140.
4.        Complaint in United States v. Bellomo, 03-CV-1683.
5.        Consent Decree in United States v. Bellomo, 03-CV-1683.
6.        Indictment in United States v. Gotti, 02-CR-606.
7.        Verdict sheet in United States v. Gotti, 02-CR-606.
8.        Amended Complaint in United States v. Local 1804-1, Int'l Longshoremen's Assoc., 90-CV-963.
9.        Consent decree of Local 1804-1 and its executive officers in United States v. Local 1804-1, Int'l Longshoremen's Assoc., 90-CV-963.
10.        Consent decree concerning ILA Local 1814 in United States v. Local 1804-1, Int'l Longshoremen's Assoc., 90-CV-963.
11.        Consent decree concerning ILA Locals 824, 1809 & 1909 in United States v. Local 1804-1, Int'l Longshoremen's Assoc., 90-CV-963.
12.        Opinion & Order of Judge John Martin in United States v. Local 1804-1, Int'l Longshoremen's Assoc., 90-CV-963.
13.        Consent decree of Albert Cernadas in this action.

66

164 (scheme to rig MILA PBM contract award incorporated by reference from <u>Gotti</u> Indictment).  The Government also argued for the first time at oral argument that, notwithstanding the fact that the words "aiding and abetting" appear nowhere in the Amended Complaint, the Court should nevertheless construe that document to allege that Bowers, Daggett, and Gleason aided and abetted the commission of the alleged predicate acts of fraud and extortion that they were not personally involved in by permitting them to occur in violation of their fiduciary duties to the ILA, <u>see id.</u> at 138, because "in the indictments that are incorporated by reference, Section 2 of Title 18 is specifically referenced."  <u>Id.</u> at 164.  In other words, the Government would have this Court conclude that the Government is permitted under the Federal Rules of Civil Procedure to allege not only individual facts, but entire legal theories that appear nowhere on the face of the Amended Complaint, by attaching an indictment in a prior criminal case to its pleading in this action.  The Court is compelled to decline the Government's request to abolish or ignore the modest pleading requirements imposed on it by Federal Rule of Civil Procedure 8(a).

    As an initial matter, notwithstanding the Government's repeated assertions to the contrary at oral argument, the Court notes that nowhere in the Amended Complaint does the Government expressly incorporate by reference any portions of the attached exhibits.  "Although there is no prescribed procedure for referring to incorporated matter, the references to prior allegations must be direct and explicit, in order to enable the responding party to ascertain the nature and extent of the incorporation."  5A Wright & Miller, <u>Federal Practice & Procedure:  Civil 3d</u> § 1326 (citing, <u>inter alia</u>, <u>Arce v. Walker</u>, 139 F.3d 329, 336 n. 7 (2d Cir. 1998) ("Arce argues that a host of additional

abuses aggravated the hardship of his administrative segregation including verbal harassment, food tampering and destruction of legal documents.  We decline to consider these abuses because they were alleged in the complaint exclusively with respect to Arce's court access claim and were not incorporated or realleged in his due process claim.")); see also Clark Constr. Group, Inc. v. Modern Mosaic, No. Civ. A. MJG-00-2331, 2000 WL 34458952, at *4 (D. Md. December 01, 2000) ("For all or part of a prior pleading to be incorporated in a later pleading, the later pleading must specifically identify which portions of the prior pleading are adopted therein.  A party may not be deemed to have admitted the allegations of a prior pleading merely by attaching that pleading to his own.").[71]  The phrase "incorporation by reference," or any similar phrase that would give notice of the Government's intent to incorporate into the Amended Complaint some portion of an attached document, does not appear in connection with its discussion of any of the exhibits attached thereto.  Each exhibit is simply noted in passing as the Amended Complaint alleges facts pertaining to it.  See, e.g., Am. Compl. ¶ 20 (discussing the Coffey prosecution, then noting that "[a] copy of the [Coffey] Indictment is annexed as Exhibit 1.").  The Amended Complaint thus gives the impression that the exhibits are attached simply as background to the factual allegations alleged in the Amended Complaint; it does not provide the "direct and

---

[71]  As an illustration of the Amended Complaint's failure to expressly incorporate by reference any of the provisions of the attached exhibits, it is useful to compare that document with the Government's complaint in the ILA Local Civil RICO Case, which attached as an exhibit a copy of the indictment and judgment of conviction in United States v. Barone, 78-CR-185 (S.D. Fl.).  Unlike the Amended Complaint, the ILA Local Civil RICO Complaint expressly incorporated certain identified portions of the Barone indictment into the Government's civil claim.  See ILA Local Civil RICO Complaint ¶ 75 ("Copies of the indictment and the judgements of conviction in [Barone] are attached to this Complaint as Exhibit B.  Plaintiff incorporates by reference Counts 1 through 7, 11 through 13, 19, 25, 27, 31, 43 and 48 of that indictment and repeats and realleges those counts as if fully set forth herein.").

explicit" notice necessary to incorporate extraneous matter by reference. The Government's failure to specifically identify which portions of the hundreds of pages of exhibits it intends to incorporate by reference into the Amended Complaint makes it impossible for the Court or the defendants to ascertain the nature and extent of the incorporation, and the purported incorporation is therefore invalid.[72]

Putting aside the fact that the Amended Complaint does not explicitly incorporate any allegations from the prior pleadings attached as exhibits, the Government's proposed method of pleading necessary elements of its RICO claim by incorporating factual allegations contained in several prior lengthy criminal and civil RICO pleadings is, as this Court noted at oral argument,[73] a blatant violation of Rule 8(a)(2)'s direction that a civil plaintiff provide a "short and plain statement of the claim showing that the

---

[72]        While the Government's memorandum of law and statements at oral argument give some impression that the Government may intend to incorporate the exhibits in their entirety, doing so would render the Amended Complaint utterly incoherent. For example, as noted above, the Gotti, Bellomo, and Coffey indictments allege that the Gambino or Genovese families, not the Waterfront Enterprise, are the relevant enterprise for RICO purposes. The Coffey Complaint also clearly portrays defendant John Bowers, Sr., as a victim of, rather than a participant in, LCN extortion. For example, in a section headed "Extortion of the President of the ILA," the Coffey Complaint depicts Bowers as a victim of extortion with respect to the role he allegedly played in supporting Daggett for a position on the ILA Executive Council. See Coffey Complaint ¶¶ 16-20. The ILA argues, on the basis of this and other inconsistencies, that the Government is judicially estopped from making many of the allegations in the Amended Complaint that are inconsistent with its positions in the prior cases. The Government responds that, first, the allegations in the Amended Complaint are not inconsistent with the charges in the prior cases, but simply broaden the scope to reveal the full extent of organized crime's influence over the Waterfront, and second, that the Government cannot be judicially estopped by its allegations in the Coffey Complaint because the Government did not prevail in that action– both defendants who went to trial were acquitted. The Government is clearly correct as to the second point, and the Court finds that it is not judicially estopped from alleging that Bowers was a co-conspirator, rather than (or perhaps in addition to) a victim of extortion. The point here is a different one: if all of the allegations in the prior pleadings are deemed to be incorporated into the Amended Complaint, then the Amended Complaint would become an unintelligible morass of self-contradictory allegations. Thus, the Court must conclude that the Government did not really intend to incorporate every statement in every one of the indictments and complaints attached to the allegations– though even if it did, that would in itself be grounds for dismissing the Amended Complaint pursuant to Rules 12(b)(6) and 8(a)(2).

[73]        See Tr. at 84 ("When I read your complaint, I said right off the bat, it seems to me this is a clear violation of Rule 8.").

pleader is entitled to relief."[74]   The Second Circuit has explained the purpose and policy

underlying Rule 8(a)(2) as follows:

> The statement should be plain because the principal function of the pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.  The statement should be short because unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage.

Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir.1988) (internal quotation marks and

citations omitted).  The Amended Complaint, together with its exhibits, fails to provide

fair notice to the defendants of the factual underpinnings of the Government's RICO

claims and certainly imposes an unduly heavy burden on their ability to adequately

reply to the Government's allegations.[75]  If the Government's position were accepted, the

---

[74]      None of the defendants expressly moved to dismiss the Amended Complaint for failure to comply with Rule 8(a)(2)'s mandate to provide a "short and plain" statement of entitlement to relief, but the ILA argues in its reply memorandum that "[s]imply attaching documents. . . to the Complaint without identification of which allegations in these indictments apply to which person and for what reason does not provide the type of notice required even under Rule 8 of the Federal Rules of Civil Procedure."  ILA Reply Mem. at 34.  Ordinarily, a party may not raise an argument in a reply brief that was not raised in the party's moving brief.  See, e.g., Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d 701, 708-09 (2d Cir. 2007) (citing Federal Trade Comm'n v. Verity Int'l, Ltd., 443 F.3d 48, 65 (2d Cir.2006)).  In this situation, however, the ILA's Rule 8(a)(2) argument is simply the other side of the 12(b)(6) coin, and is raised as a rebuttal to the Government's argument that the Amended Complaint satisfies Rule 12(b)(6) by incorporating the voluminous factual allegations in the Gotti, Bellomo, and Coffey indictments and the complaints in the Bellomo civil case and the ILA Local Civil RICO Case.

[75]      Indeed, the practice of simply incorporating factual allegations en masse into a claim for relief against numerous defendants has been held to violate Rule 8(a)(2) even where the factual allegations at issue were incorporated from an earlier portion of the complaint rather than from an external document.  See, e.g., Discon Inc. v. NYNEX Corp., No. 90-CV-546A, 1992 WL 193683, at *16 (W.D.N.Y. June 23, 1992) (dismissing with leave to re-plead pursuant to Rule 8(a) where "none of the factual allegations contained in the beginning of the Complaint are matched to any specific claims.  Each claim simply incorporates by reference all the preceding paragraphs," and noting that "[i]t is not the duty of the defendants or this Court to sift through the Complaint and guess which factual allegations support which claims."); Koch v. Hickman, No. CV F 06-171 AWI SMS P, 2007 WL 586695, at *2 (E.D. Cal. February 22, 2007) (Snyder, Mag.) (slip copy) (dismissing with leave to re-plead where "Plaintiff names eleven Defendants and lists five claims for relief, however, instead of stating the relevant facts and linking each named Defendant to an act or omission giving rise to the constitutional claim for relief, he 'incorporates by reference' everything stated in the prior 40+ pages. It is not the Court's responsibility to read Plaintiff's story and then try to determine which claim goes with which facts or which facts go with which Defendant or claim. This is the Plaintiff's responsibility.").

defendants would be forced to respond in their Answer not only to each of the 258 paragraphs of the Amended Complaint, but also to each and every paragraph of every attached pleading, some of which, as noted above, are inconsistent with the allegations made in the Amended Complaint itself. While the precise Rule 8 issue posed by the Government's unusual pleading in this action has rarely been presented to federal courts, other courts in similar circumstances have found Rule 8 to be violated where a plaintiff seeks to incorporate factual allegations essential to its claim for relief by incorporating pleadings from prior cases. For example, in <u>Davis v. Bifani</u>, No. 07-CV-122-MEH-BNB, 2007 WL 1216518, at *1 (D. Colo. April 24, 2007) (Hegarty, Mag.) (slip copy), the court granted the defendant's motion to strike the portion of the complaint that incorporated the allegations in a complaint pending in Colorado state court, noting that it "does not believe that it is proper to incorporate by reference wholesale the allegations in a complaint in a completely separate action, even if that action is between the same parties," and concluding that "[s]uch a practice violates the requirements of Fed. R. Civ. P. 8(a) requiring a short and plain statement of the claim." The <u>Davis</u> court further commented that it "does not believe that it should be required to look to a separate complaint filed years ago in Colorado state court and determine exactly what additional claims for relief Plaintiff intends to plead in this case." <u>Id.</u> If Rule 8(a) implies that the <u>Davis</u> court should not be obliged to review a single prior complaint for the purpose of discerning the claims made in the action before it, it follows <u>a fortiori</u> that this Court should not be required to read through six different pleadings, stretching back some seventeen years, in addition to various peripheral documents, in order to decipher the basic elements of the Government's claim in this action, nor should the

defendants be expected to undertake such an endeavor in preparing an Answer to the Amended Complaint.[76] The Government's effort to plead essential elements of the causes of action alleged in the Amended Complaint by incorporating allegations from several prior civil and criminal actions must therefore be rejected.

In reaching its conclusion that the Government's effort to supplement the pleadings in its 85-page Amended Complaint with over 400 pages of attached exhibits violates Rule 8(a), the Court acknowledges that Federal Rule of Civil Procedure 10(c) ("Rule 10(c)") provides that "[s]tatements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion." Some authority suggests that the reference to "prior pleadings" in Rule 10(c) is limited to prior pleadings in the same action, not pleadings in prior actions, even those involving the same parties. For example, in Texas Water Supply Corp. v. R. F. C., 204 F.2d 190, 196 (5th Cir. 1953), the Fifth Circuit held that "Rule 10(c), Federal Rules of Civil Procedure, permits references to pleadings and exhibits in the same case, but there is no rule permitting the adoption of a cross-claim in a separate action in a different court by mere reference." See also Davis, 2007 WL 1216518, at *1 (citing Texas Water Supply Corp.); but see Cooper v. Nationwide Mut. Ins. Co., No. Civ. A. 02-2138, 2002 WL 31478874, at

---

[76]     Pleading essential elements of a cause of action by purported incorporation by reference of hundreds of pages of prior pleadings in other criminal and civil cases is particularly inappropriate in a RICO case. "RICO is a specialized statute requiring a particular configuration of elements. These elements cannot be incorporated loosely from a previous narration, but must be tightly particularized and connected in a complaint." Lesavoy v. Lane, 304 F. Supp. 2d 520, 532 (S.D.N.Y. 2004) (quoting Zaro Licensing, Inc. v. Cinmar, Inc., 779 F. Supp. 276, 284 (S.D.N.Y.1991)), aff'd in relevant part sub nom. Lesavoy v. Gattullo-Wilson, 170 Fed. Appx. 721 (2d Cir. 2006); see also Gregoris Motors v. Nissan Motor Corp., 630 F. Supp. 902, 913 (E.D.N.Y.1986) (same); G&R Moojestic Treats, Inc. v. Maggiemoo's Int'l, LLC, No. 03-CV-10027 (RWS), 2004 WL 1110423, at *10-11 (S.D.N.Y. May 19, 2004) (quoting Lesavoy) (dismissing RICO claim where "[n]o particularized allegation is made. Instead, the factual information is incorporated by reference from the previous paragraphs in the complaint, and the enumeration of the statutory elements are conclusorily alleged.") (quotation marks and citation omitted)).

*5 (E.D. Pa. November 7, 2002) ("Courts have historically been reluctant to allow an incorporation by reference if it fails to provide adequate notice of the incorporating party's claims, defenses, or factual allegations. But nothing in Rule 10(c) precludes a party from incorporating all of an earlier pleading.") (citations omitted). Regardless of whether Rule 10(c) would permit a plaintiff to incorporate allegations from a pleading in a previous action in some cases, such a pleading would still remain subject to Rule 8(a)'s mandate that a plaintiff provide a short and plain statement of its claim in the complaint. Thus, even if pleading a claim by incorporating matter from a pleading in a previous case is not categorically prohibited by the Federal Rules of Civil Procedure, the Government's attempt to do so in this case runs afoul of Rule 8(a)(2).

Rule 10(c) also states that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Exhibits 5, 7, 9, 10, 11, and 13– the various consent decrees and the verdict sheet in <u>Gotti</u>– arguably constitute "written instruments" and therefore form a part of the Amended Complaint; however, the various prior pleadings upon which the Government seeks to rely do not qualify as written instruments. "A 'written instrument' is a document evidencing legal rights or duties or giving formal expression to a legal act or agreement, such as a deed, will, bond, lease, insurance policy or security agreement." <u>Murphy v. Cadillac Rubber & Plastics, Inc.</u>, 946 F. Supp. 1108, 1115 (W.D.N.Y. 1996) (citing <u>Black's Law Dictionary</u> 801, 1612 (6th ed. 1990); <u>Webster's Third New International Dictionary</u>, 1172 (1986)). <u>Murphy</u> held that several exhibits, including an affidavit by the plaintiff and an attorney's affirmation, were not "written instruments" within the meaning of Rule 10(c), noting that "[t]his court can find no decision allowing a plaintiff's own supporting statements

to be considered part of the pleadings on a motion to dismiss." 946 F. Supp. at 1115; <u>see</u> <u>also</u> <u>Rose v. Bartle</u>, 871 F.2d 331, 339 n. 3 (3d Cir. 1989) (holding that the plaintiff's affidavits do not constitute "written instruments" within the meaning of Rule 10(c), and observing that "[t]o hold otherwise would. . . further blur the distinction between summary judgment and dismissal for failure to state a claim upon which relief could be granted."). In <u>Rose</u>, the Third Circuit recognized "that the types of exhibits incorporated within the pleadings by Rule 10(c) consist largely of documentary evidence, specifically, contracts, notes, and other writing[s] on which [a party's] action or defense is based," a class of documents that would seem to exclude prior pleadings submitted for the purpose of supplementing the factual allegations in the primary complaint. 871 F.2d at 339 n. 3 (citation omitted); <u>see also</u> <u>Perkins v. Silverstein</u>,939 F.2d 463, 467 n. 2 (7th Cir. 1991) ("The newspaper articles, commentaries and editorial cartoons which Perkins attached to the complaint. . . are not the type of documentary evidence or 'written instrument[s]' which Fed. R. Civ. P. 10(c) intended to be incorporated into, and made a part of, the complaint.") (citation omitted; alteration in original). The pleadings attached as exhibits to the Amended Complaint are functionally no different than the affidavits held not to be "written instruments" in <u>Murphy</u> and <u>Rose</u>– they are nothing more than self-serving statements prepared by the plaintiff with no independent evidentiary value. They therefore shall not be deemed a part of the Amended Complaint pursuant to Rule 10(c). <u>But see</u> <u>Amini v. Oberlin College</u>, 259 F.3d 493 (6th Cir. 2001) (in granting 12(b)(6) motion to dismiss plaintiff's Title VII claims, "the [district] court erred in failing to consider information contained in Amini's EEOC filing, a document

referenced in the complaint and attached thereto.").[77]

In short, whether viewed through the lens of Rule 8(a) or Rule 10(c), the Government's attempt to plead many essential elements of the alleged RICO claims by "incorporating" hundreds of pages of prior pleadings, with no guidance as to which specific allegations are intended to be deemed incorporated, fails to satisfy even the relatively light burden that it bears under the Federal Rules of Civil Procedure to provide a "short and plain" statement of its entitlement to relief.[78] The Amended Complaint therefore must be dismissed for failure to comply with Rule 8(a). However, certain other defects in the Amended Complaint raised by the ILA compel the Court, in the interests of judicial economy, to address several other shortcomings in the Government's allegations that go deeper than the formal aspects of the Amended Complaint.

B.    The Waterfront Enterprise

RICO broadly defines an "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In United States v. Turkette, 452 U.S. 576, 580 (1981), the Supreme Court recognized that "[t]here is no

---

[77]    Even if the Court were to determine that all of the prior pleadings attached as exhibits to the Amended Complaint constitute "written instruments" within the meaning of Rule 10(c), it would have no hesitation in concluding that the resulting pleading, in excess of 500 pages and packed with redundant and to some degree mutually inconsistent factual allegations, would itself violate Rule 8(a)(2).

[78]    Should the Government choose to exercise its option to re-plead the Amended Complaint, it should bear in mind that "the Court cannot serve as a repository for the parties' evidence." Hunter v. Yates, No. CV F 07 151 AWI SMS P, 2007 WL 332751, at *4 (E.D. Cal. Feb. 1, 2007) (Snyder, Mag.). While the Federal Rules of Civil Procedure do not categorically bar the practice of attaching exhibits to a complaint, the Court is unable to see any value whatsoever in any of the 13 exhibits attached to the Amended Complaint in this action, including the various consent decrees.

restriction upon the associations embraced by the definition:  an enterprise includes any union or group of individuals associated in fact," including both legitimate ventures and wholly criminal organizations.  The ILA argues that the "Waterfront Enterprise" alleged in the Amended Complaint fails to constitute an association-in-fact for RICO purposes because it is "no more than a stringing together of entities and individuals that have no specified relationship to one another."  ILA Mem. at 30.  Specifically, the ILA points out that the Waterfront Enterprise is defined to contain a number of unidentified individuals and entities whose interrelationships in an ongoing enterprise are not established by the factual allegations contained in the Complaint,[79] and argues that the Waterfront Enterprise is nothing more than an aggregation of the pattern of racketeering activity alleged in the complaint rather than a separate entity as is required under RICO.  See Turkette 452 U.S. at 583 ("The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages.  The existence of an enterprise at all times remains a separate element which must be proved by the Government.").  The Government concedes that Turkette requires proof of an ongoing and continuous enterprise with an internal structure distinct from the pattern of racketeering activity in which the enterprise is alleged to have engaged, but argues on the basis of a single Third Circuit case that "although the attributes of enterprise set forth in Turkette must ultimately be proved, these

---

[79]      ILA Mem. at 32.  ("[T]he Complaint contains no factual allegations that even remotely suggest how or when the members of the Waterfront Enterprise, identifiable or not, joined together as a group. . . .  The Waterfront Enterprise includes countless people, business and unions. . . about whom no allegations in the Complaint have been, or ever could be, made, and whom [sic] are not even alleged to have any relationship with, or to, one another, to any of the Defendants, or to any of the conduct charged in the Complaint.").

evidentiary details need not be pleaded in the complaint." Gov. Mem. at 67 (citing Seville Indus. Machinery Corp. v. Southmost Machinery, 742 F.2d 786, 789-90 (3d Cir. 1984)) (emphasis in original). The Government also argues, presumably in the alternative to its argument that it is not required to plead these facts, that the allegations in the Complaint are sufficient to "identify the Waterfront Enterprise, state that the Enterprise operated for a common purpose, state that the Enterprise has organizational structure, and state that the Enterprise operates as an ongoing unit." Gov. Mem. at 72. The ILA disputes the Government's assertion that the Third Circuit's opinion in Seville stands for the proposition that a civil RICO plaintiff need not allege in the complaint the attributes of continuity and internal structure of an association-in-fact enterprise as distinct from the pattern of racketeering activity in which it engages. Seville does contain language to that effect,[80] but in this Court's view, Seville and the Government place too much emphasis on the Supreme Court's choice of words in Turkette, which stated that the existence of a RICO enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit," while the pattern of racketeering activity "is proved by evidence of the requisite number of acts of racketeering committed by the participants in the

---

[80]    See Seville, 742 F.2d at 789-90 ("In [United States v. Riccobene, 709 F.2d 214 (3d Cir.)] this court stated that in order to establish the existence of an enterprise, the government must demonstrate 1) that the enterprise is an ongoing organization with some sort of framework or superstructure for making or carrying out decisions; 2) that the members of the enterprise function as a continuing unit with established duties; and finally 3) that the enterprise must be separate and apart from the pattern of activity in which it engages. The court below ruled that because Seville failed to plead these three attributes, Count One did not state a cause of action under RICO and must be dismissed. In so ruling, the district court confused what must be pleaded with what must be proved. Riccobene and Turkette certainly stand for the proposition that a plaintiff, to recover, must prove that an alleged enterprise possesses the three described attributes. But neither case speaks to what must be pleaded in order to state a cause of action. The district court erred in applying the Riccobene-Turkette proof analysis to the allegations in Seville's complaint.") (citations omitted).

enterprise." Turkette, 452 U.S. at 583. Although Turkette spoke in terms of what must be proved by a RICO plaintiff in order to ultimately prevail, that case arose in the context of an appeal from a RICO conviction rather than from a motion to dismiss, so the Supreme Court's emphasis on evidentiary requirements rather than pleading standards is natural and does not suggest that the recognized sub-elements of continuity, structure, and common purpose need not be pleaded in a civil RICO complaint. In any event, more important to the resolution of the ILA's motion than the Government's frolic and detour into Third Circuit jurisprudence is the fact, unmentioned by the parties, that some district courts in this Circuit have recently questioned whether Second Circuit law requires a RICO plaintiff to plead or prove anything more than the pattern of racketeering activity in order to establish the existence of a RICO enterprise.

1.    <u>Pleading Requirements for RICO Enterprise in the Second Circuit</u>

Before resolving the parties' dispute as to the validity of the Amended Complaint's allegations concerning the Waterfront Enterprise, the Court must address the uncertainty that has recently arisen among the district courts in the Second Circuit regarding the pleading requirements necessary to adequately allege the existence of a RICO enterprise. In <u>World Wrestling Entm't, Inc. v. Jakks Pacific, Inc.</u>, 425 F. Supp. 2d 484, 494 (S.D.N.Y. 2006), the district court rejected the defendants' argument that the plaintiff must allege that the purported enterprise displays the traditional indicia of an association-in-fact enterprise– <u>i.e.</u>, formal or informal structure, operation as a continuous unit, and common purpose– in order to state a valid RICO claim, holding that controlling Second Circuit authority supported the plaintiff's position that "an

enterprise can merely be the sum of the alleged predicate acts, and that no separate, ascertainable structure is required." The crux of World Wrestling Entertainment's holding lies in what it perceived to be, albeit erroneously in this Court's view, an inconsistency between two Second Circuit opinions: United States v. Mazzei, 700 F.2d 85 (2d Cir. 1983), and First Capital Asset Mgmt. Corp. v. Satinwood, Inc., 385 F.3d 159 (2d Cir. 2004). In First Capital, the Second Circuit affirmed the dismissal of a civil RICO complaint alleging the existence of an association-in-fact RICO enterprise on the ground that the complaint failed to state that the purported enterprise manifested the characteristics of structure, continuity, and common purpose. 385 F.3d at 174-75. First Capital relied on this Court's holding in Bernstein v. Misk, 948 F. Supp. 228, 235 (E.D.N.Y. 1997), quoted in First Capital, 385 F.3d at 175, which dismissed a civil RICO claim where the plaintiff's "indifferent attempts to plead the existence of an enterprise fall short of their goal in that they frustrate assiduous efforts to identify its membership, its structure (formal or informal) or its functional unity." In World Wrestling Entertainment, the defendants moved to dismiss the RICO complaint on the ground that it failed to allege "a RICO enterprise that has an ascertainable structure beyond the purported racketeering acts." 425 F. Supp. 2d at 494. The plaintiff conceded that the complaint failed to allege an enterprise with structure, continuity, or common purpose, but nevertheless opposed the motion to dismiss, arguing that First Capital's discussion of the requirements for pleading a RICO enterprise is non-binding dicta that conflicts with the earlier decision in Mazzei. The district court accepted the plaintiff's argument and denied the motion to dismiss, holding that Second Circuit law, as articulated by Mazzei, does not require pleading or proof of the traditional indicia of a RICO enterprise

in order to state a cognizable RICO claim.  Id.

In order to assess the basis of World Wrestling Entertainment's holding that Mazzei held that a RICO plaintiff need not establish the alleged enterprise as an entity separate from the pattern of predicate racketeering acts, it is necessary to examine the Mazzei opinion in some detail.  Mazzei involved an appeal from a criminal conviction under § 1962(c) stemming from the Boston College point-shaving scandal in the early 1980s.  In that case, Mazzei and his co-conspirators in Pittsburgh conspired with organized crime figures Henry Hill and James Burke in New York and several players on the Boston College varsity basketball team to cause Boston College to fail to beat the "point spread" in certain pre-selected basketball games, thereby ensuring that the co-conspirators would win bets placed against Boston College in those games.  The indictment identified the relevant RICO enterprise as "a group of individuals associated in fact and utilizing, among other things, interstate travel and facilities in interstate commerce to influence by means of bribery the outcome of basketball games involving the Boston College varsity basketball team and to profit therefrom by wagering on those games."  700 F.2d at 88.  The alleged pattern of racketeering activity was identified as "the defendants' efforts during 1978 and 1979 to influence the outcome of B.C. basketball games. . . and the defendants' travel in interstate commerce with the intent to commit bribery in order to influence the outcome of B.C. basketball games. . . ."  Id.  On appeal from his conviction, Mazzei argued that "to establish a violation of RICO, there must be proof that the alleged enterprise was distinct from the alleged pattern of racketeering activity," and further argued that that criterion was not satisfied in his case because "the government's indictment alleged an enterprise identical to the alleged

pattern of racketeering activity, <u>to wit</u>, a conspiracy formed for the sole purpose of shaving points in B.C. basketball games." <u>Id.</u> In support of this argument, Mazzei relied principally on the Supreme Court's decision in <u>Turkette</u> and the Eighth Circuit's opinion in <u>United States v. Bledsoe</u>, 674 F.2d 647 (8th Cir. 1982). In <u>Turkette</u>, addressing the objection that its holding interpreting RICO's definition of "enterprise" as including wholly illegitimate criminal enterprises would collapse the distinction between the enterprise and the pattern of racketeering activity in which the defendants engaged, the Court wrote:

> That a wholly criminal enterprise comes within the ambit of the statute does not mean that a "pattern of racketeering activity" is an "enterprise." In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. <u>While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other.</u> The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

452 U.S. at 583 (citation omitted) (emphasis added), <u>quoted in</u> <u>Mazzei</u>, 700 F.2d at 88. The Second Circuit rejected Mazzei's argument that the group of co-conspirators operating for the common purpose of fixing Boston College basketball games could not be an "enterprise" for RICO purposes under <u>Turkette</u>. The court acknowledged that "<u>Turkette</u> requires the government to prove both the existence of an 'enterprise' and a 'pattern of racketeering activity,'" but explained that it did not "read <u>Turkette</u> to hold

that proof of these separate elements be distinct and independent, as long as the proof offered is sufficient to satisfy both elements." Id. at 89. The Mazzei court noted Turkette's observation that in cases where the alleged RICO enterprise is an illegitimate criminal organization, the evidence necessary to establish the existence of the enterprise and the pattern of racketeering activity may coalesce, and held that the evidence necessary to prove the existence of the enterprise with which Mazzei was allegedly associated and the evidence necessary to demonstrate the pattern of racketeering activity in which that enterprise engaged "coalesce comfortably in the present action. The government here proved an enterprise that was a 'group of individuals associated in fact' with evidence establishing a common or shared purpose among the individuals and evidence that they functioned as a continuing unit." Id. (quoting 18 U.S.C. § 1961(4)). Although Mazzei was correct that the defendants' alleged common purpose was essentially co-extensive with the alleged pattern of racketeering activity, the court noted that "there is no language in the legislative history to indicate that the alleged enterprise must engage in activities separate and apart from illicit gambling in order to come within the purview of RICO." Id. The court further observed that "Mazzei's interpretation would lead to the anomalous result that a large scale underworld operation which engaged solely in trafficking of heroin would not be subject to RICO's enhanced sanctions, whereas small-time criminals jointly engaged in infrequent sales of contraband drugs and illegal handguns arguably could be prosecuted under RICO," and declined to "place its imprimatur on such a counter-productive interpretation." Id. at 89. The court therefore affirmed Mazzei's conviction, finding that "[t]he government's indictment alleged an enterprise, namely, a group of individuals sharing a common

purpose– influencing the outcome of B.C. basketball games to secure a profit.  The indictment also alleged a continuing unit– throughout the 1978-79 team season." Id. at 91.

With due respect to the meticulously researched and carefully crafted opinion in World Wrestling Entertainment, this Court does not read Mazzei as standing for the proposition that a plaintiff need not plead or prove the traditional indicia of an association-in-fact enterprise in order to state a cognizable civil RICO claim.  The district court in World Wrestling Entertainment equated the defendants' argument that a valid RICO enterprise must display the characteristics of formal or informal structure, continuity, and common purpose, with the proposition that "the evidence necessary to establish an enterprise must be distinct from that which a plaintiff must adduce to show a pattern of racketeering activity," Hansel 'N Gretel Grand, Inc. v. Savitsky, No. 94-CV-4027, 1997 WL 543088, at *2 (S.D.N.Y. September 3, 1997), abrogated by Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts, 369 F.3d 212, 218 (2d Cir. 2004), quoted in World Wrestling Entertainment, 425 F. Supp. 2d at 494, and held that that argument is precluded by Mazzei.  But those propositions are not identical.  While Hansel 'N Gretel addressed the issue of what evidence must be presented to the court to prove the existence of a RICO enterprise, the issue presented in World Wrestling Entertainment pertains to the factual allegations that must be pleaded in a complaint in order to state a valid claim.  The passage from Turkette quoted above makes this distinction clear:  the existence of an association-in-fact enterprise, comprised of individuals or entities operating as a unit toward some common purpose or goal, and the existence of a pattern of racketeering, comprised of the requisite predicate acts

committed by the RICO violators, are distinct elements of a RICO claim, both of which must be established in order for liability to attach; however, where the alleged enterprise is a wholly illegitimate one that exists solely for the purpose of undertaking the criminal activities reflected in the pattern of racketeering, the evidence necessary to prove those distinct elements may coalesce so that proof of the pattern of racketeering is effectively proof of the existence of the enterprise as well. See Turkette, 452 U.S. at 583. Mazzei endorsed this interpretation of Turkette by repeatedly acknowledging the distinction between the existence of the enterprise and the pattern of racketeering, and found that both elements were satisfied by the evidence presented at trial that the defendants cooperated in a criminal enterprise whose purpose was to make money for its members by "fixing" Boston College varsity basketball games in the 1978-79 season through a pattern of bribery and other acts of racketeering.[81] Mazzei's holding therefore does not directly implicate the issue of whether enterprise and pattern of racketeering must be

---

[81] World Wrestling Entertainment characterizes the Second Circuit's en banc opinion in United States v. Indelacato, 865 F.2d 1370, 1375 (1989) (en banc), as "describ[ing] (without a hint of regret) the holding in Mazzei as rejecting the contention that the enterprise and the pattern of racketeering activity must be distinct." World Wrestling Entertainment, 425 F. Supp. 2d at 500. While that is a fair paraphrase of Indelacato's gloss on Mazzei, it overlooks an important nuance. Indelacato actually said: "Mazzei contended that no RICO violation had been shown because the alleged enterprise was indistinguishable from the alleged pattern of racketeering activity. We rejected this contention, ruling that the pattern and enterprise need not be totally 'distinct and independent, so long as the proof offered is sufficient to satisfy both elements.'" 865 F.2d at 1375 (quoting Mazzei, 700 F.2d at 89). Thus, while Indelacato's language was less precise than might be preferred, it recognized the conceptual distinction between enterprise and pattern of racketeering activity, and correctly characterized Mazzei as holding that the evidence necessary to establish those independent elements may coalesce in cases involving wholly criminal enterprises. Indeed, elsewhere in the opinion, Indelicato cautions that the relatedness between the enterprise and pattern of racketeering elements "is not to say that one should ever view the enterprise and the pattern as the same thing, for they are not," and cites Mazzei, along with Turkette, for the proposition that "the difference in the nature of the two elements does not mean that the same piece of evidence may not help to establish both." 865 F.2d at 1384.

alleged as separate elements in a RICO complaint,[82] nor does it support <u>Seville</u>'s argument that the defining characteristics of the enterprise must be proved at trial, but need not be pleaded in the complaint.[83]  <u>Mazzei</u> is therefore not inconsistent with <u>First Capital</u>'s statement that a RICO plaintiff must plead the sub-elements of continuity, structure, and purpose, which is drawn directly from the language of <u>Turkette</u> and enjoys broad support in Second Circuit precedent, even among cases that <u>World Wrestling Entertainment</u> cited in support of its view that <u>First Capital</u> misstated the law

---

[82]     Although the <u>World Wrestling Entertainment</u> opinion attached substantial significance to the fact that <u>Mazzei</u> expressly rejected the Eighth Circuit's holding in <u>Bledsoe</u>, this Court does not view <u>Mazzei</u>'s rejection of <u>Bledsoe</u> as particularly relevant to the issue at hand.  <u>Bledsoe</u> held that "the enterprise must be more than an informal group created to perpetrate the acts of racketeering," <u>id.</u> at 663, a principle that <u>Mazzei</u> recognized is "at odds" with its holding that the RICO enterprise need not engage in activities other than those charged as predicate acts.  700 F.2d at 89 (citing <u>Bledsoe</u>; <u>United States v. Lemm</u>, 680 F.2d 1193, 1198-1201 (8th Cir. 1982); <u>United States v. Anderson</u>, 626 F.2d 1358 (9th Cir. 1980)).  The Eighth Circuit's ruling in <u>Bledsoe</u> seems inconsistent with <u>Turkette</u> and does not pertain to the issue of whether the elements of enterprise and pattern of racketeering activity are conceptually distinct and must be separately pleaded in order to state a RICO claim.

[83]     The distinction relied upon by <u>Seville</u> and by the Government in this case between elements that which must be pleaded in order to state a valid claim and that which must ultimately be proved strikes this Court as a false, or at best a misleading, one, because what is pleaded foretells what must be proved and informs the other party of what he must prepare to contest.  While it is true that under the simplified pleading standard imposed by Rule 8(a), a plaintiff need not recite in mechanical detail every element of a cause of action in order to state a valid claim, <u>see</u> <u>Conley</u>, 355 U.S. at 47 ("[T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim," but only to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."); <u>Bell Atlantic</u>, 127 S. Ct. at 1964-65 ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations,  a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions. . . .") (quotation marks and citations omitted),  it remains the case that the plaintiff must set forth factual matter sufficient to put the defendants on notice of the nature of the claim and to enable them to prepare a defense.  <u>See, e.g.</u>, <u>Iqbal</u>, 490 F.3d at 157-58 (Rule 8(a) "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."); Charles Alan Wright, <u>Law of Federal Courts</u> § 68 (5th ed. 1994) (Rule 8(a) "does contemplate the statement of circumstances, occurrences, and events in support of the claim presented, though it permits these circumstances to be stated with great generality.").  The basic characteristics of an alleged RICO enterprise fall well within the class of factual allegations necessary to put a defendant on notice of the nature of the action against him.  In any event, the issue of whether, as a matter of first principles, the failure to plead the elements of continuity, structure, and common purpose requires the dismissal of a civil RICO complaint is preempted by the Second Circuit's holding in <u>First Capital</u>, which adopted an affirmative answer to that question which is binding on this Court.

on this point.[84]  Indeed, it is of more than passing interest that neither <u>World Wrestling</u>

<u>Entertainment</u> nor <u>First Capital</u> addressed the Second Circuit's holding in <u>Moss v.</u>

<u>Morgan Stanley Inc.</u>, 719 F.2d 5, 17 (2d Cir. 1983) (emphasis added), which clearly

stated that a civil RICO plaintiff bears a "pleading requirement" pursuant to which he

must "allege the existence of seven constituent elements: (1) that the defendant (2)

through the commission of two or more acts (3) constituting a '<u>pattern</u>' (4) of

'<u>racketeering activity</u>' (5) directly or indirectly invests in, or maintains an interest in, or

participates in (6) an '<u>enterprise</u>.'"  <u>First Capital</u> does not cite <u>Moss</u> at all, while <u>World</u>

<u>Wrestling Entertainment</u> cites it primarily for its statement that <u>Mazzei</u> "expressly

rejected the Eighth Circuit's view that the evidence offered to prove the 'enterprise' and

---

[84]        For example, in <u>United States v. Bagaric</u>, 706 F.2d 42, 55 (2d Cir. 1983), which <u>World Wrestling Entertainment</u> cited in support of its conclusion that <u>Mazzei</u> is not a mere "evidence case," 425 F. Supp. 2d at 499, the court entertained an appeal of a RICO conviction in which the issue presented was whether the principle announced in <u>United States v. Ivic</u>, 700 F.2d 51(2d Cir. 1993), <u>abrogated by</u> <u>National Organization for Women, Inc. v. Scheidler</u>, 510 U.S. 249 (1994), that the RICO enterprise or the pattern of racketeering acts must possess some financial purpose requires "that the enterprise itself, rather than the predicate acts of racketeering, must be shown to yield financial gain," a question which presumes a distinction between the enterprise and the pattern of racketeering activity.  <u>Bagaric</u>, 706 F.2d at 55. <u>Bagaric</u> described <u>Mazzei</u> as a decision "reflect[ing] the common sense recognition that a group of individuals may join together, and therefore be 'associated in fact,'. . . solely for the purpose of conducting their [racketeering] activities," adding that "it is logical to characterize any associative group in terms of what it <u>does</u>, rather than by abstract analysis of its structure."  <u>Id.</u> at 56 (emphasis in original).  None of this supports <u>World Wrestling Entertainment</u>'s view that a RICO plaintiff need not allege and prove the traditional indicia of the enterprise element in order to state a claim under § 1962.  Likewise, <u>World Wrestling Entertainment</u> cited the Second Circuit's statement in <u>United States v. Coonan</u>, 983 F.2d 1553, 1560 (2d Cir. 1989), <u>quoted in</u> <u>World Wrestling Entertainment</u>, 425 F. Supp. 2d at 496, that "we have previously indicated that proof of various racketeering acts may be relied on to establish the existence of the charged enterprise" as demonstrating that the circuit court has "reaffirm[ed <u>Mazzei</u>'s] core holding," <u>World Wrestling Entertainment</u>, 425 F. Supp. 2d at 496, without reconciling that assertion with the fact that <u>Coonan</u> affirmed the conviction at issue on that appeal on the ground that "overwhelming proof of the charged enterprise, and [the appellant's] participation in that enterprise, was presented to the jury," including, <u>inter alia</u>, "testimony regarding the enterprise's hierarchy, organization and activities" and the fact that the enterprise "had an informal structure based around an 'inner crew'. . . that controlled most organized criminal activities in Hell's Kitchen."  <u>Coonan</u>, 938 F.2d at 1560.  The Court could offer further examples, but the point is clear:  none of the cases cited by <u>World Wrestling Entertainment</u> support its conclusion that a RICO plaintiff is not obliged to plead and prove the existence of that enterprise by demonstrating that it has an ongoing formal or informal structure and functions as a unit united by some common purpose simply because the evidence tending to prove the charged pattern of racketeering acts will also in some cases tend to demonstrate the existence of the alleged RICO enterprise.

the 'pattern of racketeering' must necessarily be distinct," <u>Moss</u>, 719 F.2d at 22, <u>quoted in</u> <u>World Wrestling Entertainment</u>, 425 F. Supp. 2d at 426.  The portion of <u>Moss</u> quoted in <u>World Wrestling Entertainment</u> occurs in the context of the court's rejection of the district court's holding that the alleged enterprise must have an "independent economic significance from the pattern of racketeering activity."  719 F.2d at 22 (quoting <u>Moss v. Morgan Stanley Inc.</u>, 553 F. Supp. 1347, 1363 (S.D.N.Y. 1983)).  It must therefore be read in that context and in conjunction with the court's unambiguous statement that a civil RICO plaintiff is required to plead the pattern of racketeering activity and the existence of a RICO enterprise as distinct elements of a RICO offense.  <u>Moss</u>'s articulation of the elements of a RICO action has been cited many times by subsequent courts in this Circuit, and further supports the conclusion that a RICO enterprise and the pattern of racketeering activity are conceptually distinct elements with distinct characteristics that must be alleged separately in a well-pleaded RICO complaint, notwithstanding the fact that the evidence necessary to prove those elements may in some cases overlap or coalesce.  <u>See, e.g.</u>, <u>Revak v. SEC Realty Corp.</u>, 18 F.3d 81, 89 (2d Cir. 1994); <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1176-77 (2d Cir. 1993); <u>Tenamee v. Schmukler</u>, 438 F. Supp. 2d 438, 446-47 (S.D.N.Y. 2006); <u>In re Gas Reclamation, Inc. Sec. Litig.</u>, 659 F. Supp. 493, 511 (S.D.N.Y. 1987).

In short, this Court must respectfully depart from the holding of the Southern District of New York in <u>World Wrestling Entertainment</u> insofar as that case suggests that a civil RICO plaintiff need not plead any facts beyond the existence of a pattern of

racketeering activity in order to adequately allege the element of a RICO enterprise.[85]  In this Court's view, it remains the law in this Circuit that a RICO plaintiff alleging the existence of an association-in-fact RICO enterprise must plead and prove the existence of a group of individuals or other legal entities operating as a continuing unit with a formal or informal structure and united by some common purpose in order to state a valid claim.  The fact that the evidence necessary to prove the existence of the enterprise and the pattern of racketeering activity may coalesce in some cases does not undermine the fact that enterprise and pattern of racketeering remain conceptually distinct elements of a RICO violation, each of which must be alleged in the complaint in order to survive a Rule 12(b)(6) motion to dismiss.  This point is particularly important where, as here, the alleged enterprise is not a wholly illegitimate one, and the proof necessary to establish its existence cannot be expected to fully coalesce with that necessary to prove the pattern of racketeering.[86]

---

[85]        Another district court case, JSC Foreign Economic Ass'n Technostroyexport v. Weiss, No. 06-CV-6095 (JGK), 2007 WL 1159637, at *9 (S.D.N.Y. April 18, 2007) (slip copy), purports to adopt World Wrestling Entertainment's conclusion that First Capital is inconsistent with Mazzei and therefore an invalid statement of Second Circuit law.  However, JSC does not appear to accept World Wrestling Entertainment's conclusion that a plaintiff need not allege and prove the traditional indicia of enterprise in order to state a claim under RICO.  In denying the defendants' motion to dismiss the § 1962(c) claim in that case, JSC found that "[w]hile no formal structure is alleged. . . the enterprise that is alleged could constitute an 'association in fact'," because the alleged "'course of conduct' suggests that Weiss and Weiss & Co. may have functioned together with Reich, Jossem, and others as a 'continuing unit' with the 'common purpose' of concealing and laundering a large amount of funds." Id. at *10.  The court therefore denied the motion to dismiss while noting that the plaintiff "will be required to prove the existence of the enterprise." Id.  Other cases have acknowledged World Wrestling Entertainment's criticism of First Capital without resolving the issue.  See American Med. Ass'n v. United Healthcare Corp., No. 00-CV-2800 (LMM), 2006 WL 3833440, at *15 n. 15 (S.D.N.Y. December 29, 2006); Smallwood ex rel. Hills v. Lupoli, No. 04-CV-0686 (JFB) (MDG), 2007 WL 2713841, at *6 n. 5 (E.D.N.Y. September 14, 2007) (slip copy); Republic of Colombia v. Diageo North America Inc., No. 04-CV-4372 (NGG), 2007 WL 1813744, at *48 n. 18 (E.D.N.Y. June 19, 2007) (slip copy).

[86]        World Wrestling Entertainment also held that First Capital's statement that a RICO plaintiff must "detail [a] course of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves" was inconsistent with Mazzei and therefore an incorrect statement

2.    Analysis of Amended Complaint's Pleading of the Waterfront Enterprise

The ILA argues that

> [t]he Waterfront Enterprise encompasses a host of unspecified individuals
> (i.e., "certain current and former ILA officers," and "certain members and
> associates of the Genovese and Gambino crime families") and unspecified
> businesses (i.e., "certain businesses") whose operations relate in any
> manner to the transaction of commerce in the Ports of New Jersey, New
> York, Miami or elsewhere.  At a minimum, without specification as to who
> is actually part of the enterprise, no meaningful basis exists on which to
> fully evaluate the formation of the group, its continuity and its structure.

ILA Mem. at 31 (citations omitted).  In direct response to this passage, the Government

asserts that the "Defendants' position that there are no facts which could ultimately

establish the existence of the Waterfront Enterprise has no basis," Gov. Mem. at 69,

recounting the Amended Complaint's allegations regarding the decades of organized

crime influence over Waterfront businesses and labor unions and arguing that "[t]he

notion that an enterprise which was found to have existed [in the ILA Local Civil RICO

Case] from the 1950s through the 1990s simply ceased to exist thereafter defies reason."

Id. at 72.  The Government's rebuttal mischaracterizes the ILA's position.  The ILA's

argument is not that the Government may lack evidentiary support for the existence of

the Waterfront Enterprise, but rather is more fundamental:  that the Waterfront

Enterprise, as defined in the complaint, is simply an incoherent aggregation of the

various predicate acts alleged and arranged in an ad hoc manner as necessary to obtain

the equitable relief the Government seeks against the various defendants and does not

satisfy the definitional criteria of a RICO enterprise, rendering the question of its

of the law.  385 F.3d at 174, quoted in World Wrestling Entertainment, 425 F. Supp. 2d at 494.  This Court
agrees with World Wrestling Entertainment on that point– the quoted portion of First Capital statement is
not well-supported by Second Circuit precedent, as evidenced by the fact that First Capital cited only one
district court opinion in support of it, and it is flatly inconsistent with Mazzei and Turkette.

empirical existence simply unintelligible.[87]

   The Court concludes that the ILA is correct, and that the Amended Complaint fails to plead a cognizable association-in-fact enterprise. The Amended Complaint contains virtually no allegations regarding the structure and organization of the alleged Waterfront Enterprise, and leaves a plethora of unanswered questions regarding the membership, purpose, and structure of that entity. For example, who are the unnamed "current and former ILA officials" and "certain businesses operating on or about the Waterfront" that are members of the Waterfront Enterprise? What criteria distinguish a Waterfront entity that is a member of the Waterfront Enterprise from one that is not? What is the organizational structure of the Waterfront Enterprise? Who is in charge of it? How are instructions conveyed between its members? How does one become a member of, or terminate membership in, the Waterfront Enterprise? As discussed further below, what common purpose unites the members of the Waterfront Enterprise, and what is the purpose of the enterprise itself? As this Court held in <u>Bernstein</u>, "[t]he indifferent attempts to plead the existence of an enterprise fall short of their goal in that they frustrate assiduous efforts to identify its membership, its structure (formal or informal), or its functional unity." 948 F. Supp. at 235; <u>see also</u> <u>Moy v. Terranova</u>, No. 87-CV-1578, 1999 WL 118773, at *5 (E.D.N.Y. March 2, 1999) (Johnson, J.) ("Plaintiffs' conclusory 'naming of a string of entities' does not adequately allege an enterprise and, therefore, their RICO claims should be dismissed.") (quoting <u>Richmond v. Nationwide Cassel. L.P.</u>, 52 F.3d 640, 646 (7th Cir.1995)). Regrettably, the same is true in this case.

---

[87]   The heading to the section of the ILA's memorandum from which the above language was taken, "The Alleged Enterprise is not a Decipherable, Let Alone a Functioning, Unit," amply demonstrates this point. ILA Mem. at 30.

At best, the Amended Complaint depicts the Waterfront Enterprise as a quasi-discrete commercial ecosystem, populated by various entities interconnected in a web of personal and commercial relationships that evolves organically as each entity pursues its own interests, some of which coincide with those of other denizens of the Waterfront commercial habitat and others being quite adversely aligned. The same could be said of virtually any commercial or geographic sector of this District, and simply does not rise to the level of an organized, unitary enterprise as is required under RICO.[88]

It should further be noted that, by the Government's own admission at oral argument, the Amended Complaint fails to allege any common purpose uniting the Waterfront Enterprise as an entity, as is required to plead a valid association-in-fact enterprise. See Turkette, 452 U.S. at 583 (enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct."); First Capital, 385 F.3d at 174 ("[f]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes.") (alteration in original) (quoting First Nationwide Bank v. Gelt Funding Corp., 820 F. Supp. 89, 98 (S.D.N.Y. 1993)).

---

[88] The shortcomings of the Amended Complaint's allegations regarding the Waterfront Enterprise may be further illustrated by reference to the detailed allegations contained in the Government's pleadings in Gotti and Bellomo. The Gotti Indictment contains eight paragraphs occupying three full pages, describing in detail the Gambino family enterprise, including its internal organizational structure (i.e., the boss, underboss, consigliere, captains, and soldiers, and the operation of various crews) and its place within the larger structure of La Cosa Nostra. See Gotti Ind. ¶¶ 1-8. The Gotti Indictment further alleges a specific common purpose to the Gambino family: "The principal purpose of the enterprise was to generate money for its members and associates through crime, including extortion, wire-fraud, larceny, loan-sharking, illegal gambling and witness tampering. Among the methods and means by which the members and associates of the enterprise furthered its criminal activities were threatened and actual use of physical violence, and the inducement of fear of financial and economic injury." Id. ¶ 9. The Bellomo Indictment contains similarly detailed allegations concerning the organization, structure, and purpose of the Genovese family. See Bellomo Ind. ¶¶ 1-8 (organization and structure), 9 (common purpose).

Paragraph 68 of the Amended Complaint, captioned "Purpose of the Enterprise," states in relevant part that "[t]he Defendants' common purpose was to exercise corrupt control and influence over labor unions and businesses operating on the Waterfront, the Port of Miami and elsewhere in order to enrich themselves and their associates." When asked by the Court at oral argument to identify the common purpose of the Waterfront Enterprise, counsel for the Government directed the Court to the quoted language in paragraph 68.[89] However, the Government subsequently clarified that the "common purpose" identified in paragraph 68 is not intended to be attributed to the nominal defendants in this action, nor, presumably, to the non-parties that are identified as members of the Waterfront Enterprise. See Tr. at 101-05.[90] In other words, the "common purpose" alleged in paragraph 68 is only the Racketeering Defendants' common purpose, not the common purpose of the Waterfront Enterprise. While the corrupt purposes of certain members of the enterprise may be relevant to the Government's allegations of RICO conspiracy, they are insufficient to establish the existence of a cohesive association-in-fact enterprise that is a necessary component of a RICO violation.

As this Court suggested at oral argument, see Tr. at 97, what the Government is

---

[89] See Tr. at 98, 100, 106-07.

[90]  THE COURT:  When in Paragraph 68 you say, the defendants' common purpose, does that include the nominal defendants as well?
MR. HAYES:  It does not.
THE COURT:  Or just the defendants?
MR. HAYES:  Your Honor, the United States tried to take great pains. . . in distinguishing between the ILA and the Metro Funds and MILA and people such as Mr. Daggett and Mr. Bowers and Mr. Gleason. . . .
THE COURT:  So when in paragraph 68 it provides, the defendants' common purpose, that does not include the nominal defendants?
MR. HAYES:  That is correct, Your Honor.
Tr. at 101-02.

92

really alleging in this case is an enterprise comprised of the Gambino and Genovese families, certain members and associates of those families, and a handful of co-conspirators placed in key positions in the ILA and associated labor unions who together have allegedly conspired to corrupt and control interstate commerce on the New York/New Jersey Waterfront and the Port of Miami through a pattern of racketeering activity involving the infiltration and control of labor unions and businesses operating on the Waterfront.  While limiting the alleged enterprise to that relatively narrow group might create potentially insurmountable obstacles to the Government's efforts to impose equitable relief on some of the nominal defendants in this action, this Court will not abet the Government's effort to stretch the concept of a racketeering enterprise beyond all recognition in order to bring various otherwise disinterested parties within its scope, even for the worthwhile purpose of combating the influence of organized crime on the Waterfront.  The Court therefore holds that the Amended Complaint fails to allege a cognizable association-in-fact enterprise.[91]

     C.    <u>The Predicate Acts</u>

         a.    <u>Mail and Wire Fraud</u>

A substantial number of the predicate acts alleged in the Amended Complaint are

---

[91]     The Court recognizes that the definition of the Waterfront Enterprise in this action, while not precisely identical to the enterprise alleged in the ILA Local Civil RICO Case, is nevertheless quite similar to the enterprise that was held by Judge Sand to be sufficiently pleaded and proved in that case. The district court's rulings in the 1990 case are not binding on this Court, which bears a responsibility to independently assess the sufficiency of the pleadings in this action.  Moreover, as Judge Sand noted in his written opinion in the ILA Local Civil RICO Case, the sufficiency of the 1990 pleading with respect to the allegations pertaining to the Waterfront Enterprise was never challenged in that case.  See <u>Local 1804-1</u>, 812 F. Supp. at 1310 ("The remaining defendants devoted their time and energy at trial, and in their post trial submissions, to disputing the government's contention that they had participated in the criminal enterprise by committing the alleged predicate acts.  In essence, these defendants took a position which assumed the existence of the 'Waterfront' enterprise.").

asserted to be violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343.[92] As the Second Circuit has repeatedly recognized, "[t]he essential elements of a mail [or wire] fraud violation are (1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme." Fountain v. United States, 357 F.3d 250, 255 (2d Cir. 2004) (alterations in original) (quoting United States v. Dinome, 86 F.3d 277, 283 (2d Cir. 1996)); see also United States v. Miller, 997 F.2d 1010, 1017 (2d Cir. 1993) (same); United States v. Wallach, 935 F.2d 445, 461 (2d Cir. 1991) (same). The ILA argues that the Amended Complaint fails to plead the third element, in that it fails to identify any use of the mails or wires with respect to many of the alleged mail or wire fraud schemes, and in the few schemes in which it does plead some use of the mails or wires, it fails to state how the defendants' use of the mails or wires furthered the scheme at issue.[93]

"The federal mail fraud statute does not purport to reach all frauds, but only

___

[92]    Specifically, the following alleged predicate acts involve allegations of mail or wire fraud: (1) "Rigged 'Election' of Harold J. Daggett and Others to High-Ranking ILA Offices" (Am. Compl. ¶¶ 86-114); (2) "Scheme to Rig the MILA PBM Contract" (Am. Compl. ¶¶ 121-150); (3) "Scheme to Rig the MILA Mental Health Benefits Contract" (Am. Compl. ¶¶ 151-161); (4) "Fund Investment Advisor Kickback Scheme" (Am. Compl. ¶¶ 164-173); (5) "Rigged PBM Contract [METRO-ILA Welfare Fund]" (Am. Compl. ¶¶ 174-178); (6) "Rigged Mental Health Care Benefits Contract [METRO-ILA Welfare Fund]" (Am. Compl. ¶¶ 179-182); (7) "Fraud on the Local 1922 and Southeast Florida Welfare Funds [rigging of mental health benefits contracts in favor of Compsych]" (Am. Compl. ¶¶ 183-186); (8) "Control Over Local 1" (Am. Compl. ¶¶ 187-201); and (9) "Fraud on the Local 1814 Membership" (Am. Compl. ¶¶ 202-214).

[93]    The ILA also argues that the mail and wire fraud allegations regarding the rigged award of service contracts to GPP/VIP or Compsych fail to state a claim of conspiracy to violate § 1962(b) because the acquisition of a service contract does not constitute "the acquisition or maintenance of a property right in or control of the enterprise," which is required for liability under § 1962(b). ILA Mem. at 47 (citing United States v. Jacobson, 691 F.2d 110, 112-13 (2d Cir. 1982)). The Government responds that, even if it is true as a general matter that acquisition of service contracts does not constitute the acquisition of a property right in or control over the enterprise, it does so in this case because "[t]he contracts at issue are the *raison d'etre* of MILA, the METRO Funds and the Florida Funds. . . In effect, [the award of service contracts for the benefit of ILA members] was and is the funds' only business, which was supposed to have been discharged with the utmost regard for the beneficiaries. . ." Gov. Mem. at 104. Because it concludes that the mail and wire fraud allegations in the Amended Complaint fail to satisfy the pleading requirements of Rule 8(a)(2) and 9(b), the Court need not address this argument.

those limited instances in which the use of the mails is a part of the execution of the fraud. . . ." United States v. Altman, 48 F.3d 96, 102 (2d Cir. 1995) (quoting Kann v. United States, 323 U.S. 88, 95 (1944)); see also Bernstein, 948 F. Supp. at 239 (predicate act of mail fraud not sufficiently pleaded where the plaintiffs' allegations "are wholly barren of any reference to use of the mails."). Likewise, the wire fraud statute imposes liability only on those frauds "furthered by the use of interstate wires." United States v. Pierce, 224 F.3d 158, 165 (2d Cir. 2000). The Government's principal argument in opposition to this portion of the ILA's 12(b)(6) motion is that it has alleged use of the mails or wires with respect to many of the alleged mail or wire fraud schemes because the allegations regarding specific mailings or wire transmissions alleged in the criminal indictments in Bellomo, Gotti, and Coffey are incorporated into the Amended Complaint by reference. In its memorandum of law in opposition to the defendants' motions, the Government cites portions of those criminal indictments that it argues allege specific uses of the mails or wires in furtherance of the schemes alleged as predicate acts in this action. See Gov. Mem. at 96-98. As discussed above, the Government's assumption that it can satisfy its obligation under Rule 8(a)(2) to provide a "short, plain statement" of its claim to relief by attaching several hundred pages of pleadings in prior criminal and civil cases and expecting the defendants and the Court to correctly infer which of the multitude of factual allegations it intends to incorporate into the Amended Complaint in this action is woefully misguided. Although the Government does attempt to identify individual paragraphs in those indictments in its memorandum of law, the ILA correctly points out that "this is an impermissible attempt to amend a pleading in opposition to a motion to dismiss." ILA Reply Mem. at 34 (citing Fonte v.

<u>Bd. of Managers of Cont'l Towers Condo.</u>, 848 F.2d 24, 25 (2d Cir. 1988)).

As discussed above, and contrary to its position in opposition to the pending motions, the Government did not expressly incorporate by reference any of the factual allegations contained in the criminal indictments attached to the Amended Complaint. Even if it had, and even if this Court were to conclude that such a pleading practice is consistent with Rule 8(a)(2), the bare allegations in those criminal indictments are not sufficiently specific to satisfy the heightened pleading requirement that applies to allegations of mail or wire fraud under Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," and applies to allegations of mail or wire fraud alleged as predicate acts in a RICO complaint. <u>See</u> <u>First Capital</u>, 385 F.3d at 178 ("[A]ll allegations of fraudulent predicate acts are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)."); <u>see also</u> <u>Bernstein</u>, 948 F. Supp. at 239 ("When the predicate acts of a civil RICO claim are grounded in fraud, the concerns associated with pleading fraud with particularity take on even greater importance."); 5 Wright & Miller, <u>Federal Practice & Procedure:  Civil 3d</u> § 1251.1 (2004) ("Fraud claims brought under the RICO Act– such as wire fraud and mail fraud– are subject to the particularity and specificity requirements of Rule 9(b). . . ."). To satisfy Rule 9(b)'s heightened pleading requirement, a complaint alleging fraud must "specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." <u>Moore v. PaineWebber, Inc.</u>, 189 F.3d 165, 173 (2d Cir. 1999) (quoting

McLaughlin v. Anderson, 962 F.2d 187, 191 (2d Cir. 1992)); see also Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir.1989) (same). In RICO cases, "allegations of predicate mail and wire fraud acts should state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993). However, the messages conveyed by use of the mails or wires need not contain false statements themselves, so long as the mails or wires are used to further the fraudulent scheme. See Schmuck v. United States, 489 U.S. 705, 714-15 (1989).

The portions of the criminal indictments cited by the Government that identify specific telephone calls or mailings purportedly made in furtherance of the alleged racketeering schemes, which simply state the dates and the identities of the participants or addressees in various alleged telephone conversations or mailings without identifying what specific statements were made or explaining how those statements furthered the allegedly fraudulent scheme or artifice, fall far short of Rule 9(b)'s pleading standard. See Bernstein, 948 F. Supp. at 239 ("Because the complaint does not delineate any of the specifics regarding the defendants' use of the mails, there can be no predicate act of mail fraud."); McCoy v. Goldberg, 748 F. Supp. 146, 154 (S.D.N.Y. 1990) (the assertion of summary legal conclusions regarding the use of the mails absent factual specifics is insufficient to bring the alleged behavior of defendants within the scope of the mail fraud statute). The Government's failure to satisfy Rule 9(b) with respect to the mail and wire fraud allegations provides an independent basis for dismissing the portions of the Amended Complaint relating to those claims.

Finally, the Government tacitly concedes that it has not– even by reference–

alleged any use of the mails or wires with respect to several of the alleged mail or wire fraud schemes,[94] but asserts that "[e]vidence of mailings made in furtherance of the other fraud schemes alleged in the Complaint has been produced by the United States or is otherwise available to, or in the possession of, the Defendants." Gov. Mem. at 99; see id. at 99-103 (purportedly identifying specific uses of the mails or wires made in connection with the fraud schemes identified in note 92, supra). The Government cites no authority in support of the proposition that a RICO plaintiff can satisfy Rule 9(b)'s pleading requirement by simply asserting that evidence of wrongdoing is "available to, or in the possession of, the Defendants," and whatever scant authority may exist for that proposition does not aid the Government's opposition to the ILA's 12(b)(6) motion. In New England Data Servs., Inc. v. Becher, 829 F.2d 286, 290 (1st Cir. 1987) (emphasis added and omitted), which was not cited by the Government, the First Circuit held that

> in a RICO mail and wire fraud case, in regards to the details of just when and where the mail or wires were used. . . dismissal should not be automatic once the lower court determines that Rule 9(b) was not satisfied. In an appropriate case, where, for example the specific allegations of the plaintiff make it likely that the defendant used interstate mail or telecommunications facilities, and the specific information as to use is likely in the exclusive control of the defendant, the court should make a second determination as to whether the claim as presented warrants the allowance of discovery and if so, thereafter provide an opportunity to amend the defective complaint.

The Second Circuit has never addressed the holding in Becher, but some district courts in this circuit have relied on that case to soften the impact of Rule 9(b) in situations in which the information necessary to plead mail or wire fraud with the required specificity

---

[94]     Specifically, the predicate acts involving mail or wire fraud with respect to which the Government concedes the Amended Complaint does not allege a use of the mails or wires are those identified as items (3), (5), and (7) in note 92 above.  See Gov. Mem. at 99-103.

is in the exclusive possession of the defendants.[95]  While this Court would be reluctant in

any case to adopt a reading of Rule 9(b) that appears inconsistent with the plain text of

that rule and for which no Second Circuit authority can be cited, this is not an

"appropriate" case for invoking the <u>Becher</u> rule to excuse the Government's failure to

plead the elements of mail and wire fraud with adequate specificity.  Obviously, <u>Becher</u>

does not apply to situations in which evidence of the mailings or uses of the wires in

question has been produced by the United States in discovery.  If the Government

possesses these mailings, as it logically must in order to produce them to the defendants,

then it should have no trouble conforming the allegations in the Amended Complaint to

the requirements of Rule 9(b) with respect to them.[96]  Moreover, even with respect to

the evidence of mailings or wire transmissions that is purportedly in the possession of

the defendants, the Government has failed to establish any entitlement to Rule 9(b)

leniency under the <u>Becher</u> rule.  This is not a situation in which the Government has

alleged use of the mails or wires in the Amended Complaint and has shown a good-faith

belief that the information necessary to state that allegation with sufficient particularity

---

[95]      In <u>Tammac Corp. v. Williams</u>, No. 92-CV-390S, 1993 WL 330639, at *26-27 (W.D.N.Y.
August 13, 1993), the court, citing <u>Becher</u>, dismissed the defendant's RICO counterclaim, which failed to
meet Rule 9(b)'s pleading standard with respect to allegations of mail fraud, without prejudice and with
leave to re-plead that claim after deposing the plaintiff.  In <u>Jerome M. Sobel & Co. v. Fleck</u>, 03-CV-1041,
2003 WL 22839799, at *6 (S.D.N.Y. December 1, 2003) (Gorenstein, Mag.) (emphasis added), the court
cited <u>Becher</u> as an illustration that its holding that "[i]n cases in which the plaintiff claims that the mails or
wires were simply used in furtherance of a master plan to defraud. . .  a detailed description of the
underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to
satisfy Rule 9(b)" was "logic[al]" and "consistent with the notice pleading philosophy enunciated in
Fed.R.Civ.P. 8(a) and a plaintiff's obvious need for discovery when knowledge of the mailings is in the
defendant's <u>exclusive</u> possession."

[96]      Indeed, the Court notes that the Government spends approximately four pages of its
opposition brief listing numerous mailings and wire transmissions that allegedly were made in furtherance
of the predicate acts at issue, which would render any argument that it was unable to allege specific uses of
the mails or wires with respect to those acts in the Amended Complaint rather implausible.  <u>See</u> Gov.
Mem. at 99-103.

is in the <u>exclusive</u> control of the defendants; nor does the Government allege that the mailings and wire transmissions involved in the predicate acts at issue were not fraudulent in themselves, but were used to further a fraudulent scheme, as was the case in <u>Tammac Corp.</u>  To the contrary, the Amended Complaint fails to make any mention whatsoever of a fundamental element of the predicate acts it purports to allege.  This situation does not present a sympathetic case for bending Rule 9(b) so as to allow an almost-well-pleaded claim to proceed to discovery, and the Court declines the Government's request to do so.

The Court therefore finds that the Amended Complaint has failed to state a valid claim of mail or wire fraud with respect to any of the alleged predicate acts that allege those offenses.[97]

b.   <u>Extortion</u>

The United States Code defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).  The ILA argues that the Government fails to adequately plead two of the purported "extortionate" acts— the Daggett election scheme and the MILA PBM Contract scheme— because the Amended Complaint "is entirely lacking in facts showing the use of force, violence or fear" with respect to both of those schemes.  ILA Mem. at 48.  With respect to the MILA PBM scheme, the ILA points out that the only allegations even suggesting the use of

_____

[97]   Some of the wire fraud schemes identified in the Amended Complaint— specifically, the schemes identified as items (1), (2), and (8) in note 92 above— are also alleged to involve extortion and conspiracy to extort.  The discussion in this section applies only to the wire fraud aspects of those allegations, and not to the extortion and conspiracy aspects.

threats of violence are those in which "the Complaint cursorily alleges that certain LCN members instructed Cernadas, Daggett and Coffey to support a company of their choosing for the contract," but argues that those allegations are insufficient to establish extortion because "[t]he issue is whether the alleged <u>victims</u> of the scheme (i.e., the MILA beneficiaries) were extorted– instructions to Cernadas, Daggett and Coffey, who are alleged to be co-conspirators (not victims), have no bearing on that issue." ILA Mem. at 49.

The government does not expressly controvert the ILA's suggestion that the Amended Complaint does not allege the use or threat of violence with respect to the Daggett and MILA PBM schemes, but argues that the ILA's position that the Amended Complaint has not adequately pleaded extortion with respect to those schemes

> directly contradicts the ruling in <u>United States v. Gotti</u>, 459 F.3d 296 (2d Cir. 2006), which upheld the convictions of the defendants in this case. . . for violating RICO and conspiring to violate RICO based on the very acts of extortion pleaded in the Complaint in this action. Defendants' arguments also fail to take into consideration the ruling of this Court in <u>Coffey</u> which denied motions by Defendants Harold Daggett and Arthur Coffey to dismiss the extortion conspiracy count in that case which was predicated on the very acts of extortion that are pleaded in this case.

Gov. Mem. at 104-05.[98]  The Government also notes that it "[would] not be required to prove that the extortion schemes identified in the Complaint involved the making of a direct threat by any of the racketeering Defendants or their co-conspirators," because "'[w]here a union has a long history of corruption, fear can be invoked in subtle and indirect ways.'" <u>Id.</u> at 105 (quoting ILA Local Civil RICO case, 812 F. Supp. at 1343).

The Government's reliance on this Court's ruling in <u>Coffey</u> is misplaced. In that

---

[98]     The Government wisely refrains from arguing that the defendants are barred by <u>res judicata</u> from challenging the allegations of extortion in the Amended Complaint.

case, the issue presented was not whether the Indictment adequately alleged the use or threat of force in the commission of the alleged extortion, but rather whether the "right to pursue lawful business" constituted a property interest that Daggett and Coffey could "obtain" from the victims of the alleged extortion scheme.  Indeed, in its opinion in Coffey, this Court quoted the Indictment in that case, which alleged that "Daggett and Coffey conspired to use 'actual and threatened force, violence and fear' to usurp business opportunities for the Genovese family. . . that otherwise would have been acquired by third parties who would be free from the influence of the Genovese family."  United States v. Coffey, 361 F. Supp. 2d 102, 108 (E.D.N.Y. 2005) (Glasser, J.) (quoting Coffey Indictment ¶ 12).  Likewise, the issue presented to the Second Circuit in Gotti was whether the labor unions' rights under the Labor-Management Reporting Disclosure Act ("LMRDA"), specifically the "rights to free speech and democratic participation in union affairs as well as their LMRDA rights to loyal representation by their officers, agents, and other representatives," constituted intangible property rights that could be "obtained" even though the defendants in that case could not legally alienate those rights from the union members or legally exercise them.  459 F.3d at 325.  The appellate court affirmed the extortion convictions, holding that "property can qualify as extortable property under the Hobbs Act regardless of whether its exercise, transfer, or sale would be legal."  Id.  Neither Coffey nor Gotti addressed the issue of whether the pleadings in those cases adequately alleged all of the elements of extortion, and even if they had, the resolution of those cases would not be dispositive of the question whether the Amended Complaint in this case also alleges all of the necessary elements.

The Amended Complaint fails to state a claim of extortion with respect to the

Daggett election scheme or the MILA PBM contract rigging scheme.  In order to state a claim for extortion in violation of the Hobbs Act, the Government must allege that the defendants "(1) induced [the victim], with [the victim's] consent, to part with property, (2) through the wrongful use of actual or threatened force, violence or fear (including fear of economic loss), (3) in such a way as to adversely effect interstate commerce." McLaughlin v. Anderson, 962 F.2d 187, 194 (2d Cir. 1992).  Although the Amended Complaint alleges that the Daggett election and the MILA PBM schemes were executed through "extortionate and fraudulent means," it does not state that any defendant employed force, violence, or fear, or a threat of the same, to achieve the ends of either scheme, or who the victims of such a threat were.  Am. Compl. ¶¶ 75, 76.  This pleading is insufficient to establish a claim of extortion.  See, e.g., Andrea Doreen Ltd. v. Building Material Local Union 282, 299 F. Supp. 2d 129, 149 (E.D.N.Y. 2004) (alleged RICO predicate does not constitute extortion "because it does not involve threat of force, violence, or fear, as required under both the N.Y. Penal Law § 155.05(2)(e) and the Hobbs Act, 18 U.S.C. § 1951.").  While it is true that "fear can be invoked in subtle and indirect ways," particularly where organized crime is involved, the Government cites no authority for the proposition that extortion in violation of the Hobbs Act may be pleaded without even identifying the victims of the alleged extortion and indicating that some use or threat of force, however indirect, was used to compel their consent to part with property.  Local 1804-1, 812 F. Supp. at 1343 (quoting United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, 780 F.2d 267, 288 n.4 (3d Cir. 1985)).

III.    Leave to Replead

Federal Rule of Civil Procedure 15(a) provides that "leave [to amend a pleading] shall be freely given when justice so requires." The Supreme Court has held that only "undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party. . . [or] futility of the amendment will serve to prevent an amendment prior to trial." Foman v. Davis, 371 U.S. 178, 182 (1962). In this case, the Rule 8(a) problems with the Amended Complaint, and its failure to adequately allege the predicate acts, could be cured by amendment. The Court is less certain that the Government can adequately allege a cognizable RICO enterprise that includes all of the defendants named herein, but it grants leave to amend should the Government wish to make that attempt.

## CONCLUSION

For the reasons stated above, the ILA's motion to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 8(a) is hereby GRANTED. All other pending motions, including the other defendants' motions to dismiss the Amended Complaint and the ILA's motion to strike certain portions of the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(f), are hereby DENIED as moot. The Government may file a Second Amended Complaint within 60 days of the date of this Order.

SO ORDERED.

Dated:     Brooklyn, New York
           November 1, 2007          _____S/_____

                                     I. Leo Glasser
                                     United States Senior District Judge

104

Copies of the foregoing memorandum and order were electronically sent to:

**Counsel for the Plaintiff**

<u>For the United States of America</u>

Kathleen Anne Nandan
Richard K. Hayes
Zachary A. Cunha
Assistant United States Attorneys
United States Attorneys Office
One Pierrepont Plaza
Brooklyn, NY 11201

**Counsel for the Defendants**

<u>For International Longshoremen's Association, AFL-CIO</u>

Howard W. Goldstein
Fried Frank Harris Shriver & Jacobson, LLP
One New York Plaza
New York, NY 10004-1980

<u>For John Bowers, Horace T. Alston, Jorge L. Aponte Figueroa, John D. Baker, Timothy Brown, James A. Campbell, Ronald Capri, Charles Chillemi, Raymond Desgagnes, Michael Dickens, Stephen Knott, John H. Mackey, Louis Pernice, Raymond Sierra, Harrison Tyler, and Reuben Wheatley</u>

Don D Buchwald
Kelley Drye & Warren
100 Park Avenue
Suite 3060
New York, NY 10017

<u>For Robert E. Gleason</u>

Francis John Murray
Murray & McCann
100 Merrick Road
Suite 514 West
Rockville Centre, NY 11570

For Benny Holland, Jr.

Mala Ahuja Harker
Friedman Kaplan Seiler & Adelman LLP
1633 Broadway
New York, NY 10019-6708

Paul J. Fishman
Friedman Kaplan Seiler & Adelman LLP
1633 Broadway
46th Floor
New York, NY 10019

Vanessa Richards
Friedman Kaplan Seiler & Adelman LLP
1633 Broadway
46th Floor
New York, NY 10019

For Gerald Owens

Thomas R. Ashley
Robert Treat Center
50 Park Place
Suite 1400
Newark, NJ 07102

For Harold J. Daggett

George T. Daggett
Daggett,Kraemer,Elliades,Vander Wiele & Ursin
328 D Sparta Avenue
Sparta, NJ 07871

For Edward L. Brown, Sr., Clyde Fitzgerald, Perry C. Harvey, James T. McLeland, Jr.,
James H. Paylor, Jr., Kenneth Riley, and Richard Hughes

Michael G. Considine
Day Pitney LLP
One Canterbury Green
Stamford, CT 06901

Terence Joseph Gallagher, III
Day Pitney LLP
One Canterbury Green
Stamford, CT 06901

For Arthur Coffey

Gerald J. McMahon
Law Office of Gerald J. McMahon
67 Wall Street
New York, NY 10005

Thomas Aloysius Tormey, Jr
Law Offices of Thomas A. Tormey Jr.
26 Broadway
17th Floor
New York, NY 10004

For Management- International Longshoremen's Association Managed Health Trust Fund , Board of Trustees of the Management- International Longshoremen's Association Health Care Trust Fund

Donato Caruso
The Lambos Firm
29 Broadway, 9th Floor
New York, NY 10006

Kevin Marrinan
Gleason & Matthews
26 Broadway
17th Floor
New York, NY 10004

James Robert Campbell
The Lambos Firm
29 Broadway
9th Floor
New York, NY 10006

John P. Sheridan
Gleason & Matthews PC
26 Broadway
17th floor
New York, NY 10004

<u>For Metropolitan Marine Maintenance Contractors Association, Board of Trustees of the Metro-ILA Fringe Benefit Fund</u>

James P. Corcoran
239 East 79th Street
Suite 14D
New York, NY 10021

Victor J Rocco
Heller Ehrman LLP
7 Times Square
Times Square Tower
New York, NY 10036

<u>For Metro-ILA Fringe Benefit Fund, Metro-ILA Individual-Account Retirement Fund, Board of Trustees of the Metro-ILA Individual-Account Retirement Fund</u>

Victor J Rocco
Heller Ehrman LLP
7 Times Square
Times Square Tower
New York, NY 10036

<u>For Metro-ILA Pension Fund, Board of Trustees of the Metro-ILA Pension Fund</u>

Robert Henry Bogucki
Robert H. Bogucki, P.C.
666 Old Country Road, Suite 405
Garden City, NY 11530

Victor J Rocco
Heller Ehrman LLP
7 Times Square
Times Square Tower
New York, NY 10036

<u>For John Bowers</u>

John R. Wing
Lankler Siffert & Wohl LLP
500 Fifth Avenue
33rd Floor
New York, NY 10110

Lee Renzin
Lankler Siffert & Wohl LLP
500 Fifth Avenue
33rd Floor
New York, NY 10110